OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR THE PLAINTIFFS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MILTON, WILLIAM<br>ARTEAGA, RICHARD<br>BATES, ERIC<br>BEAGLE, FREDERICK<br>BRACAMONTE, RAY<br>BRADFORD, DARRELL<br>BRIONES, JOHNNY<br>BUSTAMONTE, JOSEPH<br>CAMPBELL, COREY<br>CARR, JAMES<br>CARTER, RICKY<br>CASTANEDA, PABLO<br>CONLEY, ROBERT<br>COOPER, ALVIN<br>CORLEY, KENNETH<br>CORNETHAN, WALTER<br>CORNING, ROY<br>DEAN, KEITH<br>DEL AGUILA, MARCO<br>DURAN, JOSEPH<br>DUREE, DENNIS<br>ESTRADA, VICKTER<br>EVERHART, JOHN<br>FRANCO, ANTONIO<br>FRANCO, EMMANUEL<br>FREDERIKSON, MICHAEL | **CASE NO:**<br><br>**COMPLAINT:**<br><br>**I.  FEDERAL TORT CLAIMS ACT**<br><br>**II.  BIVENS ACTION**<br><br><br>**DEMAND FOR JURY TRIAL** |

GALLOWAY, AUBREY
GARRETT, JAMES
HARDIN, KEVIN
HAYNES, HERMAN
HAYTER, CLIFFORD
HERNANDEZ, CARLOS
HERNANDEZ, WILLIAMS
HOCKLEY, JASON
HUGHES, DARNELL
ISLAS, JOSE
JALOTJOT, DANILO
JOHNSON, DANIEL
JOHNSON, JESSE
JONES, DANIEL
KLVANA, MILOS
LEINWEBER, MIKHIEL
LEWELLING, JESSE
LEWIS, ASAD
LEWIS, CLEOFAS
LEWIS, GEORGE
LEWIS, JOE
LEWIS, KEVIN
MANNING, MICHAEL
MARTINEZ, JUAN
MCDONALD, JEFFERY
MCGINLEY, JAMES
MILFORD, THOMAS
MILLER, DALE
MOODY, ANDRE
NEAL, FREDDY
NGOUN, CHEK
PAGE, MACK
PARKER, CEDRIC
PARKER, THEODORE
PEAV, SIM
PENALVA, JUAN
PRESTON, ROBERT
QUIROGA, MANUEL
RICHARDSON, PAUL
RIPOYLA, RONNIE
ROBERTSON, RICHARD
ROBINSON, DAVID
RODRIGUEZ, RONALD
RUGGLES, JOHN
SAMS, LORENZO

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

SANCHEZ, JOHNNY
SANDERS, TYRONE
SEPULVADA, ADRIAN (EST.)
SEPULVADA, IVAN
SHERROD, ALBERT
STEELS, WILLIE
TARAMONA, JULIO
TERRY, DANNY
THOMAS, MAURICE
THOMPSON, TYRONE
VASQUEZ, ROBERTO
VASQUEZ, SOLOMON
WALLACE, PATRICK
WILLIAMS, ALONZO
WILLIAMS, XAVIER
WOOD, THEODORE
YANCEY, KENNETH
YOUNG, GERALD,

PLAINTIFFS,

v.

ROBERT SILLEN, in his official capacity as former federal *Plata* receiver, an extension of the United States Federal District Court, Northern District, which is an arm of (and indistinguishable from) the sovereign United States, and in his individual capacity;

JOHN CLARK KELSO, in his official capacity as current federal *Plata* receiver, an extension of the United States Federal District Court, Northern District, which is an arm of (and indistinguishable from) the sovereign United States, and in his individual capacity,

DEFENDANTS.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 10

JURISDICTION AND VENUE ................................................................. 12

PLAINTIFFS ............................................................................................. 12

    Plaintiff 1: Milton, William ............................................................ 12

    Plaintiff 2: Arteaga, Richard .......................................................... 13

    Plaintiff 3: Bates, Eric .................................................................... 14

    Plaintiff 4: Beagle, Frederick ........................................................ 14

    Plaintiff 5: Bracamonte, Ray .......................................................... 15

    Plaintiff 6: Bradford, Darrell .......................................................... 16

    Plaintiff 7: Briones, Johnny ........................................................... 17

    Plaintiff 8: Bustamonte, Joseph ..................................................... 17

    Plaintiff 9: Campbell, Corey .......................................................... 18

    Plaintiff 10: Carr, James ................................................................ 19

    Plaintiff 11: Carter, Ricky .............................................................. 20

    Plaintiff 12: Castaneda, Pablo ........................................................ 20

    Plaintiff 13: Conley, Robert ........................................................... 21

    Plaintiff 14: Cooper, Alvin ............................................................ 22

    Plaintiff 15: Corley, Kenneth ......................................................... 22

    Plaintiff 16: Cornethan, Walter ..................................................... 23

    Plaintiff 17: Corning, Roy .............................................................. 23

    Plaintiff 18: Dean, Keith ................................................................ 24

    Plaintiff 19: Del Aguila, Marco ..................................................... 24

    Plaintiff 20: Duran, Joseph ............................................................ 25

    Plaintiff 21: Duree, Dennis ............................................................ 26

    Plaintiff 22: Estrada, Vickter ......................................................... 27

    Plaintiff 23: Everhart, John ............................................................ 27

    Plaintiff 24: Franco, Antonio ......................................................... 28

PAVONE & FONNER, LLP<br/>600 W. BROADWAY, STE. 700<br/>SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Plaintiff 25: Franco, Emmanuel ........................................................................ 29

Plaintiff 26: Frederikson, Michael .................................................................... 29

Plaintiff 27: Galloway, Aubrey ........................................................................ 30

Plaintiff 28: Garrett, James ............................................................................ 30

Plaintiff 29: Hardin, Kevin ............................................................................. 31

Plaintiff 30: Haynes, Herman .......................................................................... 31

Plaintiff 31: Hayter, Clifford .......................................................................... 32

Plaintiff 32: Hernandez, Carlos ....................................................................... 32

Plaintiff 33: Hernandez, William ..................................................................... 33

Plaintiff 34: Hockley, Jason ........................................................................... 33

Plaintiff 35: Hughes, Darnell .......................................................................... 33

Plaintiff 36: Islas, Jose ................................................................................. 34

Plaintiff 37: Jalotjot, Danilo........................................................................... 34

Plaintiff 38: Johnson, Daniel........................................................................... 35

Plaintiff 39: Johnson, Jesse ............................................................................ 35

Plaintiff 40: Jones, Daniel .............................................................................. 35

Plaintiff 41: Klvana, Milos ............................................................................. 36

Plaintiff 42: Leinweber, Mikhiel ..................................................................... 36

Plaintiff 43: Lewelling, Jesse .......................................................................... 36

Plaintiff 44: Lewis, Asad ............................................................................... 37

Plaintiff 45: Lewis, Cleofas ............................................................................ 37

Plaintiff 46: Lewis, George............................................................................. 38

Plaintiff 47: Lewis, Joe .................................................................................. 38

Plaintiff 48: Lewis, Kevin .............................................................................. 39

Plaintiff 49: Manning, Michael ....................................................................... 39

Plaintiff 50: Martinez, Juan............................................................................ 40

Plaintiff 51: McDonald, Jeffery ...................................................................... 40

Plaintiff 52: McGinley, James ............................................. 41

Plaintiff 53: Milford, Thomas ............................................. 42

Plaintiff 54: Miller, Dale .................................................... 42

Plaintiff 55: Moody, Andre ................................................. 43

Plaintiff 56: Neal, Freddy .................................................. 44

Plaintiff 57: Ngoun, Check ................................................. 44

Plaintiff 58: Page, Mack .................................................... 45

Plaintiff 59: Parker, Cedric ................................................ 45

Plaintiff 60: Parker, Theodore ............................................ 46

Plaintiff 61: Peav, Sim ...................................................... 46

Plaintiff 62: Penalva, Juan ................................................. 47

Plaintiff 63: Preston, Robert ............................................... 48

Plaintiff 64: Quiroga, Manuel ............................................. 48

Plaintiff 65: Richardson, Paul ............................................. 49

Plaintiff 66: Ripoyla, Ronnie .............................................. 49

Plaintiff 67: Robertson, Richard .......................................... 50

Plaintiff 68: Robinson, David .............................................. 50

Plaintiff 69: Rodriguez, Ronald ........................................... 51

Plaintiff 70: Ruggles, John ................................................. 52

Plaintiff 71: Sams, Lorenzo ................................................ 53

Plaintiff 72: Sanchez, Johnny ............................................. 54

Plaintiff 73: Sanders, Tyrone .............................................. 54

Plaintiff 74: Sepulvada, Adrian (Estate) ................................ 55

Plaintiff 75: Sherrod, Albert ............................................... 56

Plaintiff 76: Steels, Willie ................................................. 56

Plaintiff 77: Taramona, Julio .............................................. 57

Plaintiff 78: Terry, Danny .................................................. 58

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Plaintiff 79: Thomas, Maurice ........................................................... 58

Plaintiff 80: Thompson, Tyrone ....................................................... 59

Plaintiff 81: Vasquez, Roberto ......................................................... 60

Plaintiff 82: Vasquez, Solomon ....................................................... 61

Plaintiff 83: Wallace, Patrick .......................................................... 62

Plaintiff 84: Williams, Alonzo ......................................................... 62

Plaintiff 85: Williams, Xavier .......................................................... 63

Plaintiff 86: Wood, Theodore .......................................................... 64

Plaintiff 87: Yancey, Kenneth .......................................................... 65

Plaintiff 88: Young, Gerald ............................................................. 66

DEFENDANTS ................................................................................. 66

    Sillen, Robert ............................................................................. 66

        Official Capacity ................................................................... 66

        Individual Capacity ............................................................... 67

    Kelso, John Clark ....................................................................... 67

        Official Capacity ................................................................... 67

        Individual Capacity ............................................................... 68

ADMINISTRATIVE EXHAUSTION ............................................... 68

TOLLING .......................................................................................... 69

    Table 1 – Tolling Agreement Extension Dates ............................ 69

ACCRUAL ......................................................................................... 71

    Table 2 – Accrual Estimates ....................................................... 72

    Table 3 – Particular Grounds for Extension ............................... 78

FACTUAL ALLEGATIONS .............................................................. 95

    A.    Coccidioidomycosis is a Serious Disease ....................... 95

        1.    Origin and History of the Disease ............................... 95

        2.    Pathology of Coccidioidomycosis ............................... 96

        3.    Contraction Frequency ................................................ 98

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

4.    Special Vulnerability to the Disease ................................................ 99

5.    Treatment and Expense ................................................................. 100

6.    Scientific and Governmental Response to Cocci ........................... 101

B.    The 2004-2014 Coccidioidomycosis Epidemic ..................................... 109

Figure 1 – Satellite Image of CSP and PVSP ......................................... 110

Table 4 – Incidence Rate ...................................................................... 116

Chart 1 – VF Incidence Rate / 100K ...................................................... 117

Table 5 – Plaintiff Injuries ................................................................... 118

C.    Societal Expectations for Management of Epidemics .......................... 124

1.    The Only Jury to Render a Valley Fever Verdict Did
Not Find Unmitigated Exposure to be Societally Acceptable. ........ 124

2.    Society Expects State Authorities to Maximize the
Protective Response to Epidemics including to Valley Fever. ........ 125

3.    *Edison* Suggests that Society Expects California
Custodial Facilities to be Safe from Valley Fever. ...................... 126

D.    Former Receiver Robert Sillen's Role in the
2004-2014 Epidemic. ..................................................................... 128

E.    Receiver Clark Kelso's Role in the 2004-2014 Epidemic. ................... 134

F.    Defendants Knew Certain Groups
Were Particularly Susceptible. ....................................................... 137

G.    Defendants Knew the Severe Risks to Inmates
but Disregarded Those Risks. ......................................................... 139

I.    FIRST FTCA CLAIM FOR RELIEF
ACTION UNDER THE FEDERAL TORT CLAIMS ACT ............................ 143

A.    General Allegations ..................................................................... 143

B.    Factual Findings Applicable
to the Receiver's Office from Hines. ............................................... 143

C.    Negligent or Wrongful – General Application .................................. 148

D.    Cruel and Unusual Punishment ..................................................... 150

E.    Dangerous Condition ................................................................... 152

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

   F. Good Samaritan Cause of Action.............................................. 154

   G. Immunities ............................................................................. 155

II. VIOLATION OF THE FEDERAL EIGHTH AMENDMENT ......................... 155

   A. Defendants Violated the Eighth Amendment. ........................ 155

   B. Former Receiver Robert Sillen Knew of Serious Health
     Risks to Plaintiffs, Adopted a Duty to Protect Plaintiffs in Excess
     of His *Plata* Mandate, But Then Acted in a Manner Reflecting
     Deliberate Indifference to their Plight. .................................... 158

   C. Current Receiver Clark Kelso Knew of Serious Health
     Risks to Plaintiffs, Adopted a Duty to Protect Plaintiffs in
     Excess of His *Plata* Mandate, But Then Acted in a Manner
     Reflecting Deliberate Indifference to their Plight. ................. 160

   D. Defendants Do Not Have the Right to Quasi-Judicial Immunity
     for their Role in the Valley Fever Epidemic, as They Exceeded
     the Scope of their Authority in Passing Policies Related to It................ 163

PRAYER............................................................................................ 164

SIGNATURE BLOCK ......................................................................... 165

DEMAND FOR JURY .......................................................................... 165

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## INTRODUCTION

1.      The American system of justice embodies a societal compact that persons who commit crimes must serve their time after conviction.  However, they are not obligated to suffer additional, serious, preventable health consequences in the process.  Despite their offenses, the Plaintiffs – half of them inmates, half of them now private citizens – do not also deserve a life-long debilitating illness as a result of a defendants' wrongful conduct of ignoring a disease epidemic.

2.      Plaintiffs are 88 former and current inmates of the California state correctional system who contracted valley fever as a result of the state's contribution to a valley fever epidemic by engaging in unrelated, careless hospital construction in a cocci hot zone, which spread the infectious spores on to the neighboring PVSP campus.  This was cemented by the Defendant Receivers' disregard for inmate health by their unauthorized injection into cocci policy decisions, a decision that effectively did nothing to protect inmates from this government-created problem.

3.      In 2005, Judge Thelton Henderson (ret.) appointed a Receiver within the *Plata* case to manage the prison health care system.  That order empowered the Receiver to improve the delivery of medical care services to prisoners, having fallen into a constitutionally deficient state.  However, the Receiver's office was not empowered to also generally direct CDCR's prison policies for minimization of health (including disease) threats.

4.      Although management of an epidemic typically involves the active involvement of health care professionals, the *Plata* Receiver was only empowered under Judge Henderson's order to direct the medical treatment of the valley fever epidemic.  Yet, the Receiver decided to control valley fever health care policy.  His ultra-narrow exclusion policy essentially allowed the disease to run rampant at the subject prisons and to savagely infect the population.

5.      This warrants several conclusions: one, the Receivers exceeded their judicial mandate.  Two, while injecting themselves into the cocci problem without

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

authority, by passage of valley fever policies in August 2006 and November 2007 respectively, they otherwise effectively ignored the problem from 2007-2012.

6.     Put another way, if the Receiver's office was going to lead the management of the epidemic responsibly, even without authority, it needed to keep close watch on it.  However, after the 2006 and 2007 exclusion policies went into effect, incidence rates did not abate and yet no significant adaptive action was taken for six long years.

7.     Consequently, the Receiver's botched the response so much so that the Ninth Circuit foisted a level of published responsibility on it for mismanagement of the epidemic, in the *Hines* case.

8.     The Receivers knew that placing inmates in prisons where the prevalence of spore-laden soils was a known hazard – where valley fever was already occurring at epidemic rates – and that this posed an unacceptable risk of irreparable harm to the prisoner population's health.

9.     The Receivers could have stayed in their lane by treating the resulting cases of contraction with constitutionally adequate medical care, and otherwise deferred to CDCR's general authority over, and obligation to, prisoners to preventatively manage their safety.

10.     They could have also simultaneously urged or recommended CDCR to adopt preventative measures they thought would minimize the epidemic's worst effects.  Yet, by passing (mandatory) policies, the Receiver's office announced that it effectively had command control over the epidemic.

11.     Their policies did not work.  It did not monitor them to make sure they were working.  They did not timely expand the exclusion criteria when it was clear the exclusion criteria were overly narrow.  Consequently, the Receiver's office not only kept Plaintiffs in harm's way by subordinating CDCR's primary responsibility for the problem to their own misguided criteria, they failed to adapt an effective exclusion list until it was too late, years later, after thousands of vulnerable persons were infected.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

12.    Consequently, Defendants knowingly exposed each Plaintiff to serious disease risks and demonstrated a reckless indifference to Plaintiffs' safety, health, and constitutional right to be free of excessive punishment.

13.    In electing to go beyond their scope of authority, the Receivers are not entitled to the protections traditionally associated with judicial immunity, as an extension of the Court.

14.    Plaintiffs seek adequate medical care and other damages as appropriate to their injuries.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331, 1346(b) and 1343.  The Defendants are persons who caused the Plaintiffs to contract valley fever, a lifelong crippling disease.  Infliction of disease constitutes various established wrongs within an FTCA cause of action, and in their individual capacity, violated Plaintiffs' Eighth Amendment rights under a *Bivens* cause of action.[1]

16.    As this lawsuit names the federal receivers, who are effectively the sovereign equivalent to the United States, jurisdiction of this action is required to be in the Northern District of California under the *Barton* doctrine,[2] where the Receivership was originally ordered.

17.    Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including authorization of the receivership that resulted in the passage of the policies and actions being challenged.

## PLAINTIFFS

## PLAINTIFF 1: MILTON, WILLIAM

18.    Plaintiff William Milton is an inmate of the California Department of Corrections, assigned CDCR number P38650.

---

[1]    *Bivens v. Six Unknown Named Federal Agents*, 403 F.3d 388, 395-396 (1971).
[2]    *See Barton v. Barbour*, 104 U.S. 126 (1881); *Saba v. Houle*, 2019 U.S.App.Lex. 34527, *2 (9th Cir. 2019); *see Plata v. Newson*, 4:01-cv-01351-JST, Dkt. 473.

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

19.    Mr. Milton is a 54-year-old African-American father of two sons.

20.    In June, 2011 Mr. Milton began experiencing severe night sweats, dizziness, chills, shortness of breath, chest pains, muscle pain, fatigue, and a significant increase in joint and back pain.

21.    Initially he was refused treatment, even when he sent in requests explaining his symptoms, which by then included severe coughing, vomiting, trouble breathing, heavy sweating and an inability to eat.

22.    On July 8, 2011 a doctor finally ordered that Mr. Milton be given emergency treatment. He was diagnosed as having abnormal pulmonary and chest X-ray results.

23.    Milton was diagnosed with Valley Fever on July 20, 2011 at PVSP.

24.    He was prescribed 500 mg Levaquin for his pneumonia and 200 mg Fluconazole to treat the Valley Fever.

25.    In August 2011, Mr. Milton was told he might have to take Valley Fever medication for the rest of his life.  He still had abnormal pulmonary function. The pain he was experiencing in his neck, knees and spine was attributed to cocci.

26.    Mr. Milton continues to suffer from VF symptoms, such as a rash on his back, a growth in one of his eyes, severe joint pain, and fatigue.  He also has emotional difficulties as a result of his physical problems.

## PLAINTIFF 2: ARTEAGA, RICHARD

27.    Plaintiff Richard Arteaga is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AZ4998.

28.    Arteaga is a 46-year-old Hispanic male from Palm Springs.

29.    He lived with his brother before being incarcerated and worked as a floor installer.  He has a GED.

30.    Arteaga was transferred to Avenal State Prison in 2010.   In Transfer Form, Arteaga says he was transferred in November 2012.

31.    Arteaga is Hispanic (Mexican American).

32.    Arteaga is no longer incarcerated.

33. Prior to his incarceration, he was in good health. He began experiencing Valley Fever symptoms in 2012.

34. He was diagnosed with Valley Fever in December 2012.

35. Arteaga experienced cold/flu symtoms, chronic dizziness and fatique, and bone pain.

36. Arteaga was prescribed Fluconozole (200 mg.) for six months.

37. As a result of Valley Fever, Arteaga continues to suffer shortness of breath, chronic fatigue, and other problems.

38. Arteaga was not provided any warnings or precautions about the risk of contracting Valley Fever.

### PLAINTIFF 3: BATES, ERIC

39. Plaintiff Eric Bates is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AN5473.

40. Bates is a 54-year-old African American from Bakersfield, California.

41. Other than knee problems, Mr. Bates did not have any physical health problems before he was transferred to Avenal State Prison.

42. Bates was diagnosed with Valley Fever in 2011. He suffered from dizzy spells, pain in his side, and severe sweating.

43. After he was diagnosed, Bates was nursed back to health by other inmates as he was too weak to use the bathroom on his own or attend meals.

44. Bates continues to experience difficulty sleeping due to joint aches and breathing problems.

45. At the time of his diagnosis, Mr. Bates was prescribed an antifungal for 4 to 6 months.

### PLAINTIFF 4 - BEAGLE, FREDERICK

46. Plaintiff Freddy Beagle is a former inmate in the custody of the California Department of Corrections, assigned CDCR number G45544.

47. Beagle is a 48-year-old Caucasian from Upland, California. He has a GED and worked at a variety of jobs prior to his sentence.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

48.    Beagle was assigned to Avenal State Prison to serve a 5-year sentence.

49.    Beagle had health problems before he was housed at ASP.

50.    Prior to his incarceration, Beagle had elevated liver enzymes suggesting a compromised liver, blood clots in his legs, lower back pain, gout, and chronic pain from skin grafts.

51.    Beagle was diagnosed with disseminated Valley Fever in 2013.

52.    Now, in addition to his pre-existing medical conditions, he has aching joints, back pain, severe headaches, night sweats, inflamed rashes on his head and legs that do not respond to treatment, chest pain, and fatigue.

53.    He must take 200 mg of Fluconazole twice daily to try to keep the disease from spreading further.

54.    Beagle submitted several 602 complaints, through January 2012, which prison officials failed to respond to.

55.    Beagle is no longer in custody.

56.    Mr. Beagle is of limited means and has been unable to afford either the medication or medical exams necessary to monitor and control his disease.

57.    He is afraid that the disease will spread further, be increasingly painful, and could lead to meningitis which might be fatal.

## PLAINTIFF 5: BRACAMONTE, RAY

58.    Plaintiff Ray Bracamonte is an inmate in the custody of the California Department of Corrections, assigned CDCR number K85547.

59.    He is a 48-year-old Hispanic male from Fresno, California.

60.    He is married with a son and two step daughters. He is close to his mother, father and four sisters, who write and visit him often.

61.    Prior to his incarceration, Bracamonte was employed as a machine fabricator.

62.    While incarcerated, he continued his education and became certified in Janitorial and Graphic Arts in addition to obtaining his GED.  He is or was enrolled in Harvest Bible University seeking an Associate degree in Ministry.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

63.    Before he contracted Valley Fever, Bracamonte was in excellent health.

64.    He was active, had energy and worked out regularly.

65.    Bracamonte was diagnosed with Valley Fever in 2011 at PVSP.

66.    Before he contracted the disease, Bracamonte was assigned to a work crew that was required to dig up dirt and grass to make a baseball diamond.  The work area was not wetted and no other dust control measures were employed. Bracamonte was not provided a protective mask even after he asked for one.

67.    When Bracamonte told Correctional Officer Guerra that he would not work without a mask, he was told that he would be written up and disciplined if he did not continue digging.

68.    Bracamonte suffers uncontrollable sweating that causes him to be soaked in sweat every day.  He has lost all appetite, suffers vertigo, and has developed rashes on his legs. Previously full of energy, Bracamonte now has trouble getting out of bed and feels drained of energy. He fears that the disease will kill him.

69.    Bracamonte was prescribed Fluconazole.

## PLAINTIFF 6: BRADFORD, DARRELL

70.    Plaintiff Darrell Bradford is a former inmate in the custody of the California Department of Corrections, assigned CDCR number T49982.

71.    Mr. Bradford is a 59-year-old male of a mixed racial background, from Southern California.

72.    Mr. Bradford is currently enrolled in Palo Verde College pursuing an Associate of Arts degree with an emphasis on counseling.  He has two children who each earned college degrees.

73.    Bradford was transferred to Pleasant Valley State Prison on December 23, 2009.

74.    He was in good health prior to his transfer.

75.    He was diagnosed with Valley Fever in April 2011.

76.    His condition is considered disseminated.

77.     Bradford was initially treated with Fluconazole but suffered severe side effects.  He is currently being treated with Posaconazole and has lab work performed every 90 days to monitor his condition.

78.     Bradford's symptoms are worsening. He continues to experience severe joint aches, headaches, dizziness, and was recently diagnosed with arthritis in his upper neck. Some days he cannot get out of bed due to the discomfort.

## PLAINTIFF 7: BRIONES, JOHNNY

79.     Plaintiff Johnny Briones is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F15570.

80.     Mr. Briones is a 50-year-old Hispanic from Fresno, California.

81.     Mr. Briones suffers from asthma, seizures, and Hepatitis C.

82.     Briones was transferred to PVSP in March 2013 from California State Prison in Lancaster.

83.     Mr. Briones was diagnosed with Valley Fever in February 2014 after he was hospitalized due to shortness of breath and a high fever.

84.     Briones is treated intravenously with Abelcet.

85.     Mr. Briones filed a claim with the California Victim Compensation and Government Claims Board on July 29, 2014.

## PLAINTIFF 8: BUSTAMONTE, JOSEPH

86.     Plaintiff Joseph Bustamonte is a former inmate in the custody of the California Department of Corrections, assigned CDCR number V71627.

87.     Bustamonte is a 37-year-old Hispanic man from Salinas, California.

88.     Prior to his incarceration he was a single father and lived with his daughter and his sister and nephew.

89.     He was employed by a construction company and also attended continuing education courses to complete a college degree.

90.     Bustamonte was transferred to PVSP from North Kern State Prison on December 9, 2010.

91.     He was generally healthy at the time.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

92. Mr. Bustamonte was diagnosed with Valley Fever in 2011.

93. Bustamonte had developed golf-ball-sized lumps in different locations on his arms and legs as well as swelling of all his extremities causing excruciating pain.

94. By the time he was diagnosed and treatment started, the disseminated infection caused his legs to be so inflamed and swollen he was unable to walk. He also suffered night sweats and chills.

95. Despite these severe and characteristic symptoms, Bustamonte had to specifically request a Valley Fever test.

96. If not for his request the disease likely would not have been diagnosed and his treatment delayed even longer. Facility medical staff told Mr. Bustamonte that the 2" lumps on his arms and legs were bug bites.

97. Despite the excruciating pain and textbook symptoms of the disease, facility staff delayed giving Mr. Bustamonte appropriate medication for his Valley Fever.

98. He was eventually given a prescription for Flucanozole.

99. Mr. Bustamonte is no longer incarcerated.

### PLAINTIFF 9: CAMPBELL, COREY

100. Plaintiff Corey Maurice Campbell is an inmate or former inmate in the custody of the California Department of Corrections, assigned CDCR number AT3687.

101. Mr. Campbell is a 40-year-old African American born and raised in Los Angeles, California.

102. He has three young children and received his G.E.D. in 2003 from Bakersfield College.

103. Mr. Campbell was transferred to Central Valley Modified Community Correctional Facility ("MCCF") in early 2010.

104. Located in McFarland, California, Central Valley MCCF was well known by Defendants to be a high risk location for contracting Valley Fever.

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

105. Before he contracted Valley Fever, Mr. Campbell was in good health, played sports and worked out.

106. Campbell suffers lower back pain and fatigue so extreme he is unable to walk.

107. Campbell's back pain was the result of the disseminated cocci. The disease traveled from his lungs to his lumbar spine and dissolved his vertebrae at L2 and T12. Mr. Campbell required an operation on his lumbar spine for the destroyed discs.

108. Mr. Campbell visited the doctor at Central Valley MCCF on multiple occasions but no one seemed to know what was wrong with him.

109. When he was became unable to walk in late 2010, he was sent to North Kern State Prison and later diagnosed and treated. Mr. Campbell was prescribed Vicodin, Itraconazole, Tylenol, and morphine.

### PLAINTIFF 10: CARR, JAMES

110. Plaintiff James Carr is an inmate in the custody of the California Department of Corrections, assigned CDCR number V48223.

111. Mr. Carr is a 54-year-old African American from Chicago, Illinois. He has been married for over 20 years.

112. Prior to incarceration, he was employed in construction and in shipping and receiving.

113. Mr. Carr continued his education while incarcerated, earning his GED and numerous certificates.

114. He was transferred to PVSP in 2006 when the sensitive needs yard at Donovan State Prison was closed.

115. While at PVSP, Mr. Carr was assigned to work on the yard crew. Part of his assignment included digging in the soil to repair sprinklers.

116. Carr suffers from Hepatitis C.

117. In February 2012, he began experiencing night sweats, headaches, a sore throat and chest pains.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

118.   He later experienced constant body aches, low energy, and sores on his head and body.

119.   Mr. Carr was diagnosed with Valley Fever in March 2012.

120.   He was prescribed 200mg of Fluconazole, twice a day, for one year.

121.   Carr continues to be fearful of triggering infection relapse or worsening of his symptoms.  He tires easily and experiences constant body aches.

## PLAINTIFF 11: CARTER, RICKY

122.   Plaintiff Ricky Carter is an inmate in the custody of the California Department of Corrections, assigned CDCR number J59549.

123.   Mr. Carter is a 47-year-old African American.

124.   Prior to his assignment to PVSP in 2008, Mr. Carter was in good health.

125.   He was diagnosed with Valley Fever in September 2013.

126.   His symptoms include breathing difficulty, chronic fatigue, loss of appetite and difficulty sleeping.

## PLAINTIFF 12: CASTANEDA, PABLO

127.   Plaintiff Pablo Castaneda is an inmate or former inmate in the custody of the California Department of Corrections, assigned CDCR number G28767.

128.   Mr. Castaneda is a 55-year-old Hispanic from Salinas, California. He has four daughters, two sons and four grandchildren.

129.   Castaneda graduated high school and is presently attending courses at Coastline College.

130.   He has worked as a forklift driver and as a welder.

131.   Mr. Castaneda was transferred to PVSP from Los Angeles State Prison after he was reclassified from a level 4 to a level 3, and his custody level was reduced from Close B to Med A.

132.   He was originally endorsed for transfer to Sierra Conservation Center, Correctional Training Facility, and Mule Creek State Prison but a last minute decision apparently was made to transfer him to PVSP instead.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

133.   Before he contracted Valley Fever, Castaneda was in good health and able to exercise every day.

134.   Castaneda was diagnosed with Valley Fever in 2013.

135.   As a result of the disease, Castaneda experienced night sweats, body aches, shortness of breath, involuntary joint movement, sleeplessness, weight loss, memory loss and constant fatigue.  He has also suffered pneumonia.

136.   Castaneda was prescribed Fluconazole.

137.   Castaneda filed Claim G619389 with the Victim's Compensation and Government Claims Board through his attorney on July 13, 2014.

138.   In a letter dated July 24, 2014 but mailed after August 4, 2014, the VCGCB requested more information relative to Mr. Castaneda's date of contraction.  That information was provided to the VCGCB by mail on August 28, 2014.  The claim was deemed denied pursuant to Government Code § 911.6, because the VCGCB did not act within 45 days passed.  As such, Mr. Castaneda has exhausted his administrative remedies.

## PLAINTIFF 13: CONLEY, ROBERT

139.   Plaintiff Robert Conley is an inmate in the custody of the California Department of Corrections, assigned CDCR number V21840.

140.   Conley is a 64-year-old of Irish and American Indian descent.

141.   He graduated high school in Folsom, California.

142.   He has three brothers and one sister and was previously employed as a carpenter.

143.   Mr. Conley has been married for 30 years.

144.   Conley was transferred to PVSP on or about September 4, 2009.

145.   Before he contracted Valley Fever, Mr. Conley was in good health.

146.   He was diagnosed with VF in late 2010.

147.   On July 28, 2011, Mr. Conley had a CT scan on his lungs that showed a spot had grown.

148.   A spot on Conley's liver also grew.

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

149.   Conley was prescribed Diflucan.

150.   Valley Fever has damaged Mr. Conley's lungs and liver.

151.   Additionally, he has not been receiving the follow-up appointments that are necessary to properly monitor his Valley Fever.

152.   The damage to Conley's lungs and liver is ongoing.

153.   He also does not believe that the prison is sufficiently providing him follow-ups, PET scans, or C.T. scans.

### PLAINTIFF 14: COOPER, ALVIN

154.   Plaintiff Alvin Cooper is a former inmate in the custody of the California Department of Corrections assigned CDCR number F87720.

155.   Cooper is a 46-year-old African American from East St. Louis, Illinois. He has a daughter who lives in Modesto, California.

156.   On or about June 12, 2013, Cooper was transferred to PVSP.

157.   Prior to his incarceration, Cooper was in good health.

158.   Cooper was diagnosed with VF in 2013.

159.   As a result of the Valley Fever, Cooper suffers body aches, headaches, difficulty eating due to stomach pains, and uncontrollable sweating even when it is cold outside. He has difficulty breathing and cannot maintain weight.

160.   Cooper was prescribed 200 mg of Diflucan.

161.   Cooper was released from custody in April 2014.

### PLAINTIFF 15: CORLEY, KENNETH

162.   Plaintiff Kenneth Corley is a former inmate in the custody of the California Department of Corrections assigned CDCR number K23790.

163.   Corley is a 70-year-old African American from Nashville, Tennessee. He has three sisters and two brothers.

164.   Corley worked as a mechanic for many years. He obtained his GED while in prison.

165.   Corley was transferred to PVSP on or about January 10, 2010.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

166.    Prior to his incarceration, Corley had no known respiratory issues and was in generally good health.

167.    He was diagnosed with Valley Fever in 2011.

168.    Corley now suffers severe shortness of breath.

169.    Corley was hospitalized at San Joaquin Community Hospital and was prescribed 200 mg of Fluconozale for three months.

170.    Corley was incarcerated for a non-violent drug offense. He was released from prison on November 29, 2011.

## PLAINTIFF 16: CORNETHAN, WALTER

171.    Plaintiff Walter Cornethan is a former inmate in the custody of the California Department of Corrections assigned CDCR number AI2224.

172.    Mr. Cornethan is a 48-year-old African American male.

173.    He was transferred to PVSP on November 19, 2012.

174.    Before he contracted Valley Fever, Mr. Cornethan worked out regularly.

He occasionally suffered heartburn but was otherwise in good health.

175.    He was diagnosed with Valley Fever in 2013.

176.    Cornethan suffers extreme fatigue. He has trouble breathing, and his back and knees ache.  He is unable to exercise and has difficulty getting out of bed.

177.    At times the pain is so severe he feels he may pass out.

178.    Cornethan experiences significant stress and worries the disease may spread throughout his body and into his brain.

## PLAINTIFF 17: CORNING, ROY

179.    Plaintiff Roy Corning is an inmate in the custody of the California Department of Corrections assigned CDCR number C44289.

180.    Corning is a 72-year-old Caucasian from San Diego, California.

181.    He married when he was 18 and has two children from that marriage and a grandson as well.

182.    Prior to his incarceration, he worked as a mechanic and sandblaster.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

183.    Mr. Corning was transferred to Avenal State Prison in 2007.

184.    Corning is a first time offender who acted in the heat of the moment in self-defense in his own home but was convicted.

185.    Before he contracted Valley Fever, Corning was in relatively good health.

186.    In 2011, Corning was diagnosed with Valley Fever.

187.    Corning suffers night sweats, chills, fatigue, shortness of breath, loss of appetite, and weight loss, and problems with his nervous system.

188.    Corning is being treated with Fluconazole.

### PLAINTIFF 18: DEAN, KEITH

189.    Plaintiff Keith Dean is a former inmate in the custody of the California Department of Corrections assigned CDCR number J90922.

190.    Mr. Dean is a 41-year-old African American.  Prior to his incarceration, he was an entrepreneur.  Dean ran his own retail business selling clothes and music.

191.    Mr. Dean was transferred to Avenal State Prison in 2011.

192.    Prior to his incarceration, Dean was an active young man.  He received a pacemaker in September 2011 due to symptomatic bradycardia, which was the first time he was made aware of this condition.

193.    Dean was diagnosed with Valley Fever in October 2011.

194.    Dean suffers constant head and body aches, night sweats, coughing fits, and overall weakness.

### PLAINTIFF 19: DEL AGUILA, MARCO

195.    Plaintiff Marco Del Aguila is a former inmate in the custody of the California Department of Corrections assigned CDCR number T00044.

196.    Marco Del Aguila is a 59-year-old Guatemalan native, raised in Glendale, California.

197.    Mr. Del Aguila obtained his GED and is a certified optical technician as well as an optical lab mechanic.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

198.   Del Aguila was transferred to Pleasant Valley State Prison on December 20, 2006.

199.   Del Aguila was diagnosed with Valley Fever in May 2014 shortly after his release.

200.   He was released from CDCR custody on April 17, 2014.

201.   Del Aguila currently suffers from skin lesions all over his body, as well as sweating at night, fatigue and joint pain.

202.   Mr. Del Aguila filed a VCB claim on or about September 1, 2014, within 6 months of his accrual date.

### PLAINTIFF 20: DURAN, JOSEPH

203.   Plaintiff Joseph Duran is an inmate in the custody of the California Department of Corrections, assigned CDCR number V95938.

204.   Mr. Duran is a 53-year-old Hispanic-American born in Montebello, California.

205.   He is the second eldest of five.  Mr. Duran is a high school graduate with ten years of work experience in telemarketing.

206.   Mr. Duran was transferred from Salinas Valley State Prison to PVSP on October 19, 2009.

207.   It was an adverse transfer.

208.   Duran had asthma.

209.   Mr. Duran began experiencing symptoms in 2010, when he suffered a blinding headache.

210.   He believes he inhaled the cocci spores while he was walking to and from meals, because he did not otherwise spend time in the yard.

211.   Mr. Duran was treated for Valley Fever in September, 2010.

212.   Duran suffers headache, night sweats, chills, and his entire body aches.

213.   On the morning of September 8, 2010, Mr. Duran's mattress was completely soaked through to the metal frame.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

214.   Mr. Duran was treated with Diflucan, Zithromax, and Advil before he received the results from blood tests for Valley Fever.

215.   This occurred when he was finally seen at the Facility "A" Clinic.

216.   Prior to that, nurses dismissed his symptoms as a cold and prescribed him cough syrup.

217.   In October 18, 2010, Mr. Duran's symptoms flared up more severely than they initially presented.

218.   At that time, he was treated by Dr. Coleman who stated that he had disseminated Valley Fever.

219.   Dr. Coleman informed Duran that the disease had disseminated from his lungs into his hips, knees, ankles and feet.

220.   At that time, Mr. Duran was prescribed Itraconozale, Zithromax, and Tylenol with codeine.

221.   Valley Fever ultimately caused Mr. Duran to suffer from Bronchiectasis.

222.   His doctors at one point suggested partial removal of his lower left lung.

### PLAINTIFF 21: DUREE, DENNIS

223.   Plaintiff Dennis Duree is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AD2220.

224.   Duree is a 37-year-old African-American from San Francisco, California.

225.   He graduated from Hoffman High School and attended San Francisco Community College.

226.   Duree completed a pre-apprentice training program for carpentry and was admitted into Local Union No. 22 in San Francisco.

227.   Duree was transferred from San Quentin to PVSP in 2010.

228.   Before he contracted Valley Fever, Mr. Duree was in good health and very athletic.  He loved to play basketball, volleyball, baseball, and table tennis.

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

229. Duree was diagnosed with Valley Fever in 2013.

230. Duree now suffers such extreme fatigue and pain in his joints and bones that he is frequently unable to walk or get out of bed.

231. Duree is being treated with Fluconozale and Ambisome

232. The disease has reportedly attacked his sacrum which could eventually cause him to become paralyzed.

### PLAINTIFF 22: ESTRADA, VICKTER

233. Plaintiff Vickter Estrada is an inmate in the custody of the California Department of Corrections, assigned CDCR number G67609.

234. Mr. Estrada is a 37-year-old Hispanic male.

235. Mr. Estrada was transferred to PVSP in 2009.

236. Before he contracted Valley Fever Estrada was in excellent health.

237. Estrada was diagnosed with Valley Fever in January 2014.

238. He suffers from pain in his lungs and joints, along with loss of energy and strength and has developed painful sores on his feet.

239. Estrada was treated with Fluconazole and continues to take this medication twice a day. He was also treated with medication to control coughing caused by his pneumonia. The sores on Estrada's feet have gone untreated by his facility's medical staff.

240. Estrada filed a VCB claim on or about June 23, 2014. The Board rejected his claim on or about August 29, 2014.

### PLAINTIFF 23: EVERHART, JOHN

241. Plaintiff John Everhart is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AB6873.

242. Mr. Everhart is a 74-year-old Caucasian.

243. Prior to his incarceration, Mr. Everhart worked as a manual laborer. He is known as a hard worker. During his incarceration he volunteers his time. For the past two years, he has acted as a wheelchair pusher for disabled inmates.

244. Everhart was transferred to PVSP in 2010.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

245.   Mr. Everhart had a known prior susceptibility from Hepatitis C and Type 2 diabetes.

246.   Everhart was diagnosed with Valley Fever in November 2011.

247.   He suffers overall weakness and difficulty breathing and developed lesions on his legs.

248.   Everhart was prescribed Fluconazole and remained on this medication for approximately one year.  When his symptoms returned in August 2013, he was again prescribed Fluconazole, which he continues to take.

## PLAINTIFF 24: FRANCO, ANTONIO

249.   Plaintiff Antonio Franco is a former inmate in the custody of the California Department of Corrections, assigned CDCR numbe E69947.

250.   Mr. Franco is a 63-year-old Hispanic.  He is a husband and father, originally from Guadalajara, Mexico.

251.   Mr. Franco was transferred to PVSP in 2010 from Avenal State Prison.

252.   Franco had a compromised immune system from Hepatitis C and suffered from asthma for over 20 years.

253.   Franco was diagnosed with pulmonary coccidioidomycosis in April 2012.

254.   He experienced severe and painful symptoms including fever, sweating at night, chills, weakness, piercing lung pain, headaches, and coughing fits including coughing up blood.

255.   At one point, Franco submitted three health care service request forms over the course of three days prior to being treated.  He was without his asthma medication for over two weeks, which created difficulty for him to breathe.

256.   Once seen by a physician, he was prescribed Fluconazole for three months, which did not help.  He was then prescribed Itraconazole.

257.   As a result of the coccidioidomycosis, Franco states his life has changed 100% for the worse.  He suffers headaches, excruciating pain, and can no longer perform daily activities.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

258.    Franco experiences mental suffering and describes his life as a living hell.  Due to an already compromised immune system, Franco fears that the Valley Fever will lead to his death.

## PLAINTIFF 25: FRANCO, EMMANUEL

259.    Plaintiff Emmanuel Franco is a former inmate in the custody of the California Department of Corrections, assigned CDCR numbe AB6948.

260.    Mr. Franco is a 33-year-old Hispanic.  He has his GED.

261.    Prior to his incarceration, Mr. Franco was in good health.  He enjoyed exercising and being active.

262.    Franco was transferred to Avenal State Prison in August 2010.

263.    He was prescribed Fluconazole.

264.    Franco was diagnosed with Valley Fever in July 2011.

265.    He now suffers from joint pain and shortness of breath.  He suffers sharp stabbing pain in his lower left lung, fever and sweating spells.  He can no longer enjoy physical activity as he once did due to the impact to his breathing.

266.    Franco lost his job in the prison because he cannot participate in strenuous labor.

## PLAINTIFF 26: FREDERIKSON, MICHAEL

267.    Plaintiff Mikheil Frederikson is an inmate in the custody of the California Department of Corrections, assigned CDCR number K22061.

268.    Mr. Frederiksen is 59 years old and the father of two children.

269.    Mr. Frederiksen was diagnosed with Valley Fever in 2012.

270.    Frederiksen's symptoms at the onset included body aches, body rashes, and difficulty breathing.

271.    Frederiksen was initially put on an antibiotic regimen.  He was later prescribed Diflucan, to which he suffered an allergic reaction and which provided  no relief for his symptoms.  He was then prescribed Itraconazole, which reportedly has improved his condition.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

272.   Frederiksen continues to suffer body aches and shortness of breath. The disease has weakened his immune system and he struggles to fight off common illnesses.

## PLAINTIFF 27: GALLOWAY, AUBREY

273.   Plaintiff Aubrey Galloway is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F95092.

274.   Mr. Galloway is a 66-year-old African American.

275.   Prior to his incarceration, Mr. Galloway obtained his GED and was supporting his daughter, her mother and her sister.  He worked as a certified fork lift driver and was an avid athlete who enjoyed keeping in shape.

276.   Since he has been incarcerated, Galloway has enrolled in college classes and continues to further his education.

277.   Galloway was transferred to PVSP in January 2009.

278.   Galloway had asthma.

279.   Galloway suffers severe headache, fatigue, coughing and chronic bone and joint pain.  He has night sweats and early morning coughing fits causing an inability to breathe.  He suffered a thirty pound weight loss over three weeks, which took a toll on his physical and mental well-being. He no longer is able to enjoy physical activities as he once did and his asthma has become unmanageable.  He has lesions on his legs that cause severe itching. He requires food supplements to maintain weight.

280.   Galloway was prescribed Fluconazole and continues to take the medication.

## PLAINTIFF 28: GARRETT, JAMES

281.   Plaintiff James Garrett is a former inmate in the custody of the California Department of Corrections, assigned CDCR number T47531.

282.   Mr. Garrett is a 68-year-old African American.

283.   Mr. Garrett grew up on the East Coast.

284.   He was a singer in a band called the Blackbyrds.  The group had a hit in 1975 called "Walking in Rhythm."

285.   Garrett enjoyed good health except for asthma, for which he uses an inhaler.

286.   Garrett was diagnosed with Valley Fever in November 2011.

287.   Since then, he has experienced severe weight loss, loss of appetite, constant body aches, and bodily weakness. He has taken several medications including Azithromycin and Fluconazole which have caused uncomfortable side effects.

## PLAINTIFF 29: HARDIN, KEVIN

288.   Plaintiff Kevin Hardin is an inmate in the custody of the California Department of Corrections, assigned CDCR number K75820.

289.   Mr. Hardin is a 58-year-old African American.

290.   Mr. Hardin was born in Chicago, Illinois.  He moved to California in 1968.  Hardin obtained his GED in prison.  Before his incarceration, he was a laborer and painter.

291.   Hardin was diagnosed in December 2013 at Avenal State Prison.

292.   Mr. Hardin suffers from labored breathing and other symptoms of the disease.

293.   Hardin has been prescribed Fluconazole.

294.   Mr. Hardin filed a VCB claim on or about May 8, 2014.

## PLAINTIFF 30: HAYNES, HERMAN

295.   Plaintiff Herman Haynes is an inmate in the custody of the California Department of Corrections, assigned CDCR number J69292.

296.   Haynes is a 45-year-old African-American from Pomona, California.

297.   He was diagnosed in 2011-2012 with Valley Fever, based on contraction of the disease that occurred at Corcoran State Prison.

298.   Before being afflicted, he was a body builder and worked out regularly, sometimes multiple times daily.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

299.   His health was not compromised before suffering from the disease.

300.   In late 2010, he started coughing blood, experienced chest pain and dizziness, sweating, fatigue, he lost weight, had sores on his face and felt like he was dying.

301.   He is consistently tired now and sometimes his chest hurts.

302.   He also gets nauseous, his joints ache, and he has relapsed to the point of requiring hospitalization.

303.   He was treated with 800mg of Fluconazole, which they slowly reduced to 200mg, but he relapsed and his dosage was returned to 800mg.

304.   He has a lesion in his lungs.

## 31: HAYTER, CLIFFORD

305.   Plaintiff Clifford Hayter is an inmate in the custody of the California Department of Corrections, assigned CDCR number V32822.

306.   Mr. Clifford Hayter is a 63-year-old African American.

307.   Mr. Hayter was diagnosed with Valley Fever in May, 2013 at PVSP.

308.   He suffers back pain, headaches and skin problems.

309.   Mr. Hayter filed a VCB claim May, 2014.

## PLAINTIFF 32: HERNANDEZ, CARLOS

310.   Plaintiff Carlos Hernandez is a former inmate in the custody of the California Department of Corrections, assigned CDCR number H56355.

311.   Carlos Hernandez was born in 1970 in Guadalajara, Mexico.  He is Hispanic.

312.   Mr. Hernandez was a carpenter before he was incarcerated and now that he has been released, intends to continue working in the construction industry.

313.   Mr. Hernandez was diagnosed with Valley Fever in 2013 at Avenal State Prison.

314.   He suffers chest pain, coughing and wheezing.

315.   Hernandez has been prescribed numerous medications and is currently taking two including Fluconazole which he believes he will be on for life.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**PLAINTIFF 33: HERNANDEZ, WILLIAM**

316.   Plaintiff William Hernandez is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AN8637.

317.   Mr. Hernandez is a 50-year-old Mexican American from San Luis Obispo, California.  He has two daughters. Before prison, he worked as a welder.

318.   His expected release date is December 2017.

319.   He was diagnosed in December 2014 with Valley Fever, which he contracted while housed at Avenal State Prison.

320.   Mr. Hernandez suffers from aching joints and back, a rash on his legs, severe headaches and migraines, pneumonia in his left lung, night sweats, fever, chills, fatigue, weight loss of 20 pounds, nausea, depression, trouble standing for too long, restless sleep, back pain, fatigue, and blurry vision. He was hospitalized in November 2014.

321.   Mr. Hernandez has been prescribed Diflucan.

**PLAINTIFF 34: HOCKLEY, JASON**

322.   Plaintiff Jason Hockley is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F97434.

323.   Mr. Hockley is a 35-year-old African American.

324.   Mr. Hockley graduated from high school and has some college education.  He was raised in Los Angeles and has two children.

325.   Hockley was diagnosed with VF in March 2011 at Pleasant Valley State Prison.

326.   Hockley suffered various symptoms.

**PLAINTIFF 35: HUGHES, DARNELL**

327.   Plaintiff Darnell Hughes is a former inmate in the custody of the California Department of Corrections, assigned CDCR number G65611.

328.   Darnell Hughes is a 65-year-old African American.

329.   Mr. Hughes had Hepatitis C, asthma and chronic hay fever.

330.   Hughes was diagnosed with Valley Fever in March 2011 at PVSP.

331.    He experiences chest pains, kidney pain, feels tired, has suffered weight loss, night sweats, pneumonia, constant cough, headaches, and has pus-filled bumps on his skin and a rash on his right lower leg.

332.    Mr. Hughes currently takes medication for the Valley Fever, including Fluconazale and Itraconzole.

### PLAINTIFF 36: ISLAS, JOSE

333.    Plaintiff Jose Islas is an inmate in the custody of the California Department of Corrections, assigned CDCR number J89852.

334.    Mr. Islas is a 43-year-old Mexican and Native American.

335.    Mr. Islas was diagnosed with Valley Fever in 2011 at PVSP.

336.    Islas now has a lump on his stomach, suffers from night sweats, shortness of breath, weight loss, and fatigue.  His Valley Fever is disseminated.

337.    Mr. Islas has been on multiple medications for Valley Fever including Fluconazole.

### PLAINTIFF 37: JALOTJOT, DANILO

338.    Plaintiff Danilo Jalotjot is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AB5298.

339.    Mr. Danilo Jalotjot was born in 1966.  He is of Asian descent.

340.    Mr. Jalotjot was employed in architectural drafting before he was incarcerated.  Now that he has been released, he intends to continue working in the same industry.

341.    Jalotjot was transferred to ASP in December 2009. He was then transferred to CIM Chino in March 2013 and has since been released.

342.    Jalotjot was diagnosed with Valley Fever in 2011.

343.    He suffers from chills and night sweats, shortness of breath, and weakness, and had to have fluid drained from his left lung and was hospitalized due to Valley Fever in 2011.

344.    Jalotjot has been prescribed numerous medications and is currently taking Voriconazole and Diflucan.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**PLAINTIFF 38: JOHNSON, DANIEL**

345.    Plaintiff Daniel Johnson is an inmate in the custody of the California Department of Corrections assigned CDCR number J09293.

346.    Mr. Johnson was born in 1960.  He is Caucasian.

347.    Mr. Johnson dropped out of high school but completed his education at West Valley Occupational Center and became certified in baking.  He has worked as a baker and a roofer and has worked building scenery for studios.

348.    Johnson had a history of hepatitis C but was physically active.

349.    Johnson was transferred to PVSP in 2004, then to ASP in 2012, and now resides at CMF Vacaville, where he has been since 2014.

350.    Johnson was diagnosed with Valley Fever in 2011 at PVSP.

351.    He suffers lower extremity edema, pain in his right lung, muscle aches, chills, night sweats, fever, shortness of breath, left peroneal/tibial neuropathy, and blood clots in his legs.

352.    He is now confined to a wheelchair.

353.    Johnson must now take Coumadin for life.

354.    Johnson has been prescribed numerous medications including Levaquin and Fluconazole and is currently taking Itraconazole.

**PLAINTIFF 39: JOHNSON, JESSE**

355.    Plaintiff Jesse Johnson is an inmate in the custody of the California Department of Corrections, assigned CDCR number D74460.

356.    Mr. Johnson is an African American born on December 13, 1965.

357.    Mr. Johnson was diagnosed with Valley Fever in July 2011 at Avenal State Prison.

358.    Johnson suffers from loss of appetite, nausea, weight loss, and body pains.

**PLAINTIFF 40: JONES, DANIEL**

359.    Plaintiff Daniel Jones is an inmate in the custody of the California Department of Corrections, assigned CDCR number F99657.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

360. Mr. Jones is a 68-year-old African American.

361. Before being diagnosed with Valley Fever, Mr. Jones was paralyzed on his left side and had osteoporosis.

362. Jones was diagnosed with Valley Fever on February 15, 2012 at PVSP.

363. Currently, Mr. Jones experiences severe fatigue and other symptoms.

364. Mr. Jones has not been prescribed medication for Valley Fever.

### PLAINTIFF 41: KLVANA, MILOS

365. Plaintiff Milos Klvana is a former inmate in the custody of the California Department of Corrections, assigned CDCR number E47395.

366. Klvana is an 81-year-old Caucasian male of Eastern European descent.

367. Due to his advanced age, he is considered a high-risk inmate, apart from the fact that he had pre-existing health problems.

368. He was formerly a physician, but was convicted of a criminal offense for mistakes in the course of delivering babies as part of his practice.

369. He began having breathing related problems in 2011 at PVSP when a chest X-ray showed in 2011 that he had pneumonia.

370. He was hospitalized with VF and later placed on Fluconazole.

### PLAINTIFF 42: LEINWEBER, MIKHIEL

371. Plaintiff Mikhiel Leinweber is an inmate in the custody of the California Department of Corrections, assigned CDCR number T58130.

372. Mr. Leinweber is a 39-year-old Caucasian of Russian descent.

373. Mr. Leinweber was diagnosed with Valley Fever on January 5, 2011 while at PVSP.

374. Currently, Mr. Leinweber has scars on his lungs and chest pains due to the disease.

375. He has been on multiple medications.

### PLAINTIFF 43: LEWELLING, JESSE

376. Plaintiff Jesse Lewelling is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F74936.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

377.   Mr. Lewelling is a 44-year-old African American from San Luis Obispo, California. He has a nine-year-old son.

378.   Mr. Lewelling graduated from high school and went to college for two years.

379.   He has worked in private security around the country.

380.   Before his transfer to PVSP, Lewelling was healthy and exercised two hours a day, five days a week. He had no immune problems.

381.   Lewelling was diagnosed with Valley Fever in August or September of 2011 at PVSP.

382.   He was prescribed Diflucan for the disease.

383.   Lewelling continues to experience shortness of breath, loss of appetite, fluid in his lungs, loss of weight, and joint aches.

## PLAINTIFF 44: LEWIS, ASAD

384.   Plaintiff Asad Lewis is an inmate in the custody of the California Department of Corrections, assigned CDCR number G17886.

385.   Mr. Lewis was born in 1961.  He is African American.

386.   Lewis graduated from high school, has one year of college, and worked as a manager for several different small businesses.

387.   Lewis was first transferred to Wasco from 2008-2009, then to Corcoran until 2011, then to PVSP, where he currently resides.

388.   Lewis contracted Valley Fever in or about September 2011.

389.   Lewis suffers joint and bone pain, skin lesions, headaches and uncontrollable sweating.

390.   Lewis has been prescribed numerous medications and is currently taking fluconazole.

## PLAINTIFF 45: LEWIS, CLEOFAS

391.   Plaintiff Cleofas Lewis is a former inmate in the custody of the California Department of Corrections, assigned CDCR number T23096.

392.   Cleofas Lewis was born in 1960.  He is African American.

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

393. Mr. Lewis has diabetes.

394. Lewis was formerly a forklift driver and had his GED. While in prison, he completed two trade courses, computers and electronics.

395. Lewis was transferred to PVSP in 2010.

396. He contracted Valley Fever in 2012.

397. Lewis suffers fatigue, coughing and night sweats such that he is unable to sleep, loss of appetite and weight loss, and headaches.

398. Mr. Lewis has been prescribed Fluconazole.

### PLAINTIFF 46: LEWIS, GEORGE

399. Plaintiff George Lewis is an inmate in the custody of the California Department of Corrections, assigned CDCR number P90583.

400. George Lewis was born on June 13, 1981. He is African American.

401. Mr. Lewis has his high school diploma and attended community college.

402. Before being diagnosed with Valley Fever, Lewis had a medical history that included asthma.

403. Mr. Lewis first started feeling ill in late 2010 with sweating at night, headaches, loss of appetite, rash, joint pain and muscle pain, and weight loss.

404. He was diagnosed with Valley Fever in 2012 while at PVSP.

405. He currently suffers from fatigue, headaches, body pains, weight loss, and night sweats.

406. Lewis takes Fluconazole for his Valley Fever.

### PLAINTIFF 47: LEWIS, JOE

407. Plaintiff Joe Lewis is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AM5760.

408. Mr. Lewis was born on September 22, 1948.

409. He is African American.

410. Mr. Lewis worked as a letter carrier, bartender and bouncer.

411. Lewis resided in Avenal State Prison from January 2013 to July 2013.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

412.   Lewis contracted Valley Fever in 2013.

413.   Lewis suffers coughing, headaches, and joint pain.

414.   He has been prescribed numerous medications and is currently taking Fluconazole.

415.   Lewis has been released from custody.

**PLAINTIFF 48: LEWIS, KEVIN**

416.   Plaintiff Kevin Lewis is a former inmate in the custody of the California Department of Corrections, assigned CDCR number G61810.

417.   Mr. Lewis is a 35-year-old Caucasian.

418.   Mr. Lewis was formally diagnosed with Valley Fever on January 15, 2014 while at PVSP.

419.   He suffers fatigue, shortness of breath, has had pneumonia, chronic cough and has been hospitalized and has suffered permanent injury to his right lung due to his Valley Fever.

420.   He was diagnosed with a 5 cm mass on his lung that may, or did, require surgical removal.

421.   Mr. Lewis has been on multiple medications for Valley Fever including Fluconazole.

422.   Mr. Lewis filed VCB claims on July 14, 2014 and August 4, 2014.

**PLAINTIFF 49: MANNING, MICHAEL**

423.   Plaintiff Michael Manning is an inmate in the custody of the California Department of Corrections, assigned CDCR number H95717.

424.   Mr. Manning is a 63-year-old African American.

425.   Mr. Manning was transferred to PVSP in June 2008.

426.   He was diagnosed with disseminated Valley Fever in 2012.

427.   Manning suffers weakness, tightness in his chest, fever, chills, severe coughing, pain, bleeding, and breathing problems.  He has lesions on his chest, shoulder, and torso, and neurological symptoms.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

428.    Manning was hospitalized at Montclair Hospital and prescribed 800 mg of Diflucan daily.

### PLAINTIFF 50: MARTINEZ, JUAN

429.    Plaintiff Juan Martinez is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AL8674.

430.    Juan Martinez is 39 years old and Hispanic.

431.     Mr. Martinez was transferred to Wasco State Prison in 2012.

432.    In 2012, Martinez reported symptoms of fever, chills, insomnia, persistent cough, fatigue, headache, body aches, and appetite loss.

433.    He was seen by a nurse, who offered him allergy pills.

434.    Later in 2012 he was put on Valley Fever medication (Fluconazole, Diflucan) but was not able to see a doctor until late 2012.

435.    In April 2013 Mr. Martinez was hospitalized for an internal staph infection and had Diflucan administered intravenously.

436.    He subsequently lost the use of his left arm and shoulder and is living in chronic pain as a result.

437.    In addition to his chronic pain, Martinez suffers from fatigue and shortness of breath as a result of Valley Fever.

### PLAINTIFF 51: MCDONALD, JEFFERY

438.    Plaintiff Jeffery McDonald is an inmate or former inmate in the custody of the California Department of Corrections, assigned CDCR number P05806.

439.    Mr. McDonald is a 47-year-old African American.

440.    McDonald had Hepatitis C and liver disease.

441.    McDonald was transferred to PVSP in 2010.

442.    McDonald sought medical treatment for eight-to-ten weeks but was told he just had a cold and was given cold medicine. Then he was told he had pneumonia. Medical staff accused Mr. McDonald of malingering.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

443.    His symptoms included deep coughing, vomiting, violent seizures, trouble breathing, dizziness, joint pain, fluid coming out of his nose and lungs, and painful and crushing headaches.

444.    When he became dehydrated and incoherent, medical staff decided to test him for Valley Fever.

445.    McDonald was diagnosed with Valley Fever in or about 2012.

446.    By that time McDonald had lost 60 pounds, his lungs were infiltrated, and the cocci had disseminated. He had severe chest pains and cardiac problems.

447.    Prison officials sent Mr. McDonald to Mule Creek State Prison for treatment, and later to High Desert State Prison.

448.    McDonald still suffers from intense chest and joint pain, seizures, irregular heartbeats and hypertension.

449.    Among the many medications he must take each day are: 1800 mg. gabapentin, 220 mcg. monetasone, 2400 mg. oxcarbazepine, 100 mg. atonoxetine, 10 mg. amlodipine, 1200 mg. fluconazole, and 40 mg. lisinopril.

## PLAINTIFF 52: MCGINLEY, JAMES

450.    Plaintiff James McGinley is a former inmate in the custody of the California Department of Corrections, assigned CDCR number K73555.

451.    Mr. McGinley is a 43-year-old Caucasian from West Virginia.

452.    Mr. McGinley worked as a journeyman painter and his passion is rebuilding cars.

453.    McGinley was transferred to ASP in about March 2011.

454.    Inmates including McGinley were required to turn sod over while performing yard work.

455.    McGinley was diagnosed with Valley Fever in April, 2011.

456.    He was put on Fluconazole, 400 mg per day.

457.    He has suffered from a sore throat, night sweats, severe headaches, coughing, weight loss, exhaustion, and overall body soreness. McGinley still suffers from aching bones, headaches, mental confusion, and vertigo.

## PLAINTIFF 53: MILFORD, THOMAS

458.   Plaintiff Thomas Milford is an inmate in the custody of the California Department of Corrections, assigned CDCR number K40081.

459.   Mr. Milford is 52 years old and African American.

460.   Mr. Milford has asthma.

461.   Milford was sent to Corcoran State Prison in 2012.

462.   Milford was diagnosed with Valley Fever in 2013.

463.   He was hospitalized at San Joaquin General Hospital for three months, and then placed in the hospital at Corcoran for an additional three months of treatment.

464.   He suffers rapid weight loss, hot flashes, diarrhea, vomiting, fatigue, coughing, choking, body aches and severe pain.

465.   Milford reports he often played sports on bare dirt at CSP and walked the dirt track, and was forced by guards to lie face-down in the yard with his face in bare dirt.

466.   Milford was prescribed Noxafil to treat the cocci.  He will have to take medication for the rest of his life although it may cause brain injury and memory loss.

## PLAINTIFF 54: MILLER, DALE

467.   Plaintiff Dale Miller is a former inmate in the custody of the California Department of Corrections, assigned CDCR number T94358.

468.   Mr. Miller is 59 years old.

469.   Mr. Miller had chronic Hepatitis C, liver cirrhosis, and portal fibrosis, all of which put him at high risk for disseminated Valley Fever.

470.   Miller was transferred to Pleasant Valley State Prison in August 2010.

471.   Miller was diagnosed with Valley Fever later in 2011.

472.   Miller suffers joint aches, night sweats, fever, chills, nausea, weight loss, severe headaches, and has partially lost the use of his left leg.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

473.   His nurse practitioner thought he had become infected with another type of hepatitis C.  She would not believe Mr. Miller when he explained he was and had been drug free for years.

474.   He was treated with Ibuprofen and sinus pills.

475.   After his eventual diagnosis of Valley Fever, Mr. Miller was treated with Diflucan for five months.

476.   Miller is afraid that his drug's liver toxicity, combined with his cirrhosis and fibrosis, will cut short his life.

477.   On August 22, 2014, Mr. Miller was paroled.

478.   A painter by trade, he can no longer climb ladders or scaffolds or stand for long periods of time.

479.   Mr. Miller has facial scars and growths on his legs from the disease.

### PLAINTIFF 55: MOODY, ANDRE

480.   Plaintiff Andre Moody is a former inmate in the custody of the California Department of Corrections, assigned CDCR number J58963.

481.   Mr. Moody is a 62-year-old African American.

482.   Moody had acute asthma, chronic hepatitis C, stage 1-2 liver fibrosis, and was anemic when he was sent to Avenal State Prison on January 6, 2011.

483.   In 2011, Mr. Moody developed a dry cough and his head started to ache. He thought he had a cold. He began getting dizzy spells in which his head would spin for a minute or two.

484.   He also had painful coughing that would continue until he thought he would pass out, along with weight loss, hand cramp pain, boils and loss of strength.

485.   Mr. Moody was not promptly tested for Valley Fever although he sought medical treatment and evaluation. He was told he had an allergic reaction to medication. The only medication he was given was sinus pills.

486.   Moody was diagnosed with Valley Fever later in 2011.

487.   He was prescribed 400 mgs a day of Diflucan.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

488.    On December 26, 2011, Mr. Moody's throat became so swollen he was sent to the emergency room, where he was treated for three days.

489.    On August 14, 2012, Mr. Moody was again hospitalized; it was thought he had tuberculosis, but it turned out to be a recurrence of his Valley Fever.

490.    Moody suffers from pulmonary infection, spots on his left lung, lesions in both nostrils, dizzy spells, internal pain, and he is often tired. The bones in both his hands, knees, and his right shoulder are swollen and painful. He has daily dizzy spells, his eyes ache, and he suffers from skin boils.

491.    Moody reports that he believes he became infected shortly after being outside on the bleachers during windy season.

### PLAINTIFF 56: NEAL, FREDDY

492.    Plaintiff Freddie Neal is an inmate in the custody of the California Department of Corrections, assigned CDCR number H44704.

493.    Mr. Neal is 49 years old and is African-American.

494.    Mr. Neal has worked hard to improve himself while incarcerated and has so far earned 51 college credits with Coastline College.

495.    Neal was transferred to PVSP on January 21, 2011.

496.    Neal was diagnosed with Valley Fever on about January 24, 2012.

497.    Neal suffers from a persistent cough, headache, fever, sweats, fatigue, and loss of appetite. He lost 13 pounds in two weeks.

498.    Neal is being treated with 400 mg of Fluconazole twice a day.

### PLAINTIFF 57: NGOUN, CHEK

499.    Plaintiff Chek Ngoun is an inmate in the custody of the California Department of Corrections, assigned CDCR number P47103.

500.    Chek Ngoun is of Thai and Cambodian descent.

501.    Mr. Ngoun is 49 years old.

502.    Mr. Ngoun was housed at Pleasant Valley State Prison.

PAVONE & FONNER, LLP
600 W. BRADOWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

503.    In 2013, Ngoun began to experience painful coughing and his lungs filled with fluid. The doctor, however, diagnosed his condition as gas and prescribed medication for digestion.

504.    Ngoun was finally diagnosed with Valley Fever in 2013 and prescribed 400 mg. of fluconazole daily.

505.    Ngoun suffers from chest pain whenever he breathes; he has scar tissue in both lungs, and he experiences intense pain in his heels when he stands up.

### PLAINTIFF 58: PAGE, MACK

506.    Plaintiff Mack Page is an inmate in the custody of the California Department of Corrections, assigned CDCR number J66125.

507.    Mr. Page is a 73-year-old African-American.

508.    Mr. Page was transferred to PVSP in June, 2012.  He was immune-compromised with a history of heart trouble and COPD.

509.    Page was diagnosed with Valley Fever in August 2012 at PVSP.

510.    Page suffers chills, difficulty breathing, night sweats, chest pain and coughing.

511.    He now uses an inhaler to help him breathe and can only walk 100 yards. In August of 2013, he was transferred out of PVSP.

512.    Page was given Itraconozole to treat the disease.  He was recently taken off it.

### PLAINTIFF 59: PARKER, CEDRIC

513.    Plaintiff Cedric Parker is an inmate or former inmate in the custody of the California Department of Corrections, assigned CDCR number T38256.

514.    Mr. Parker is a 56-year-old African-American. He has asthma.

515.    Parker was diagnosed with Valley Fever on September 6, 2011 at PVSP.

516.    Since contracting the disease, Parker has had more frequent asthma attacks.  He suffers from low energy, and muscle and joint pain that prevent him from working out.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

517.    Parker was prescribed Fluconazole 400mg to manage his Valley Fever and 325mg mapap for pain.

### PLAINTIFF 60: PARKER, THEODORE

518.    Plaintiff Theodore Parker is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AR2709.

519.    Mr. Parker is a 39-year-old African American.

520.    Mr. Parker was diagnosed with Valley Fever in January, 2012 at PVSP.

521.    Parker had a pre-existing asthma condition.

522.    Parker was treated with Pnemovac.

523.    Parker initially suffered from pain, fever, and chills and other VF symptoms.  He has become anxious and depressed as a result.

524.    Mr. Parker was released in June, 2014.

### PLAINTIFF 61: PEAV, SIM

525.    Plaintiff Sim Peav is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AA4542.

526.    Sim Peav is 52 years old and Asian.

527.    Mr. Peav has TB-32.

528.    Peav came to the US from Cambodia because of the Vietnam War.

529.    He went to school for journalism and social science and wanted to do overseas coverage of wars.

530.    Peav was transferred to PVSP on Feb 19, 2010.

531.    The day before the transfer he had been told that he was going to be transferred to Mule Creek III SNY but instead he was sent to PVSP.

532.    On August 26, 2011 Peav was asked to sweep the floor outside and inside the Program Office and D-Yard in windy and dusty conditions.

533.    On September 4, 2011 Mr. Peav felt sick and nauseous for the first time and requested medical attention.

534.    Prison officials told Peav it was "probably allergies."

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

535.   On September 12, 2011 a blood test suggested that Peav had Valley Fever.

536.   Peav was not given any medication at that time.

537.   Peav was transferred to CIM on November 30, 2011. His joint pain and kidneys worsened after the transfer.

538.   Peav was diagnosed on September 16, 2013 with Valley Fever.

539.   Peav suffered from a high fever, nausea, congestion, coughing, sweating, and rashes all over his body.  He is exhausted all the time and unable to work out.

540.   He suffers from swollen joints and coughing so hard that he choked up blood.

### PLAINTIFF 62: PENALVA, JUAN

541.   Plaintiff Juan Penalva is an inmate in the custody of the California Department of Corrections, assigned CDCR number P41303.

542.   Juan Penalva is 45 years old and came to the US from El Salvador.

543.   Mr. Penalva is Hispanic. He has worked in two trades, upholstery and janitorial services.

544.   Penalva contracted Valley Fever while incarcerated at PVSP in late 2010.

545.   Penalva noticed symptoms when he had a sharp pain in his lung and could not breathe.  He was sweating, had headaches, pain all over in his bones, and dizziness.

546.   He was given conflicting diagnoses. One doctor told him it was Valley Fever while another said it was not.

547.   Penalva continues to suffer breathing problems, shortness of breath, and lack of strength. He suffers from problems with his stomach and internal bleeding.

548.   Penalva was given Valley Fever medication.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## PLAINTIFF 63: PRESTON, ROBERT

549.   Plaintiff Robert Preston is a former inmate in the custody of the California Department of Corrections, assigned CDCR number V67998.

550.   Preston, 35, was born in San Clemente, California. He spent his teen years in group homes as a ward of the state.

551.   He has worked primarily in manual labor and construction.

552.   Mr. Preston was transferred to Kern Valley State Prison in August of 2010.

553.   Preston had Hepatitis C.

554.   Preston was diagnosed with Valley Fever in late October 2010.

555.   Preston now has masses in his left lung. He experiences frequent headaches and night sweats. He has a hard time exerting himself physically because he is quickly out of breath. He also suffered from nausea, muscle spasms in his neck, and a cough that later developed into pneumonia.

556.   Preston was given Diflucan four times a day for about six months.

557.   After that, he was denied medication because medical staff told him that he was cured of Valley Fever.

## PLAINTIFF 64: QUIROGA, MANUEL

558.   Plaintiff Manuel Quiroga is a former inmate in the custody of the California Department of Corrections, assigned CDCR number P49751.

559.   Mr. Quiroga is a 73-year-old Cuban from Stockton, California.

560.   Mr. Quiroga is married with three children.

561.   Quiroga suffered from asthma, emphysema, and diabetes before his transfer to PVSP.

562.   Quiroga was diagnosed with Valley Fever in late June 2013 at PVSP.

563.   Mr. Quiroga experienced chest pain, shortness of breath, hot and cold sweats, chills, a fever, and pain throughout his body.  He lost 30 lbs in three months.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

564.   As a result of the Valley Fever, Mr. Quiroga was classified as disabled with numerous pulmonary and respiratory problems.  He has a 4cm mass in his right lung.

565.   Quiroga now walks with a cane or walker.

566.   Mr. Quiroga was initially prescribed 400mg of Diflucan per day, but had an allergic reaction to it.  He was then prescribed 400mg a day of Itraconazole.

## PLAINTIFF 65: RICHARDSON, PAUL

567.   Plaintiff Paul Richardson is a former inmate in the custody of the California Department of Corrections, assigned CDCR number J46614.

568.   Richardson is a 54-year-old African American.

569.   Mr. Richardson was co-founder of a movie production company.  After growing up in a ghetto on the East Coast, he moved to California to start a business.

570.   Richardson was transferred to Avenal State Prison in 2010 from the Reception Center in Delano.

571.   Richardson was a fitness expert and in good health.

572.   Richardson was diagnosed in 2012 with pulmonary coccidioidomycosis and in 2013 was diagnosed with the disseminated form.

573.   Richardson has suffered night sweats, shakes, body aches, bones hurting anxiety, difficulty in thinking, persistent tiredness, weight and body mass loss, and skin problems.

574.   Richardson has been prescribed Fluconazole, pain relievers, and supplements for weight loss.

## PLAINTIFF 66: RIPOYLA, RONNIE

575.   Plaintiff Ronnie Ripoyla is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AB8197.

576.   Ronald Ripoyla is a 55-year-old Hispanic from Fresno, California.

577.   Mr. Ripoyla was transferred to PVSP on March 1, 2010.

578.   Ripoyla was released on July 14, 2015.

579.   Prior to his incarceration, Mr. Ripoyla was in no way immune or respiratorily compromised.  However, he was diabetic and had high blood pressure.

580.   He was diagnosed with Valley Fever on November 16, 2010.

581.   Ripoyla suffered body aches, headaches, night sweats, chest pains, back pains, aching bones and coughing.  He also experienced a loss of appetite.

582.   Mr. Ripoyla's liver is being damaged by the Valley Fever medication.

### PLAINTIFF 67: ROBERTSON, RICHARD

583.   Plaintiff David Robinson is a former inmate in the custody of the California Department of Corrections, assigned CDCR number P40846.

584.   Richard Robertson is a 61-year-old Caucasian, born in Indiana and raised in Los Angeles.  He worked as a truck driver.

585.   Mr. Robertson suffered from Chronic Obstructive Pulmonary Disease (COPD), asthma, and diabetes mellitus type 2.

586.   Robertson was diagnosed with Valley Fever on December 27, 2010 at PVSP.

587.   He was treated with Diflucan for 6 months.

588.   Robertson suffers various symptoms of Valley Fever, including shortness of breath and sporadic wheezing.

### PLAINTIFF 68: ROBINSON, DAVID

589.   Plaintiff Richard Robertson is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F13839.

590.   Mr. Robinson was born in San Francisco in 1951.  He came from a troubled family background but managed to graduate high school and became a dental technician.

591.   Mr. Robinson is African American. He has Hepatitis C.

592.   Robinson was transferred to Pleasant Valley State Prison in June of 2011 and remained there until December of 2013.

593.   Robinson contracted Valley Fever in 2011 at PVSP.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

594.    Robinson suffered from nose and mouth bleeds, shortness of breath, flu-like symptoms, blood in his urine, and pain in his spine.

595.    After contracting Valley Fever, Robinson lost 30 pounds. He reports he now is so thin that his ribs protrude and he looks like someone from the concentration camps.  The pain in his spine is so bad that he has to warm up before he can take a walk.

596.    Robinson was prescribed Diflucan for a few months and then the medication was discontinued.

597.    His symptoms worsened in May 2013 and he was again put on Diflucan.

### PLAINTIFF 69: RODRIGUEZ, RONALD

598.    Plaintiff Ronald Rodriguez is an inmate in the custody of the California Department of Corrections, assigned CDCR number C34155.

599.    Rodriguez is a 48-year-old Caucasian who grew up in Anaheim, California.

600.    Mr. Rodriguez was a firefighter.

601.    Rodriguez was transferred to Avenal State Prison on or about August 2, 2011.

602.    Rodriguez was in good health before he contracted Valley Fever.  He exercised regularly and rarely suffered from any aches, pains or other medical issues.

603.    Rodriguez was diagnosed with Valley Fever in 2011.

604.    Rodriguez reports that he was forced to stay outside for two or more hours at a time even when it was very windy.

605.    Rodriguez now suffers constant aches, joint pains, and fatigue.  A chest X-ray revealed left upper lobe pneumonia.  The fatigue debilitates him and prevents him from doing his normal daily tasks. He feels weak and dizzy and must lie down immediately, and this occurs at least three to four times a week and lasts four to five hours.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

606.    He has lesions on his hands, arms and legs that swell, burst, and leak puss, cause itching, and leave scars.

607.    Mr. Rodriguez is treated with Fluconazole.  He reports that his doctor's visits are not regular nor does he receive prompt follow-ups.

### PLAINTIFF 70: RUGGLES, JOHN

608.    Plaintiff John Ruggles is in the custody of the California Department of Corrections, assigned CDCR number G23563.

609.    John Ruggles is a 65-year-old from Oroville, California where he worked as a building technician/electrician.

610.    Mr. Ruggles went to school at University School of Nashville from 1974-1979.

611.    Ruggles was transferred to PVSP in October of 2009 when his classification dropped to level 3.  Ruggles was told by medical staff that because he was white he could not contract Valley Fever.

612.    Ruggles was diagnosed with VF in October, 2010 while at Pleasant Valley State Prison.

613.    Ruggles was originally classified as low risk but over time he has been classified as medium risk in 2013 and high risk on January 30, 2014.

614.    Ruggles suffers pain in his feet, hips, ankles, and shoulder, and also experiences headaches, body aches, sores, night sweats, and chest pain every time he breathes. He gets hot and cold flashes and has had a loss of appetite

615.    His X-rays in 2010 indicated a white section of his lungs.

616.    In 2014, Ruggles mentioned in a medical request form that he was suffering from chest pain and his lungs are causing a dry cough that was keeping him up most of the night.

617.    This report was initially ignored.

618.    Ruggles was eventually prescribed an inhaler, allergy medication, and Naproxen.

619.    He received VF Meds in PVSP but they were stopped at some point.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

620.   He received VF meds in CIM Chino; these were stopped in March of 2013.

621.   Ruggles has medicine costs estimated at $1500 per month that he expects to continue for the rest of his life.

### PLAINTIFF 71: SAMS, LORENZO

622.   Plaintiff Lorenzo Sams is an inmate in the custody of the California Department of Corrections, assigned CDCR number G36561.

623.   Mr. Sams is a 68-year-old African-American from Moreno Valley, California. He has a large family of siblings, nephews, and nieces.

624.   Mr. Sams was a United States Marine and was honorably discharged for medical reasons.

625.   Before being incarcerated, Sams had asthma and arthritis which caused his immune system to be compromised.

626.   Sams was transferred from North Kern State Prison to PVSP on January 7, 2009.

627.   Before his transfer to PVSP Sams had pneumonia in his right lung. He was hospitalized for six weeks and had his spleen removed.

628.   When he had his spleen removed, physicians informed Sams that he would become more susceptible to contacting diseases.

629.   Sams was diagnosed with Valley Fever at PVSP in 2011.

630.   The disease progressed causing him to have chronic pneumonia, rashes on his legs, loss of appetite, and fatigue.

631.   Medical records suggest enlargement of the heart and heart disease.

632.   He now has asthma attacks more often, his arthritis has worsened, he feels tired all the time, and he has aches and pains throughout his entire body.

633.   He was given Erithromycin for his pneumonia and Fluconazole for Valley Fever.

634.   He was prescribed various other medications for his cough and asthma.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**PLAINTIFF 72: SANCHEZ, JOHNNY**

635.    Plaintiff Johnny Sanchez is an inmate in the custody of the California Department of Corrections, assigned CDCR number E72914.

636.    Johnny Sanchez is a 54-year-old Mexican-American from Los Angeles, California.

637.    He has a son, step-daughter, three brothers and a sister.

638.    Mr. Sanchez attended high-school through his senior year and earned a GED.

639.    Sanchez was transferred to PVSP in 2011.

640.    Prior to his incarceration Mr. Sanchez was strong, athletic and in excellent health.

641.    He started experiencing symptoms of Valley Fever in 2012 when he suffered coughing and night sweats for about three weeks.

642.    Mr. Sanchez was admitted to Community Regional Medical Center for pneumonia in 2012, where he was hospitalized for about nine days.

643.    Mr. Sanchez was diagnosed with Valley Fever in 2012.  Upon discharge from the hospital he was prescribed fluconazole 200mg.

644.    The disease has since caused overall weakness, dizziness, painful coughing, reduced appetite, stomach pain, night sweats, weight loss and a collapsed lung.

**PLAINTIFF 73: SANDERS, TYRONE**

645.    Plaintiff Tyrone Sanders is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F20814.

646.    Tyrone Sanders is a 39-year-old Hispanic-American. He has a five-year-old son.

647.    Mr. Sanders was born in Boston, Massachusetts, raised in Texas, and his home is Las Vegas, Nevada.

648.    Sanders completed some college courses and his job history includes work in construction, docks and warehouses among other things.

649. Mr. Sanders was transferred to PVSP on August 19, 2011.

650. Mr. Sanders first started experiencing symptoms in 2012.

651. He suffered breathing difficulties, uncontrollable coughing, vomiting with blood, migraines and severe knee pain.

652. Mr. Sanders was diagnosed with Valley Fever in 2012.

653. He currently is prescribed fluconazole 200mg and an inhaler.

654. The disease has caused Sanders walking pneumonia, asthma, high blood pressure, erratic heartbeat, constant joint pain, daily migraines and chest pain.

655. Aside from the physical toll the disease has taken on Mr. Sanders, he also reports that it has had a large psychological and emotional impact.

656. Mr. Sanders reports that while on the yard at PVSP he was forced to sit in the dirt next to exposed construction areas during alarms.

### PLAINTIFF 74: SEPULVADA, ADRIAN (ESTATE OF)

657. Plaintiff Estate of Adrian Sepulvada, represented by his next of kin Ivan Sepulvada, is a former inmate in the custody of the California Department of Corrections, assigned CDCR number K61449, who brings claims on behalf of Ivan and Adrian's Estate.

658. Mr. Sepulvada was a 43-year-old Hispanic originally from Puerto Rico.

659. He was transferred to PVSP from Solano State Prison in May 2011.

660. Sepulvada contracted tuberculosis in 2009 while at Solano State Prison, after an outbreak of the disease there.

661. He suffered a compromised immune system as a result.

662. Defendants were aware of his condition.

663. Sepulvada started feeling sick in December 2011 and was diagnosed with Valley Fever in January 2012 while housed at PVSP.

664. He was prescribed Diflucan and took the medication continuously. He continued to suffer from body aches, fatigue, dizziness, chest pain, swollen legs, loss of weight, and coughing.

665. He was left with permanent lung damage from the disease.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## PLAINTIFF 75: SHERROD, ALBERT

666.    Plaintiff Albert Sherrod is an inmate in the custody of the California Department of Corrections, assigned CDCR number P18116.

667.    Sherrod is a 64-year-old African American from Michigan.

668.    Mr. Sherrod worked as a cook in his family's business and attended community college for two years.

669.    He also worked at Ford Motor Company.

670.    Sherrod was transferred to PVSP in 2008.

671.    He started feeling sick in 2011, with night sweats, joint pain, coughing, breathing problems, body aches and bleeding but was not diagnosed with Valley Fever until 2012.

672.    Sherrod has been treated with Fluconazole. He continues to suffer coughing, breathing problems, swollen glands, dizziness, lower back pain, extreme fatigue, muscle spasms and constantly aching joints.

673.    Before he contracted Valley Fever, Sherrod was active and healthy.

674.    Mr. Sherrod believes he contracted Valley Fever as a result of his job assignment on the yard crew.  He worked continuously in the dust and dirt and was not given respiratory protection.

## PLAINTIFF 76: STEELS, WILLIE

675.    Plaintiff Willie Steels is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AC1812.

676.    Willie Steels is a 48-year-old African-American who grew up in Riverside, California. He is one of six children.

677.    Mr. Steels attended college and completed some computer studies.

678.    Steels was transferred to PVSP in July2010.

679.    Prior to his incarceration at PVSP, Steels enjoyed excellent health.

680.    He was diagnosed with "a primary coccidioidal infection" in 2010 when a Coccidioidal Serology report at Foundation Laboratories Inc., in Pomona CA, tested positive for precipitin (IgM) antibody.

681.   Later in 2010, the same lab conducted a second test which tested positive for both IgM and IgG, concluding that Mr. Steels' "[…] serum now is positive for coccidioidal CF... ."

682.   At the onset of the disease, Mr. Steels began to experience coughing, night sweats, weight loss, bruising in his hands and feet, headaches, fatigue, shortness of breath and loss of consciousness. He has also experienced significant hair loss, and started experiencing frequent heart burn.

683.   Steels was prescribed Fluconazole and antibiotics when he developed pneumonia.

## PLAINTIFF 77: TARAMONA, JULIO

684.   Plaintiff Julio Taramona is an inmate in the custody of the California Department of Corrections, assigned CDCR number H83259.

685.   Mr. Taramona is a 61-year-old Mexican national who grew up in the state of Guerrero in a town not far from Acapulco City.

686.   Taramona has two sisters who also live in the U.S.

687.   He worked for years in construction, including landscaping, plumbing, and electrical.

688.   Taramona was transferred to Pleasant Valley in June, 2008.  Taramona is a level II inmate so PVSP was an inappropriate endorsement for him irrespective of the Valley Fever risk.

689.   In or about July 2011, while at PVSP, Taramona contracted Valley Fever.

690.   He was treated for approximately four months with antibiotics.

691.   Prior to the infection, Taramona was in good health. He now suffers skin rash, muscle pain, night sweats, fever, and coughing, and also has difficulty breathing.

692.    Sometimes he feels as if he is suffocating because he cannot inhale oxygen into his lungs.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**PLAINTIFF 78: TERRY, DANNY**

693.    Plaintiff Danny Terry is a former inmate in the custody of the California Department of Corrections, assigned CDCR number D39439.

694.    Mr. Terry is a 63-year-old African-American, from California.

695.    Terry suffered from Hepatitis C and arthritis and was immune/respiratory compromised.

696.    In 2001, he was transferred to Avenal.

697.    Until 2009, from Terry's vantage point, Avenal maintained the grounds by watering the ground cover.  However, they stopped irrigating and the ground cover all died.

698.    In December 2010, Terry began to experience night sweats, shortness of breath, chronic cough, and headaches, accompanied by a weight loss of 30 pounds.

699.    Terry was first diagnosed with pneumonia, but in January 2011, was informed that he was infected with cocci.

700.    He was prescribed Fluconazole and Tylenol.

701.    On information and belief, the delay in treatment allowed the cocci to travel from his lungs to his bloodstream, which worsened his condition.

702.    Terry suffers painful, swollen joints and chronic headaches, skin rash, and back pain.

703.    The symptoms have been so severe that he lost consciousness.

**PLAINTIFF 79: THOMAS, MAURICE**

704.    Plaintiff Maurice Thomas is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AL9879.

705.    Mr. Thomas is an inmate or former inmate in the custody of the California Department of Corrections, assigned CDCR number AL9879.

706.    Maurice Thomas is a 51-year-old African-American from Oakland, CA.

707.    Mr. Thomas graduated from high school and completed one year of college. Thomas has been employed as a bus driver.

708.    Thomas was transferred to PVSP in December 2012.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

709.   In May 2013, Thomas began to feel ill with increasing shortness of breath to the point that he could barely walk a few yards on level ground; he had a dry, irritating cough, fever with rigors and chills, night sweats, muscle pain, and loss of weight.

710.   On May 21, 2013, after having been rushed to the hospital, Thomas was diagnosed with Valley Fever.

711.   He requires constant medical treatment and daily medications including Fluconazole 400 mg and Naproxen 500 mg each twice per day.

712.   Thomas continues to suffer the effects of Valley Fever.

### PLAINTIFF 80: THOMPSON, TYRONE

713.   Plaintiff Tyrone Thompson is an inmate in the custody of the California Department of Corrections, assigned CDCR number H84131.

714.   Tyrone Thompson is a 60-year-old African-American man.

715.   He grew up in Pomona, California.

716.   Thompson has successfully completed Vocational Business Occupations, Level 1 Office Services.

717.   He expects to be released from prison soon.

718.   In 2010, Thompson was living at California Men's Colony.

719.   During that time, he was transferred to Pleasant Valley State Prison.

720.   Thompson began to feel ill after arriving and requested medical attention.

721.   He was experiencing fever, coughing, pain, breathing difficulty, and night sweats.

722.   Thompson attempted to obtain medical treatment on several occasions but RN Dye dismissed his complaints as non-existent.

723.   He was only seen by a doctor when he was able to bypass this nurse.

724.   He was told by his doctor that he had become infected with Valley Fever and pneumonia in 2012.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

725.    In 2012, Defendants had to transport Thompson by gurney to a waiting ambulance for transportation to Twin Cites Community Hospital where he remained for treatment for 10 days.

726.    Thompson was discharged from Twin Cities with a treatment plan.

727.    However, Dr. Olufemi Owolabi, Dr. Sundarum, and RN Martinez refused to implement the plan.

728.    Thompson has been prescribed Fluconazole, Tylenol with codeine, Ipratropium Bromide, Llsinopril, Metoprolol Tartrate, Nitroglycerin, Ranitidine HCL, Citalopram Hydrobromide.

729.    However, his doctor neglects to provide the medications on a regular basis.

730.    Since the infection, Thompson has not been able to walk more than 10 feet without needing to stop, sit down, and use an inhaler to help him breathe.

731.    He uses a wheelchair for transportation.

732.    He suffers from a chronic cough.

733.    Thompson has a chronic bloody nose, chronic pain, he is incontinent, he cannot eat for days at a time, and he suffers from sleeplessness.

734.    Pleasant Valley State Prison does not maintain its air conditioners or ventilation systems, which leaves them filthy and cocci laden.

735.    Staff use machines that stir up cocci laden dust.

736.    At those times Thompson requested a mask to filter the dust before breathing it; prison staff refused.

## PLAINTIFF 81: VASQUEZ, ROBERTO

737.    Plaintiff Roberto Vasquez is a former inmate in the custody of the California Department of Corrections, assigned CDCR number V95883.

738.    Roberto Vazquez is a 31-year-old Hispanic man. He lived in San Diego before his incarceration.

739.    Mr. Vasquez worked in construction.

740.    Vazquez was assigned to Avenal State Prison.

741.   In 2011, Vazquez began to feel ill with symptoms of joint pain, fatigue, night sweats.

742.   A chest X-ray image showed right middle lobe pneumonia.

743.   In 2011, Vazquez was diagnosed with Valley Fever.

744.   He requires constant medical treatment and daily medications including 200mg Fluconazole twice per day.

745.   Vazquez continues to suffer the effects of Valley Fever.

### PLAINTIFF 82: VASQUEZ, SOLOMON

746.   Plaintiff Solomon Vasquez is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F53309.

747.   Solomon Vasquez is a 39-year-old Hispanic from Porterville, CA.

748.   Mr. Vasquez is married with three adopted children.

749.   Vasquez's occupation is landscaping, irrigation, and tree service.

750.   He is currently pursuing high school course work in order to earn his GED.

751.   Vasquez was transferred to Pleasant Valley State Prison.

752.   Vasquez thereafter began to suffer from fatigue, shortness of breath, headache, dizziness, night sweats, joint and muscle pain, muscle spasms, memory loss, weight loss, and loss of interest in activities.

753.   Prior to this illness, Vasquez suffered from Hepatitis C and hypoactive thyroid gland rendering him immunocompromised.

754.   Vasquez now requires constant medical treatment and daily medications.

755.   Doctors prescribed Fluconazole/Voriconazole 200 mg two times per day which he continues to take.

756.   Vasquez continues to suffer symptoms of Valley Fever including chronic fatigue, shortness of breath, headaches, night sweats, joint pain, muscle pain, back pain, memory loss, loss of appetite, dry, itchy skin, poor eye sight, emotional impacts, and side effects from the medications.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1

**PLAINTIFF 83: WALLACE, PATRICK**

2    757.    Plaintiff Patrick Wallace is a former inmate in the custody of the

3    California Department of Corrections, assigned CDCR number H13381.

4    758.    Patrick Wallace is a 55-year-old African-American.

5    759.    Mr. Wallace grew up in a small town in South Carolina.

6    760.    Wallace enlisted in the US Navy in 1986.

7    761.    He was stationed in San Diego when he met his wife.

8    762.    Wallace has two children who are now grown and have children of their

9    own.

10    763.    Before his incarceration at Avenal State Prison, Wallace was in

11    excellent health.

12    764.    Before his diagnosis, he exercised and was on work crews daily while

13    at ASP.

14    765.    He began to notice something was not right in 2011.

15    766.    He was diagnosed with Valley Fever later that year.

16    767.    His health has steadily declined since that time.

17    768.    His symptoms include high fever, nausea, throwing up, severe fatigue,

18    severe pain in his joints, sores and blisters on his legs.

19    769.    He was put on a breathing machine and hospitalized for nearly a month.

20    770.    His eyesight is also diminishing.

21    771.    Wallace had three different surgeries in a three months period.

22    772.    Wallace was prescribed Fluconaloze in 2011 to take twice daily through

23    2013.

24    773.    His symptoms progressed, and he was then prescribed Prozadeal,

25    Posaconazole, and Morphine tablets.

26    774.    He has been informed that he is classified as high risk.

27    **PLAINTIFF 84: WILLIAMS, ALONZO**

28    775.    Plaintiff Alonzo Williams is a former inmate in the custody of the

California Department of Corrections, assigned CDCR number F07231.

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

776.  Mr. Williams is a 59-year-old African American

777.  Mr. Williams has a background in athletics, including professional football.

778.  He was convicted of comparatively minor theft-related offenses.

779.  Williams was transferred to PVSP in 2009.

780.  He was diagnosed with Valley Fever in April, 2011.

781.  Mr. Williams lives with a compromised immune system, allergies, respiratory strain and fatigue as a result of his VF.

782.  He has been treated with Fluconazole.

### PLAINTIFF 85: WILLIAMS, XAVIER

783.  Plaintiff Xavier Williams is an inmate in the custody of the California Department of Corrections, assigned CDCR number G06665.

784.  Williams is a 28-year-old African-American.

785.  He is currently working towards becoming a Fire Fighter.

786.  He recently received his GED.

787.  He is worried that his dream to become a firefighter may no longer be possible.

788.  Xavier had asthma, which made him immune-compromised before contracting Valley Fever.

789.  Xavier first started having symptoms of shortness of breath, severe back pain, progressive headaches, sharp chest pain, neck stiffness, and small bumps, which progressed to rashes.

790.  He was then transferred to North Kern State Prison.

791.  He was diagnosed with Valley Fever in 2011 at NKSP, the day after he was transferred from PVSP.

792.  Xavier reports that theprison is not giving him his medication on time and he has to remind them every month.

793.  He was hospitalized for a lung and spine ailment at Mercy Hospital in Bakersfield at Corcoran Hospital from March 7, 2012 to June 15, 2012.

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

794.   He was being treated for an elevated titer and disseminated cocci.  He has been informed that surgery will be inevitable in the long run.

795.   He has been given several medications including Fluconazole, 800mg twice a day.

796.   Once his titer was lower, they switched him to Sporanox (Itraconozole) 200mg.

797.   He has been told that he will have to take this medication for the rest of his life.

798.   He has been classified as high risk.

## PLAINTIFF 86: WOOD, THEODORE

799.   Plaintiff Theodore Wood is a former inmate in the custody of the California Department of Corrections, assigned CDCR number F16295.

800.   Mr. Theodore Wood is a 50-year-old Caucasian male born in Ohio.

801.   Mr. Wood graduated high school and attended the University of Toledo.

802.   His occupation is residential maintenance and he has worked as a supervisor for various property-management companies.

803.   Mr. Wood was transferred to Avenal prison in February 2009 and was there until approximately February 2011.

804.   Prior to his incarceration at Avenal, Wood was healthy and active.

805.   He began to suffer nausea, dizziness, fatigue and blurry vision, broke out in sores on his lower body, experienced swelling of his hands and face, and could barely breathe.

806.   He was diagnosed with Valley Fever in August, 2010 and prescribed Fluconazole, Asacol, Tramadol, and Prednisone, as well as other medications.

807.   He was in Bakersfield Hospital for six days and had to receive a blood transfusion.

808.   Wood continues to suffer from chronic joint pain, fatigue, anemia and cognitive and balance problems.

809.   He developed Crohns disease and likely has a permanent nodule in his lung.

### PLAINTIFF 87: YANCEY, KENNETH

810.   Plaintiff Kenneth Yancey is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AN2997.

811.   Kenneth Yancey is a 45-year-old Caucasian from Riverside, California. He is a loving father with two daughters and three sons.

812.   Before arriving at Wasco State Prison, Mr. Yancey tested positive for Hepatitis C causing his immune system to be compromised.

813.   He began to feel sick in February, 2013.

814.   His symptoms included a fever, cold sweats, chest pain, continuous coughing, headache, nausea, tiredness, and weakness.

815.   Yancey was diagnosed with Valley Fever on May 31, 2013.

816.   He believes he contracted the disease while at Wasco State Prison when bulldozing and construction was being done on the recreation yard in front of his dorm.  Going out to the yard was mandatory, and he believes that this was when he breathed in the spores.

817.   He now suffers symptoms including joint pain, rash outbreaks, mental and physical anxiety, and depression.

818.   He has been told that he is not eligible for treatment for his Hepatitis C because he contracted Valley Fever.

819.   Yancey has now been released from prison.

820.   Yancey brings both a state and federal claim.

821.   Kenneth Yancey is a 38-year-old Caucasian from Riverside, California. He is a loving father with two daughters and three sons.

822.   Before arriving at Wasco State Prison, Mr. Yancey tested positive for Hepatitis C causing his immune system to be compromised.

823.   He began to feel sick in February, 2013.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

824.   His symptoms included a fever, cold sweats, chest pain, continuous coughing, headache, nausea, tiredness, and weakness.

825.   Yancey was diagnosed with Valley Fever on May 31, 2013.

826.   He believes he contracted the disease while at Wasco State Prison when bulldozing and construction was being done on the recreation yard in front of his dorm.  Going out to the yard was mandatory, and he believes that this was when he breathed in the spores.

827.   He now suffers symptoms including joint pain, rash outbreaks, mental and physical anxiety, and depression.

828.   He has been told that he is not eligible for treatment for his Hepatitis C because he contracted Valley Fever.

829.   Yancey has now been released from prison.

### PLAINTIFF 88: YOUNG, GERALD

830.   Plaintiff Gerald Young is a former inmate in the custody of the California Department of Corrections, assigned CDCR number AE9076.

831.   Gerald Young is a 63-year-old African American.

832.   He was in good health before his transfer.

833.   Young was hospitalized for Valley Fever on December 22, 2011.

834.   He has been prescribed Fluconazole.

835.   He has suffered various symptoms and lost 30 pounds.

## DEFENDANTS

## ROBERT SILLEN

### Sillen - Official Capacity

836.   Robert Sillen acted as the former Receiver of the California Department of Correction's medical delivery provider, from April 17, 2006 through January 23, 2008, when he was replaced by current receiver, Clark Kelso.

837.   Mr. Sillen is sued in his individual and official capacities.

838.   In his official capacity, as a federally-appointed receiver of the United States District Court, Northern District, he was ordered and designated to be an

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

extension of the federal district court itself, which is in turn an indistinguishable component of the sovereign United States.

839. Accordingly, Sillen, in his official capacity, is legally indistinguishable from the sovereign United States and it is liable to Plaintiffs the same as a private person in accordance with state law governing his conduct in the State of California, pursuant to the standards set forth in 28 U.S.C. § 1346(b).

840. Sillen, sued in his official capacity as the sovereign United States, waived its sovereign immunity by Plaintiffs' completion of the FTCA administrative process. Accordingly, Sillen in his official capacity, is liable to Plaintiffs for violation of the Federal Tort Claims Act.

### Sillen - Individual Capacity

841. Mr. Sillen is also sued in his individual capacity, as he violated the Plaintiffs' federal constitutional rights by personally passing the 2007 cocci policy and leading the management of the 2004-2014 epidemic and is liable to Plaintiffs in what is commonly called a *Bivens* action.

842. Mr. Sillen is believed to be a resident of San Diego County.

### J. CLARK KELSO

### Kelso - Official Capacity

843. John Clark Kelso serves as the Receiver of the California Correctional Health Care Services (CCHCS). Mr. Kelso became Receiver on or about January 23, 2008.

844. Mr. Kelso is named in his official and individual capacities.

845. In his official capacity, as a federally-appointed receiver, he was ordered and designated to be an extension of the United States federal district court itself, an indistinguishable component of the sovereign United States.

846. Accordingly, Kelso, in his official capacity, is legally indistinguishable from the sovereign United States and it is liable to Plaintiffs the same as a private person in accordance with state and federal law governing his conduct in the State of California, pursuant to 28 U.S.C. § 1346(b).

847.   Kelso, sued in his official capacity as the sovereign United States, waived its sovereign immunity by Plaintiffs' completion of the FTCA administrative process.  Accordingly, Sillen in his official capacity, is liable to Plaintiffs for violation of the Federal Tort Claims Act.

848.   As the Receiver, Mr. Kelso is liable for the actions of his subordinates within his office as a matter of standard agency principles, including, but not limited to, the actions of Dr. Dwight Winslow, to the extent that Winslow acted as Kelso's agent as opposed to any other role he, Winslow, might have possessed.  Kelso was also personally involved in the supervisory process of implementing cocci policy decisions with Winslow.

### Kelso - Individual Capacity

849.   Mr. Kelso is also sued in his individual capacity, as he personally violated the Plaintiffs' federal constitutional rights by mismanaging the 2004-2014 cocci epidemic and is liable to Plaintiffs in what is commonly called a *Bivens* action.

850.   Mr. Kelso is believed to be a resident of Sacramento County.

### ADMINISTRATIVE EXHAUSTION

851.   Plaintiffs long ago exhausted their internal prison ("602") grievances for wrongful contraction of valley fever, prior to filing the 2013-2015 lawsuits against the CDCR state prison defendants.

852.   Plaintiffs litigated the 2013-2015 cases while reserving the right to file suit against the Receivers, pursuant to certain tolling agreements, as itemized in Table 1.

853.   On or about September 30, 2020, Plaintiffs transmitted an FTCA claim form to four different federal agencies, all potentially responsible for the actions of a federal receiver, including the CDC, the federal Bureau of Prisons, the Administrative Office of the Courts, and the California Northern District Federal Court.

854.   Pursuant to 28 CFR 14.2(b), an FTCA claim is obligated to be presented to the most logical federal agency. When it is not clear which agency that would be, an FTCA claim may be presented to multiple candidate federal agencies. In

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

such situations, the agencies are obligated to communicate with each other and designate a single agency to investigate the claim. If the designated agencies cannot agree on a single agency, the Department of Justice is required to be consulted to designate a single agency to investigate the claim.

855.    The claim was not acted on by any federal agency and expired by its own terms on or about April 1, 2021.

## TOLLING

856.    Plaintiffs contracted valley fever at different times, mostly in the window of 2008-2013.  Pursuant to the following table below, Plaintiffs and the Receivers entered an agreement that tolled Plaintiffs' statute of limitation in the window described:

| No. | Name | Age | Tolling Start | Tolling End |
|---|---|---|---|---|
| | **TABLE 1 – TOLLING AGREEMENT EXTENSION DATES** | | | |
| 1. | Arteaga, Richard | 45 | November 10, 2013 | November 10, 2020 |
| 2. | Bracamonte, Ray | 58 | November 10, 2013 | November 10, 2020 |
| 3. | Bates, Eric | 53 | December 30, 2013 | December 30, 2020 |
| 4. | Beagle, Frederick | 48 | February 6, 2014 | February 6, 2020 |
| 5. | Bradford, Darrell | 59 | December 30, 2013 | December 30, 2020 |
| 6. | Briones, Johnny | 50 | December 30, 2013 | December 30, 2020 |
| 7. | Bustamonte, Joseph | 38 | February 6, 2014 | February 6, 2020 |
| 8. | Campbell, Corey | 39 | October 5, 2013 | October 5, 2020 |
| 9. | Carr, James | 53 | December 30, 2013 | December 30, 2020 |
| 10. | Carter, Ricky | 46 | December 30, 2013 | December 30, 2020 |
| 11. | Castaneda, Pablo | 54 | November 10, 2013 | November 10, 2020 |
| 12. | Conley, Robert | 64 | October 5, 2013 | October 5, 2020 |
| 13. | Cooper, Alvin | 56 | November 10, 2013 | November 10, 2020 |
| 14. | Corley, Kenneth | 70 | November 10, 2013 | November 10, 2020 |
| 15. | Cornethan, Walter | 57 | November 10, 2013 | November 10, 2020 |
| 16. | Corning, Roy | 72 | November 10, 2013 | November 10, 2020 |
| 17. | Dean, Keith | 41 | December 30, 2013 | December 30, 2020 |
| 18. | Del Aguila, Marco | 59 | December 30, 2013 | December 30, 2020 |
| 19. | Duran, Joseph | 53 | November 10, 2013 | November 10, 2020 |
| 20. | Duree, Dennis | 37 | November 10, 2013 | November 10, 2020 |
| 21. | Estrada, Vickter | 37 | December 30, 2013 | December 30, 2020 |
| 22. | Everhart, John | 74 | December 30, 2013 | December 30, 2020 |
| 23. | Franco, Antonio | 63 | December 30, 2013 | December 30, 2020 |

PAVONE & FONNER, LLP
600W. BRADDWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 1 – TOLLING AGREEMENT EXTENSION DATES | | | |
|---|---|---|---|---|
| No. | Name | Age | Tolling Start | Tolling End |
| 24. | Franco, Emmanuel | 39 | December 30, 2013 | December 30, 2020 |
| 25. | Frederikson, Michael | 59 | December 30, 2013 | December 30, 2020 |
| 26. | Galloway, Aubrey | 66 | November 10, 2013 | November 10, 2020 |
| 27. | Garrett, James | 68 | December 30, 2013 | December 30, 2020 |
| 28. | Hardin, Kevin | 59 | December 30, 2013 | December 30, 2020 |
| 29. | Haynes, Herman | 46 | November 10, 2013 | November 10, 2020 |
| 30. | Hayter, Clifford | 63 | December 30, 2013 | December 30, 2020 |
| 31. | Hernandez, Carlos | 50 | November 10, 2013 | November 10, 2020 |
| 32. | Hernandez, Williams | 50 | December 19, 2021 | December 19, 2021 |
| 33. | Hockley, Jason | 35 | December 30, 2013 | December 30, 2020 |
| 34. | Islas, Jose | 44 | December 30, 2013 | December 30, 2020 |
| 35. | Hughes, Darnell | 65 | December 30, 2013 | December 30, 2020 |
| 36. | Jalotjot, Danilo | 55 | November 10, 2013 | November 10, 2020 |
| 37. | Johnson, Daniel | 60 | November 10, 2013 | November 10, 2020 |
| 38. | Johnson, Jesse | 55 | December 30, 2013 | December 30, 2020 |
| 39. | Leinweber, Mikhiel | 38 | December 30, 2013 | December 30, 2020 |
| 40. | Lewelling, Jesse | 44 | December 30, 2013 | December 30, 2020 |
| 41. | Lewis, Asad | 59 | November 10, 2013 | November 10, 2020 |
| 42. | Lewis, Cleofas | 60 | December 30, 2013 | December 30, 2020 |
| 43. | Lewis, George | 39 | October 28, 2013 | October 28, 2020 |
| 44. | Lewis, Joe | 74 | November 10, 2013 | November 10, 2020 |
| 45. | Lewis, Kevin | 34 | December 30, 2013 | December 30, 2020 |
| 46. | Jones, Daniel | 68 | December 30, 2013 | December 30, 2020 |
| 47. | Klvana, Milos | 81 | November 10, 2013 | November 10, 2020 |
| 48. | Manning, Michael | 63 | December 30, 2013 | December 30, 2020 |
| 49. | Martinez, Juan | 39 | November 10, 2013 | November 10, 2020 |
| 50. | McDonald, Jeffery | 54 | November 10, 2013 | November 10, 2020 |
| 51. | McGinley, James | 42 | December 30, 2013 | December 30, 2020 |
| 52. | Milford, Thomas | 51 | November 10, 2013 | November 10, 2020 |
| 53. | Miller, Dale | 51 | November 10, 2013 | November 10, 2020 |
| 54. | Milton, William | 54 | December 30, 2013 | December 30, 2020 |
| 55. | Moody, Andre | 62 | November 10, 2013 | November 10, 2020 |
| 56. | Neal, Freddy | 59 | November 10, 2013 | November 10, 2020 |
| 57. | Ngoun, Check | 49 | November 10, 2013 | November 10, 2020 |
| 58. | Page, Mack | 72 | December 30, 2013 | December 30, 2020 |
| 59. | Parker, Cedric | 54 | December 30, 2013 | December 30, 2020 |
| 60. | Parker, Theodore | 39 | December 30, 2013 | December 30, 2020 |
| 61. | Peav, Sim | 52 | November 10, 2013 | November 10, 2020 |
| 62. | Penalva, Juan | 45 | October 5, 2013 | October 5, 2020 |
| 63. | Preston, Robert | 34 | October 5, 2013 | October 5, 2020 |

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 1 – TOLLING AGREEMENT EXTENSION DATES | | | |
|---|---|---|---|---|
| No. | Name | Age | Tolling Start | Tolling End |
| 64. | Quiroga, Manuel | 73 | December 30, 2013 | December 30, 2020 |
| 65. | Richardson, Paul | 55 | November 10, 2013 | November 10, 2020 |
| 66. | Ripoyla, Ronnie | 55 | November 10, 2013 | November 10, 2020 |
| 67. | Robinson, David | 69 | November 10, 2013 | November 10, 2020 |
| 68. | Robertson, Richard | 60 | December 30, 2013 | December 30, 2020 |
| 69. | Rodriguez, Ronald | 48 | November 10, 2013 | November 10, 2020 |
| 70. | Ruggles, John | 65 | October 5, 2013 | October 5, 2020 |
| 71. | Sams, Lorenzo | 68 | November 10, 2013 | November 10, 2020 |
| 72. | Sanchez, Johnny | 54 | December 30, 2013 | December 30, 2020 |
| 73. | Sanders, Tyrone | 39 | December 30, 2013 | December 30, 2020 |
| 74. | Sepulvada, Adrian | RIP | November 10, 2013 | November 10, 2020 |
| 75. | Sherrod, Albert | 64 | November 10, 2013 | November 10, 2020 |
| 76. | Steels, Willie | 48 | October 5, 2013 | October 5, 2020 |
| 77. | Taramona, Julio | 60 | December 30, 2013 | December 30, 2020 |
| 78. | Terry, Danny | 63 | December 30, 2013 | December 30, 2020 |
| 79. | Thomas, Maurice | 51 | November 10, 2013 | November 10, 2020 |
| 80. | Thompson, Tyrone | 60 | November 10, 2013 | November 10, 2020 |
| 81. | Vasquez, Roberto | 30 | November 10, 2013 | November 10, 2020 |
| 82. | Vasquez, Solomon | 39 | October 5, 2013 | October 5, 2020 |
| 83. | Wallace, Patrick | 54 | November 10, 2013 | November 10, 2020 |
| 84. | Williams, Alonzo | 68 | December 30, 2013 | December 30, 2020 |
| 85. | Williams, Xavier | 28 | November 10, 2013 | November 10, 2020 |
| 86. | Wood, Theodore | 49 | November 10, 2013 | November 10, 2020 |
| 87. | Yancey, Kenneth | 45 | November 10, 2013 | November 10, 2020 |
| 88. | Young, Gerald | 63 | December 30, 2013 | December 30, 2020 |

## ACCRUAL AND STATUTE ISSUES

857.   Because Plaintiffs allege a general FTCA cause of action, with a number of interior claims founded under state and federal law within it, they were generally required to file an FTCA claim within two years of the accrual of their cause of action.

858.   Their FTCA claims were not filed within two years of the date of contraction, and barring other circumstances, this might result in a successful statute defense.  However, a series of other circumstances serve to extend their time to file, as partially detailed in Table 2 below.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

859.   Plaintiffs' estimated diagnosis date is reported in Column 2, subject to further (exact) confirmation.  It is not alleged as a binding position.  Generally, many diagnosis dates are around 2011.  Their FTCA administrative claims were generally filed on or about October, 1, 2020, about 10 years later.  However, most of this time is excused by the tolling agreements referenced by detail in Table 1, which roughly speaking provided them about seven years of permissible delay.

860.   Plaintiffs avail themselves of a second form of extension inherent within the required 42 U.S.C. 1997e protocol ("602" process), which requires that prefatory to the enforcement of any federal law, including an FTCA claim under Title 26, they must complete that procedure.

861.   Column 4 reflects an average amount of time, six months as estimated and assigned, for each plaintiff to complete the 602 procedure (exact individual detail to be determined later).  It is also not reported as a binding figure.  A precise calculation of each inmate's time spent in the 602 process requires a detailed calculation that is beyond the scope of this complaint.

862.   Column 5 provides the filing date of the plaintiff's original complaint, where tolling per the parties' agreements begins.

863.   As can be seen from column 7 in Table 2, in order to have filed an FTCA administrative claim within the two-year deadline, some Plaintiffs require no additional time beyond the extensions associated with the parties' tolling agreements (including the estimated delay inherent in the 602 process and delay inherent in the FTCA claim process), while other plaintiffs require an additional extension premised on fixing an accurate accrual date, between 1-27 months.

| TABLE 2 – ACCRUAL ESTIMATES | | | | | | |
|---|---|---|---|---|---|---|
| No. | (1) PLAINTIFF | (2) EST'D DIAGNS'S DATE | (3) 2 YEARS BEFORE 6-MOS | (4) 6-MOS AE BEFORE FILING | (5) FILING DATE | (6) FTCA CLAIM | (7) TOLL'G NEEDED (MOS) |
| 1. | Arteaga, Richard | 2012-12-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 6 |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 2 – ACCRUAL ESTIMATES | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | (1) PLAINTIFF | (2) EST'D DIAGNS'S DATE | (3) 2 YEARS BEFORE 6-MOS | (4) 6-MOS AE BEFORE FILING | (5) FILING DATE | (6) FTCA CLAIM | (7) TOLL'G NEEDED (MOS) |
| 2. | Beagle, Frederick | 2013-03-00 | 2011-08-06 | 2013-08-06 | 2014-02-06 | 2020-03-04 | 0 |
| 3. | Bracamonte, Ray | 2011-05-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 13 |
| 4. | Bates, Eric | 2011-03-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 17 |
| 5. | Bradford, Darrell | 2010-04-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 27 |
| 6. | Briones, Johnny | 2014-02-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 7. | Bustamonte, Joseph | 2011-07-30 | 2011-08-06 | 2013-08-06 | 2014-02-06 | 2020-03-04 | 1 |
| 8. | Campbell, Corey | 2010-11-00 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 18 |
| 9. | Carr, James | 2012-05-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 2 |
| 10. | Carter, Ricky | 2013-09-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 11. | Castaneda, Pablo | 2013-12-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 12. | Conley, Robert | 2014-03-18 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 0 |
| 13. | Cooper, Alvin | 2013-12-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 14. | Corley, Kenneth | 2011-09-24 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 8 |
| 15. | Cornethan, Walter | 2013-08-08 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 16. | Corning, Roy | 2011-06-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 11 |
| 17. | Dean, Keith | 2012-00-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 6 |
| 18. | Del Aguila, Marco | 2014-03-18 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 19. | Duran, Joseph | 2010-09-17 | 2012-01-14 | 2014-01-14 | 2014-07-14 | 2020-10-01 | 15 |
| 20. | Duree, Dennis | 2013-01-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 21. | Estrada, Vickter | 2014-01-08 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 22. | Everhart, John | 2011-09-09 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 10 |
| 23. | Franco, Antonio | 2012-05-08 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 2 |
| 24. | Franco, Emmanuel | 2011-07-14 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 12 |
| 25. | Frederikson, Mikheil | 2010-06-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 24 |
| 26. | Galloway, Aubrey | 2010-05-17 | 2012-01-14 | 2014-01-14 | 2014-07-14 | 2020-10-01 | 19 |
| 27. | Garrett, James | 2011-11-02 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 8 |
| 28. | Hardin, Kevin | 2013-12-06 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 29. | Haynes, Herman | 2014-12-26 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 30. | Hayter, Clifford | 2013-05-02 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 31. | Hernandez, Carlos | 2013-05-13 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 32. | Hernandez, William | 2014-12-26 | 2013-06-19 | 2015-06-19 | 2015-12-19 | 2020-10-01 | 0 |
| 33. | Hockley, Jason | 2011-03-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 15 |
| 34. | Hughes, Darnell | 2011-03-09 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 16 |
| 35. | Islas, Jose | 2011-08-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 11 |
| 36. | Jalotlot, Danilo | 2012-01-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 4 |
| 37. | Johnson, Daniel | 2011-05-01 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 13 |
| 38. | Johnson, Jesse | 2011-07-25 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 12 |
| 39. | Jones, Daniel | 2012-02-15 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 5 |
| 40. | Klvana, Milos | 2011-12-12 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 5 |
| 41. | Leinweber, Mikhiel | 2013-00-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 42. | Lewelling, Jesse | 2011-08-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 11 |

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | | | | |
|---|---|---|---|---|---|---|
| **TABLE 2 – ACCRUAL ESTIMATES** | | | | | | |
| (1)<br>No. | (1)<br>PLAINTIFF | (2)<br>EST'D<br>DIAGNS'S<br>DATE | (3)<br>2 YEARS<br>BEFORE<br>6-MOS | (4)<br>6-MOS AE<br>BEFORE<br>FILING | (5)<br>FILING<br>DATE | (6)<br>FTCA<br>CLAIM | (7)<br>TOLL'G<br>NEEDED<br>(MOS) |
| 43. | Lewis, Cleofas | 2012-08-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 44. | Lewis, George | 2010-10-19 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 19 |
| 45. | Lewis, Asad | 2012-01-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 4 |
| 46. | Lewis, Joe | 2013-03-23 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 47. | Lewis, Kevin | 2014-01-15 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 48. | Manning, Michael | 2012-05-12 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 2 |
| 49. | Martinez, Juan | 2012-11-00 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 0 |
| 50. | McDonald, Jeffery | 2012-06-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 51. | McGinley, James | 2012-05-23 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 2 |
| 52. | Milford, Thomas | 2013-02-13 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 53. | Miller, Dale | 2011-09-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 9 |
| 54. | Milton, William | 2011-07-21 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 13 |
| 55. | Moody, Andre | 2011-01-02 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 17 |
| 56. | Neal, Freddy | 2012-01-11 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 4 |
| 57. | Ngoun, Chek | 2013-03-23 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 58. | Page, Mack | 2013-08-06 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 59. | Parker, Cedric | 2011-09-08 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 10 |
| 60. | Parker, Theodore | 2012-01-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 5 |
| 61. | Peav, Sim | 2011-09-28 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 8 |
| 62. | Penalva, Juan | 2010-10-00 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 19 |
| 63. | Preston, Robert | 2010-10-21 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 18 |
| 64. | Quiroga, Manuel | 2013-06-29 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 65. | Richardson, Paul | 2012-07-19 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 66. | Ripoyla, Ronnie | 2010-11-16 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 18 |
| 67. | Robinson, David | 2011-11-00 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 6 |
| 68. | Robertson, Richard | 2010-08-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 23 |
| 69. | Rodriguez, Ronald | 2011-10-25 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 7 |
| 70. | Ruggles, John | 2010-10-00 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 19 |
| 71. | Sams, Lorenzo | 2010-07-02 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 23 |
| 72. | Sanchez, Johnny | 2011-01-04 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 18 |
| 73. | Sanders, Tyrone | 2012-07-31 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 0 |
| 74. | Sepulvada, Adrian | 2012-01-00 | 2011-12-07 | 2013-12-07 | 2014-05-07 | 2020-10-01 | 0 |
| 75. | Sherrod, Albert | 2012-11-00 | 2011-12-07 | 2013-12-07 | 2014-05-07 | 2020-10-01 | 0 |
| 76. | Steels, Willie | 2010-10-26 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 18 |
| 77. | Terry, Danny | 2010-12-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 19 |
| 78. | Taramona, Julio | 2011-07-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 12 |
| 79. | Thomas, Maurice | 2013-05-01 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 80. | Thompson, Tyrone | 2012-01-13 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 4 |
| 81. | Vasquez, Roberto | 2011-10-21 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 7 |
| 82. | Vasquez, Solomon | 2010-11-04 | 2012-04-05 | 2014-04-05 | 2014-10-05 | 2020-10-01 | 18 |
| 83. | Wallace, Patrick | 2011-10-00 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 9 |

PAVONE & FONNER, LLP<br>600 W. BRAODWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| TABLE 2 – ACCRUAL ESTIMATES | | | | | | |
|---|---|---|---|---|---|---|
| No. | (1)<br>PLAINTIFF | (2)<br>EST'D<br>DIAGNS'S<br>DATE | (3)<br>2 YEARS<br>BEFORE<br>6-MOS | (4)<br>6-MOS AE<br>BEFORE<br>FILING | (5)<br>FILING<br>DATE | (6)<br>FTCA<br>CLAIM | (7)<br>TOLL'G<br>NEEDED<br>(MOS) |
| 84. | Williams, Alonzo | 2011-05-20 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 2 |
| 85. | Williams, Xavier | 2011-12-11 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 5 |
| 86. | Wood, Theodore | 2010-08-23 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 21 |
| 87. | Yancey, Kenneth | 2013-05-31 | 2012-05-10 | 2014-05-10 | 2014-11-10 | 2020-10-01 | 0 |
| 88. | Young, Gerald | 2011-12-21 | 2012-06-30 | 2014-06-30 | 2014-12-30 | 2020-10-01 | 7 |

864.   To make up this 1 to 27-month window as to certain plaintiffs, they generally allege that they are entitled to an extension of their presumptive accrual date[3] by virtue of a combination of the following recognized factors that afford inmates extra time to protect their rights:

(a)   Concealment of information by CDCR personnel, including the fact that CDCR did not timely, publicly acknowledge the scope or magnitude of the epidemic to the inmate population so as to give inmates notice that individual cases of contraction might be more than aberrational and thus constitute a legal violation.

A single case of cocci contraction is generally not actionable without evidence that officials did not act to safeguard the inmate population against a larger cocci problem, here an epidemic, which triggers various duties.

The magnitude of the epidemic was only formally acknowledged when CCHCS published its October, 2012 "Coccidioidomycosis in California Department of Corrections and Rehabilitation" report, which would allow for an inference that officials *(i)* knew their cocci problem was more than an isolated incident, *(ii)*, they can be held legally responsible for the failure to implement more robust prevention measures, and *(iii)*, it can be shown that the failure of such measures plausibly caused the plaintiff's

---

[3]   Accrual principles apply to the filing of an FTCA administrative claim. 28 U.S.C. § 2401(b) ["A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues*…"]

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

contraction.[4]  Prior to this time, inmates possessed only anecdotal information and this was generally insufficient to meet *Iqbal/Twombly* federal pleading standards.

(b)   Lack of access or limited access to information, including but not limited to, the fact that most inmates did not have timely internet access, did not have access to computerized research databases, did not have access to a quality or current law library, one which contained current legal periodicals, newspapers and/or legal trade media.[5]

(c)   Misinformation given to the plaintiff (intentionally or negligently), even before an accurate valley fever diagnosis as this tends to create doubt and sow confusion as to the inmate's exact rights and medical status.[6]

(d)   Violation of a duty toward inmate including a duty to make timely, mandatory disclosures about circumstances affecting their health.[7]

(e)   Other circumstances reflecting insufficient mandatory disclosure of the VF problem to the inmates.[8]

---

[4]   *Bartleston v. United States*, 96 F.3d 1270, 1277 (9th Cir. 1996)(citing *Landreth v. United States*, 850 F.2d 532, 533 (9th Cir. 1988))..

[5]   *Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009); *Sossa v. Diaz*, 729 F.3d 1225, 1236 (9th Cir. 2013).

[6]   *See, e.g., Cooper v. Sorenson*, 1980 U.S. Dist. Lex. 10510, *9 (D. Nev. 1980).

[7]   *Borzeka v. Heckler*, 739 F.2d 444, 448 n. 3 (9th Cir. 1984).

[8]   *See, e.g.,* CDCR Memo dated August 31, 2010 (Exhibit *) reflecting the revelation of some information about the disease to inmates at ASP, but in many ways, understating the risk, failing to accurately identify high-risk groups (by race), failing to disclose key facts necessary for a reasonable person to appreciate the danger he faces, and failing to disclose information about the range of mitigation steps a government agency should take in order to assess the question of responsibility and culpability.  There is clearly a mismatch between this 2010 memo, as an example, and the 1995 valley fever memos (Exhbits *, *), in which officials privately discussed a much greater scope and severity of the disease than they later disclosed to the inmates. *See also, e.g.,* Health & Saf. Code, 120175 [obligating health officials to "take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases" which would logically include a formal duty to timely notify all inmates in the epidemic area that an outbreak has and is occurring, including extra disclosures to vulnerable populations such as African-Americans].

PAVONE & FONNER, LLP
600W. BRADOWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(f)    Any government mistakes in the process (*e.g.*, disclosures that exclude particular risk to minorities).[9]

(g)    Disclosures that negate a plaintiffs need to investigate promptly.[10]

(h)    Other extraordinary circumstances (delay out of an inmate's control, *e.g.*, lockdown).[11]

(i)    Lack of symptomology upon diagnosis, such that legally recognized (appreciable) injury did not actually set in until a later date, beyond the diagnosis date.[12]

(j)    A justified inability and resulting understandable ignorance[13] to anticipate in the window of 2008-2013 that the Ninth Circuit, six years later in 2019 in *Hines v. Youssef*,[14] would excuse CDCR state officials on a qualified immunity theory arguing that CDCR officials relied on the Receiver, even though CDCR itself signed the controlling 2007 policy, and as such, that the inmates faced a two-year statute instead of a four-statute.

865.    In addition to generally alleging that Plaintiffs' accrual dates were extended according to the observations and categories above, certain Plaintiffs affirmatively allege additional, more particular factual grounds for an extended accrual date, as itemized in Table 3 below.

---

[9]    *Jablon v. United States*, 657 F.2d 1064, 1067 n. 5 (9th Cir. 1981).

[10]    *Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir. 1980).

[11]    *Sossa v. Diaz*, 729 F.3d 1225, 1236 (9th Cir. 2013).

[12]    *Reyes v. United States*, 2017 U.S. Dist. Lex. 72758, *9 (D. Or. 2017), *citing United States v. Kubrick*, 444 U.S. 111, 123-124; *see Kronisch v. United States*, 150 F.3d 112, 121(2d Cir. 1998); *Hobson v. Wilson*, 737 F.2d 1, 35, 237 U.S. App. D.C. 219 (D.C.Cir.1984); *Katz v. Children''s Hospital*, 28 F.3d 1520 (9th Cir. 1994)

[13]    *Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir. 1980).

[14]    *Hines v. Youssef*, 914 F.3d 1218, 1231 (9th Cir. 2019).

| No | INMATE | EST. MOS. SHORT | GROUNDS FOR ACCRUAL[15] |
|---|---|---|---|
| | **TABLE 3** **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | |
| 1. | Arteaga, Richard | 6 | |
| 2. | Beagle, Frederick | 0 | |
| 3. | Bracamonte, Ray | 13 | (Latino)<br>2 - Lack of access/limited access to information (no Internet access, no database access). Some reading material.<br>4 – VF was misdiagnosed (given teaspoon of cough syrup, aspirin, told he would be fine). He and others were consistently diagnosed with the flu, then — when they were half-dead — staff suddenly admitted that it was VF.<br>4, 6, 9 - No disclosures by prison regarding severity of crisis. No information, education, guidance. Nothing about racial dynamic. Nothing about liability, legal rights. No disclosures to Bracamonte personally about his own susceptibility.<br>7 – "Once I exhausted my state's remedy, I didn't know who to contact...".<br>10 – Incapacitated, exhausted, impaired by medication. |
| 4. | Bates, Eric | 17 | |
| 5. | Bradford, Darrell | 27 | (African-American)<br>2 - Lack of access/limited access to information (no Internet access, no database access).<br>4 – VF was misdiagnosed (strep throat, flu). Delay between symptom onset and official diagnosis.<br>3 – Was told by prison officials that they "have no control over transfers" |

[15] 1 – Concealment by CDCR personnel, especially fraudulently
2 – Lack of access/limited access to information
3 – Misinformation given to inmate (intentionally or fraudulently)
4 – Any violation of a duty toward inmate (e.g., failure to make disclosures)
5 – Information reflecting positive disclosure of VF problem to inmate
6 – Government mistakes (e.g., disclosures that exclude risk to minorities)
7 – Efforts reflecting diligence by inmate
8 – Information that purpose of limitations period has been satisfied
9 – Tactical silence by defendant
10 – Other extraordinary circumstances (delay out of inmate's control)

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | TABLE 3<br>PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION |
|---|---|---|---|
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 6, 9 - No disclosures by prison or emphasis on racial susceptibility. No real awareness of liability issues, lawsuit potential until following year, 2011. |
| 6. | Briones, Johnny | 0 | |
| 7. | Bustamonte, Joseph | 1 | |
| 8. | Campbell, Corey | 18 | (African-American)<br>2 - Extreme lack of access to relevant information. "We couldn't even watch TV."<br>4 – Three-month delay between early symptoms and formal diagnosis.<br>4 – Mail, communication restricted.<br>6, 9 – Tactical silence (nothing official about extreme risk, racial susceptibility, possible liability, etc. Inmate learned much of what he knew from grandmother upon release).<br>10 - Other extraordinary circumstances (inmate so ill and so medicated and transferred so frequently – for treatment – that he is unable to exercise diligence to pursue his case). |
| 9. | Carr, James | 2 | (African-American)<br>2 - Lack of access to relevant information (no Internet access, no database access, very little television). Law library access was restricted.<br>4 - Violation of duty to patient, misdiagnosis (common cold). Diagnosed properly a month later.<br>6, 9 - Never told that prisons posed exceptional risk. No emphasis on racial susceptibility. "You're housed where you're supposed to be".<br>10 - Describes physical incapacitation. "I never suspected that Valley Fever was eating out T12 and L2 in my lumbar spine." |
| 10. | Carter, Ricky | 0 | |
| 11. | Castaneda, Pablo | 0 | (Hispanic)<br>2 – No Internet access or database access but had some ability to access some reading materials, law library, etc.<br>7 – Diligence. Within first six months, did extensive research and contacted an attorney. |
| 12. | Corley, Robert | 0 | |
| 13. | Cooper, Alvin | 0 | |
| 14. | Corley, Kenneth | 8 | (African-American) |

<table>
<tr><td colspan="4"><strong>TABLE 3</strong><br><strong>PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION</strong></td></tr>
<tr><td><strong>No</strong></td><td><strong>INMATE</strong></td><td><strong>EST. MOS. SHORT</strong></td><td><strong>GROUNDS FOR ACCRUAL[15]</strong></td></tr>
<tr><td></td><td></td><td></td><td>2 - Limited information. Some access to newspaper articles on VF, but no Internet, databases, television.<br>4 - Diagnosed roughly a month after initial symptoms. Not a misdiagnosis, but again, this is remarkably slow, as a blood test should only take a couple of days.<br>4 - "I only had three months of treatment when I should have had six months".<br>9, 6 - No disclosures about extreme risk or liability. No attention paid to racial heritage and vulnerability.</td></tr>
<tr><td>15.</td><td>Cornethan, Walter</td><td>0</td><td></td></tr>
<tr><td>16.</td><td>Corning, Roy</td><td>11</td><td></td></tr>
<tr><td>17.</td><td>Dean, Keith</td><td>6</td><td>(African-American)<br>2 - Limited information. No Internet, databases, television. Some newspaper access.<br>4 - Had significant physical vulnerabilities – especially heart issues, which worsened as a result of infection.<br>10 - Limited in ability to pursue case during initial six months as a result of mental distress, psychological issues, crowding.<br>6, 12 - No disclosure of extremity of disease risk or liability. No effort to warn inmate of racial susceptibility.</td></tr>
<tr><td>18.</td><td>Del Aguila, Marco</td><td>0</td><td>(Race: Other)<br>4 - Serious misdiagnosis and dismissal of symptoms.  Slow and protracted process prior to diagnosis (delays, indifference, etc.).<br>3, 4 - Faulty diagnostics that delayed appreciation of the severity of his condition and the beginning of effective treatment. Was told symptoms would "go away by themselves." Reliance on faulty third-party tester. Violation of duty to inmate -- indifference, delay, distrust. "Sue me, you're a lifer -- I'll never have to see you in court!".  Consistently misinformed, at best out of indifference, at worst out of desire to volitionally obfuscate, delay.<br>6, 9 - No disclosure of extreme danger.<br>6, 9 - No disclosure of necessary information, guidance. No detail regarding possible racial susceptibility.<br>7 - Inmate diligent in his determination to get to the bottom of his symptoms.</td></tr>
<tr><td>19.</td><td>Duran, Joseph</td><td>15</td><td></td></tr>
<tr><td>20.</td><td>Duree, Dennis</td><td>0</td><td></td></tr>
</table>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | |
|---|---|---|---|
| **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | | |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| 21. | Estrada, Vickter | 0 | |
| 22. | Everhart, John | 10 | 2 - Lack of access/limited access to information/restricted information.<br>4 – Misdiagnosed<br>7 – attempted to retain counsel unsuccessfully |
| 23. | Franco, Antonio | 2 | (Hispanic)<br>2 - Complete information black hole. No ability to conduct research and pursue case.<br>4 - Misdiagnosed with pneumonia. VF diagnosis confirmed a full month later.<br>4 - Implies that once he was diagnosed, there was an intentional delay before he was told: "They might [have known] it was VF but did not tell me until 5-8-12".<br>6 - 602 transfer request denied.<br>9 - No disclosures or warnings issued. No consideration taken of patient's racial heritage, vulnerability.<br>10 - Ill and incapacitated during period after diagnosis. Attempted to retain an attorney but had difficulty until he called Ben Pavone. Significant lockdown interfered with his ability to pursue case.<br>10 - Locked down, no help from other inmates. |
| 24. | Franco, Emmanuel | 12 | (Hispanic)<br>2 – Limited access to information (9).  Law library access restricted.<br>4 – VF was misdiagnosed as pneumonia.<br>9 – No disclosures by prison.<br>10 – No reason to suspect wrongdoing until 11/13. |
| 25. | Frederikson, Michael | 24 | 1, 4 - Misdiagnosed with pneumonia. Implies this was intentional and part of a broader effort to  "lower the [VF-] infected number[s]."<br>2 - Limited access to information. No Internet or database access.<br>5 - Indicates that DoC staff at Pleasant Valley told him and his cohort upon arrival that VF was an issue at the prison, yet this may have been nothing more than a notice  "posted in R.R. upon arrival."<br>6 - Unclear if authorities emphasized heightened vulnerability on the basis of race. Likely not, though again (see above) some general information was provided. |
| 26. | Galloway, Aubrey | 19 | (African-American) |

| | | | **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** |
|---|---|---|---|
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL**[15] |
| | | | 1 - Claims his CT of lung damage was hidden from him until 2-1-12, though test was performed on 10-26-10. Found out through an Olsen Review.<br>2 - Very limited information. Some television, some reading. No Internet, databases, etc.<br>4, 1 - At least a three-month delay between initial symptoms and formal diagnosis. Violation of duty toward inmate (failure to make disclosures). Again, patient claims key pieces of information were concealed from him.<br>5 - Medical told him that VF was a problem at California prisons in 2009.<br>5 - No official discussion of VF epidemic, but claims inmates themselves provided orientation and stressed to new arrivals the need to wear a mask. |
| 27. | Garrett, James | 8 | (African-American)<br>2 - Almost no information access -- only newspapers from other VF sufferers as well as occasional TV news reports. No Internet, databases, etc. Law library access limited.<br>3 - Didn't attribute liability because, "I was misinformed by medical staff -- 'Once you catch it, you can't catch it again!' -- a lie!"<br>4 - Told he had pneumonia, as this was the general diagnosis for all.<br>4 - Was refused treatment.<br>4 - Significant delay between recurrence of VF (beginning November 30, 2012) and confirmation of this fact (August 20, 2013).<br>4 - At some point following his second bout of VF, a physician assistant performed examination unrelated to VF. Misdirection. Interrupted or delayed his VF treatment. Misdiagnosed with pneumonia.<br>5 - Informed by staff nurse that VF was a problem in California's prisons.<br>9 - Does mention a document that was passed out by the prison to new arrivals, presumably warning of the dangers of VF -- but no apparent mention of racial vulnerability.<br>10 - First six months – extremely fatigued from VF.<br>10 - Stresses significant delays within the prison system in terms of obtaining copies, mailing and receiving documents, etc. |

PAVONE & FONNER, LLP<br>600W. BRADWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| No | INMATE | EST. MOS. SHORT | GROUNDS FOR ACCRUAL[15] |
|---|---|---|---|
| | | | 10 - Says his "memory and intellect are limited" as a result of a car accident. Brain damage. |
| 28. | Hardin, Kevin | 0 | (African-American)<br>1, 3 - "A few weeks before ASP transferred me PA N. Siegrist smirked at me and said, 'You'll be leaving soon'".<br>1, 4 - "She refused to test me. Refused to talk about it".<br>4 - Significant delay between early symptoms in July 2013 and formal diagnosis in December 2014.<br>4 - Early misdiagnosis. "Around July PA Siegrist said, 'It's probably a cold.'" Dr. Enomoto: "[VF is] not the issue here." No test.<br>4 - "They started passing out masks if you asked for one. But quite often the nurse would say, 'We don't have any more'" (6).<br>4 - "They purposely kept me here knowing sooner or later I'd contract it." |
| 29. | Haynes, Herman | 0 | (African-American)<br>1, 3, 4 - Diagnosed with a cold or flu.<br>6, 9 - No effective information dissemination or warning regarding racial susceptibility. CDCR offered no information to suggest that he was at exceptional risk of VF. |
| 30. | Hayter, Clifford | 0 | (African-American)<br>2 - Almost no access to useful information and/or the ability to locate such information.<br>6, 9 - No warning or dissemination of VF info by prison officials. No attention paid to racial susceptibility. |
| 31. | Hernandez, Billy | 0 | (African-American/Hispanic)<br>1, 3, 4 - As above, diagnosed mistakenly with simple pneumonia at first, despite the fact that he requested a full VF exam due to a range of clear VF symptoms. Then he was started on VF meds as a "precautionary measure" despite going "man down" and ending up in hospital.  Reassured that it wasn't VF until lab results showed that it was.<br>1, 4, 9 - Only one of many Olsen review requests honored. Reticence and foot-dragging on part of officials.  Strategic silence, failure to meet reasonable inmate demands and requests.<br>2 - Very limited information. Limited access to media. His access was so limited that he regarded the communal telephones as one of his best sources of info. Law library was always closed when he finally got off work. |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** |
|---|---|---|---|
| **No** | **INMATE** | **EST.<br>MOS.<br>SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 2 - Access to some reading material, no Internet, databases, TV, etc.<br>10 - Attributes delays partially to "diminished" health and mindset stemming from VF. Nauseated from VF medication.<br>5 - "A nurse named Marty stated that ASP should be shut down."<br>1, 3, 4 - Claims medical personnel only concerned with avoiding VF liability, not caring for inmates. Constant arguments, conflict with docs, nurses, etc.<br>7 - Patient diligent in filing docs, requesting docs and info, etc. Organized, on time.<br>9 - Little to no info from prison officials. Only understood gravity of situation upon reading newspaper article from CTF (cut out and posted on the wall). |
| 32. | Hernandez, Carlos | 0 | 1, 9 - Sources of info - Inmates and local TV news reports, not prison system. "Our worsening health conditions were being ignored."<br>4 - Had early symptoms upon arrival at Avenal, going back to 2005. Initially misdiagnosed, as per usual, probably with pneumonia, asthma.<br>4 – Tested in 2009-2010, by not diagnosed until 2013. Many other inmates afflicted, but no open discussion of situation. Illness possibly allowed to worsen during delay.<br>4 - Implies that if prison officials had adopted a preventative approach, and had given him VF meds early on (being aware of his vulnerability), his condition would never have worsened as it did.<br>6, 9 - Complaints ignored. Never informed of exceptional risk posed by VF. No account taken of racial susceptibility. |
| 33. | Hockley, Jason | 15 | |
| 34. | Islas, Jose | 16 | (Hispanic)<br>2 - Referring to restricted Law Library access, he writes: "Lockdowns, mail delay, etc." No Internet, databases or newspapers.<br>4 - Began experiencing symptoms as far back as 2009, but wasn't diagnosed formally until 2011.<br>7 - Claims he was very diligent. Conducted research, filed a 602, requested that he not be sent to PVSP and, after his arrival, asked to be transferred.<br>10 - Physical incapacitation? "Yes, by facility, lockdowns--forced by gang violence--and no CDCR resources." Possibly confused by medication. Tried repeatedly to obtain counsel. Also suggests the |

| | | | TABLE 3 |
| | | | **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** |

| No | INMATE | EST. MOS. SHORT | GROUNDS FOR ACCRUAL[15] |
|---|---|---|---|
| | | | limited phone access interfered with his ability to report the problem: "I could barely call anyone." |
| 35. | Hughes, Darnell | 11 | |
| 36. | Jalotjot, Danilo | 4 | (Asian/Filipino)<br>2 - Virtually no access to information (no Internet, etc.). Filipino. Reports that Law Library access was restricted.<br>4 - Misdiagnosed, possibly with asthma, even though this was in the midst of a VF epidemic. Staff implied VF could be responsible for symptoms in winter 2011, and yet wasn't diagnosed formally until early 2012.<br>7 - Diligent but unsuccessful attempt to retain counsel.<br>9 - Absolutely no disclosures of any kind regarding dangers of VF, especially the danger to Filipinos. Suggests there was no consideration of his susceptibility.<br>10 - Cognition clouded by medication. |
| 37. | Johnson, Daniel | 13 | (Caucasian)<br>2 – Minimal information – television, newspapers. No mention of Internet, databases, research opportunities.<br>4 - Became aware of pain in right lung in February 2011. One month later, misdiagnosed.<br>6, 9 - No communication from prison system regarding VF as exceptional risk. No mention of race as a vulnerability factor.<br><br>10 –Has been in a wheelchair since October 2012 due to neuropathy in left leg (reasons unknown). This is 18 months after diagnosis. VF clearly affecting physical health and capacity to pursue claim. |
| 38. | Johnson, Jesse | 12 | 1, 3, 4 - Having contacted prison officials to complain about their possible role in his illness, he was told, "It's just pneumonia – you will be OK. Go back and get some rest."<br>4 - Early incomplete diagnosis. Delay between initial symptoms and formal diagnosis.<br>9 – Was completely in the dark about dangers of VF or even that it was an issue. "I was never told at all. No one told me at all."<br>6, 9 – Reports no effort to disseminate useful information. Was never aware of any "exceptional risk." No mention made of race. Claims he was never told anything about the larger crisis. |
| 39. | Jones, Daniel | 5 | |
| 40. | Klvana, Milos | 5 | (Caucasian) |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

<table>
<tr><td colspan="4"><strong>TABLE 3</strong><br><strong>PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION</strong></td></tr>
</table>

| No | INMATE | EST. MOS. SHORT | GROUNDS FOR ACCRUAL[15] |
|---|---|---|---|
| | | | 1, 9 - "There was total lack of information."<br>1, 4, 9 - "There was like a conspiracy of silence by clinic, COs, bulletin board news, counselors to tell inmates anything about VF".<br>2 – Restricted Law Library access, no Internet, no TV programs offering suggestions of liability.<br>4 - Klvana was a doctor, and yet he never suspected VF in his breathing and sinus difficulties (and other health issues), attributing issues to dirty air vent.  Having pneumonia in his lung, he was apparently prescribed VF meds well before being told explicitly that he had VF.  No disclosure on prison's part.<br>4 - Misdiagnosed. Initially diagnosed with bacterial pneumonia, UTI in December 2011. Never formally diagnosed, but strongest evidence came with testing in December 2011, January 2012. Since his symptoms began in July 2011, this represents delay, possibly allowing illness to fester and to impair his ability to pursue a claim.<br>4, 9 – No disclosures. Only picked up VF info (e.g. no cure, ineffective meds) from other inmates. No sources of information in any rooms, with the exception of a one-page article in a medical handbook. Flu? Significant material. VF? None.<br>8-9 months later, when he was given info by another inmate.<br>9 – No awareness of VF within prison system until June-July 2012,<br>10 - After contraction, suffered malnourishment (130 pounds), physical and mental incapacitation. Also describes Lithium and Zoloft interfering with his ability to think clearly. Attempted but unable to obtain counsel. |
| 41. | Leinweber, Mikhiel | 0 | (Caucasian)<br>1, 3, 4 - Misdiagnosed (COPD). Initially told he didn't have VF, despite symptoms and examination in 2011. Formal diagnosis in 2013. Claims he was lied to and was not given the medication he required.  Thus there was significant delay prior to diagnosis and treatment, allowing disease to advance and making pursuit of a claim more difficult: "I wasn't told until 2013, that's why I was sick."<br>1, 3, 4 - "Dr. did not tell me & cleared me 'full duty' to continue to work on PUSP yard crew – I received no treatment!" |
| 42. | Lewelling, Jesse | 11 | |
| 43. | Lewis, Cleofas | 0 | |
| 44. | Lewis, George | 19 | |

PAVONE & FONNER, LLP<br>600W. BRADWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| | | | |
|---|---|---|---|
| | **TABLE 3** | | |
| | **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| 45. | Lewis, Asad | 4 | 4, 9 - Diagnosed in January 2012, but only heard of severity of VF problem in the prisons via another inmate. No formal or informal disclosures of vital information regarding extreme risk. <br> 9 – Learned most of his information from other infected inmates. "I feel that the medical staff is not really here to help but to distribute pills according to the side deals that are made with drug companies" |
| 46. | Lewis, Joe | 0 | |
| 47. | Lewis, Kevin | 0 | |
| 48. | Manning, Michael | 2 | 2 – Virtually no access to information of any kind, including Internet, legal journals, newspapers, etc. <br> 4 - Began experiencing symptoms in 2010 at PVSP. Misdiagnosed two years later at CIM-Chino with simply pneumonia. <br> 9 - Prison officials did not make him aware of the severity of the VF risk. <br> 10 – Taking medication that clouded his thinking. |
| 49. | Martinez, Juan | 0 | 4 - Initially misdiagnosed with allergy issues. <br> 5 – Nurse(s) provided him with some information about the epidemic. Describes sparsely-positioned notices and bulletins that said very little. <br> 1, 3, 4, 9 – Upon diagnosis, he describes the attitudes of the medical personnel as "nonchalant." They acted as if his concerns "were like any other medical concerns" and "nothing out of the ordinary." <br> 2 – Virtually zero access to information flow. Nothing. He reports that his family was his only (very sporadic) sources of reading material. <br> 9 - "I was ignorant and not informed that I could take any action at all." Only really became aware through PLO and BLP's efforts and greater access to literature. <br> 10 - Developed a staff infection in 2013. Hospitalized. In major pain and taking strong pain medication continually. Not in a position to assert his rights. <br> 9- No mention of exceptional risk of any kind. Notes that the bulletins and flyers he mentions, which disclose some elements of VF do not suggest that the state is in any way liable. |
| 50. | McDonald, Jeffery | 0 | 1, 3, 4, 9 – Prison officials lied to him, concealing the fact that he had VF.  Implies that the general "pneumonia" diagnosis was |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | |
|---|---|---|---|
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | intended to hide the reality of VF and indicates that this "caused a lot of injuries needlessly." Officials impeded his efforts.<br>4 – Symptoms in 2010, misdiagnosed with pneumonia 8-12 months later, and then came to suspect VF through information gathered through word-of-mouth and PBS special. Finally diagnosed formally with VF in 2011-2012 following transfer to another prison.<br>9 - Officials did not disclose exceptional risk. |
| 51. | McGinley, James | 2 | 4 - Had symptoms in early 2011, more than a year before diagnosis. Misdiagnosed in mid-2011, with diagnosis provided by Nurse Practitioner. Diagnosed with VF more than a year after symptoms first appeared.<br>2 – Had no access to information, including Internet, written materials, etc. Law library restricted.<br>9 - Had no knowledge of lawsuits, liability, possible case, etc.<br>9 - "They did not tell me I was at risk at Avenal." No mention of exceptional risk. |
| 52. | Milford, Thomas | 0 | 2 - Virtually no information flow. Restricted law library access.<br>4 - Misdiagnosed with the flu on the same day he began to exhibit symptoms. Hospitalized.<br>9 - Unaware of the VF issue in California prisons.<br>9 - Blames prison system for not telling him about VF "when he got off the bus." Received no information suggesting VF posed an exceptional risk to him.<br>10 - Has DDP-ADHD -- Greatly limited by this in his ability to pursue case. Says he was "physically incapacitated." Heavily-medicated. Unable to obtain counsel. |
| 53. | Miller, Dale | 9 | |
| 54. | Milton, William | 13 | 1, 9 - No information or advice from prison officials. Told he had to "learn to live" with his symptoms. Zero information about severe health risk.<br>8 - Diligent in filing documents, conducting research, collecting information, questioning others, etc.<br>9 - Blocked from inquiring about an illness he had not yet acquired. |
| 55. | Moody, Andre | 17 | 4 - Initially diagnosed with symptoms of a cold.<br>4, 9 - Knew nothing about VF and was at Avenal twice. Developed cold symptoms and visited clinic weekly for seven weeks; he was finally told he needed to be tested for VF and was tested next day (Dec. 2, 2011). Seven weeks were lost. |

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | **TABLE 3** |
|---|---|---|---|
| | | | **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL**[15] |
| 56. | Neal, Freddy | 4 | 2 - Virtually no information access. No Internet, no newspapers, other media, etc. Only law library. No help offered by family members, etc.<br>4 - Initially misdiagnosed with simply pneumonia.<br>4 - Accuses officials of failing to correct ventilation difficulties and failing to prevent inmates from going outside during periods of spore activity.<br>6, 9 - No info provided about "exceptional risk" to Black inmates or any other inmate.<br>9 - Had no idea about potential liability until 2013 and the onset of prisoner transfers.<br>10 - Medication caused fatigue, which limited him post-diagnosis. |
| 57. | Ngoun, Chek | 0 | |
| 58. | Page, Mack | 0 | (African American)<br>2 - Almost no information flow. Managed to read something about VF at one point.<br>6, 9 - Black, but told nothing about any "exceptional risk" posed by VF.<br>10 - No investigative help from family; can't afford an attorney. |
| 59. | Parker, Cedric | 10 | 4 - Misdiagnosed as flu by yard nurse.<br>6, 9 - No information provided to educate/warn him, especially egregious since they knew that Blacks were at high risk. |
| 60. | Parker, Theodore | 5 | 2 - Virtually no information access outside of law library. No resources to retain lawyer.<br>9 - "I was not informed [about VF] until I saw that the prison was being closed." Requested a transfer prior to contraction of VF. Was denied. |
| 61. | Peav, Sim | 8 | (Cambodian-American)<br>2 - Almost no information. Some law library access and reading, but that's it.  Criticizes limited resources at CIM.<br>3 - Inmate told he was "clear" when he clearly wasn't.<br>4 - Delayed diagnosis — one month after initial symptoms — with no advice or recommendations, then mistakenly told he was clear. Apparently told he'd been exposed to VF but didn't have VF in his blood, the result of which is that he did not receive treatment.  He was transferred and then symptoms exploded in severity. Was again denied treatment after a VF test at CIM.<br>9 - No information re VF information received, disseminated, etc. |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | |
|---|---|---|---|
| **TABLE 3** **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | | |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 10 - Speaks of severe physical limitations following diagnosis and incapacitation due to medication. |
| 62. | Penalva, Juan | 19 | (Salvadorian) 2 - Had heard of VF in CA prisons as an issue but knew nothing about it. No access to Internet or other info with the exception of law library, newspapers. 3 - Was told explicitly that there was "no valley fever in his system and never was." 4 - Chaotic, disorganized diagnosis. Told nothing was wrong with him and that he needed to rest, then informed that he "could" have VF or pneumonia. 6, 9 - Never told in any way about exceptional risk of VF nor about his own vulnerability based on ethnicity. 9 - Wasn't aware of any liability issues/possibilities until 2014. Didn't realize CDCR could potentially be held responsible. |
| 63. | Preston, Robert | 18 | 2 - No info access of any significance, some law library access, but that's all. No relatives available to help. 4 - Diagnosed with pneumonia, treated for that, and only later learned – with delayed diagnosis following – that VF was the cause. 7 - Has learned a significant amount about VF through intensive research. Never occurred to him for some time that CDCR could be held responsible. Felt intimidated. |
| 64. | Quiroga, Manuel | 0 | |
| 65. | Richardson, Paul | 0 | |
| 66. | Ripoyla, Ronnie | 18 | |
| 67. | Robinson, David | 6 | |
| 68. | Robertson, Richard | 23 | 2 - Limited information access. No Internet or database access. Some access to newspapers, periodicals and law library. 4 - Misdiagnosed initially with a cold. "You'll be fine." 4, 6, 9 - No provision of VF information and no discussion of risk or severity or potential liability with respect to VF. |
| 69. | Rodriguez, Ronald | 7 | |
| 70. | Ruggles, John | 19 | 2 - Almost no information access beyond the Fresno Bee. Law library access restricted. 3 - Was told he could be "cured," which delayed his interest in a legal option. |

| | TABLE 3 PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION | | |
|---|---|---|---|
| No | INMATE | EST. MOS. SHORT | GROUNDS FOR ACCRUAL[15] |
| | | | 3 - Medical told him he either didn't need counsel or medication, falsely. <br> 3, 4, 6 - "They said I was white and could not get it." <br> 4 – Initially misdiagnosed. <br> 9 - Requested VF protocols and received no response. |
| 71. | Sams, Lorenzo | 23 | (African-American) <br> 2 - Very little informational access. "I sent home for information on Valley Fever." Read maybe one article from Fresno Bee. Law library access severely restricted. Saw TV program on VF but not immediately aware of issues of liability. <br> 4, 9 - VF pamphlet he received outlined symptoms and to see a doctor if necessary. Minimal, basic, underplayed severity of situation. <br> 5, 7 - Consulted Prison Law Office. <br> 7 - Notable diligence. Wrote family members to download VF info and forward it to him. Indictment of information flow inside facility. <br> 9 - No information offered about legal options. <br> 10 - Exhausted from illness, which affected his ability to advance his case. |
| 72. | Sanchez, Johnny | 18 | Race: other. <br> 3 – Hispanic probably, but told that VF only affects African-Americans. <br> 7 - Filed a Medical 602 a year after diagnosis when he became conscious of liability issues. <br> 2 - Zero sources of accurate information. No Internet, no databases, no relevant television, law library restricted. <br> 2, 3 - Was told explicitly by officials that VF is a disease of Blacks, Chinese, and Filipinos -- and/or those with weak immune systems (and thus not him). <br> 9 - No information, disclosures highlighting "exceptional risk" of any kind. <br> 10 - Unable to obtain counsel. |
| 73. | Sanders, Tyrone | 0 | (African-American) <br> 2 - Almost zero access to free, up-to-date information via media. No Internet, no databases, no relevant television programs, no newspapers, etc. <br> 4 - Roughly six-week delay between initial symptoms and diagnosis. (Mis)diagnosed with simple kidney infection and pneumonia. |

PAVONE & FONNER, LLP <br> 600 W. BRAODWAY, STE. 700 <br> SAN DIEGO, CALIFORNIA 92101

| | | | |
|---|---|---|---|
| **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | | |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 4, 6 - Failure of duty to inmate. No attempt to determine level of vulnerability based on racial background.<br>9 - "I had no knowledge in regards to these legal matters."<br>10 - Incapacitated physically and mentally. Meds were interfering with his ability to think clearly.<br>10 - "I was too sick to even think about [legal options]." |
| 74. | Sepulvada, Adrian Estate<br>Sepulvada, Ivan<br>(next of kin) | 0 | 2 - Had little or no access to interactive media that would have allowed him to conduct extensive research.<br>4 - Appears to have been misdiagnosed as having the flu. Never formally diagnosed with VF.  Came to conclusions based on information from other infected inmates, TV news reports, individual articles in the Fresno and Sacramento Bee, etc..<br>4, 9 - He mentions reading a warning pamphlet, but all it said was stay indoors on windy days and wear a mask on the yard. No urgency.<br>10 - "No legal advice was available, I was bedridden with fatigue and joint pains."<br>10 - Totally incapacitated.  Headaches, disorientation, joint pain. Also taking powerful meds that clouded thinking.<br>10 - Massive inmate transfers destroyed the connections he'd made trying to find a lawyer. This set him back. |
| 75. | Sherrod, Albert | 0 | (African-American)<br>6, 9 - No mention of extreme risk: "PVSP never told inmates anything."  No mention of unique risks to Black inmates.<br>7 - "PVSP was wrong from the get-go. I did look into this matter." Diligent. "I file[d] on time with the Victims Compensation Board (VCB). Tort claim." Active, engaged. "I was able to do my legal paperwork." "I was starting [my case] myself in proper." |
| 76. | Steels, Willie | 18 | (African-American)<br>4 - Became aware of liability issues only after the courts got involved. |
| 77. | Terry, Danny | 19 | (African-American)<br>2 - Limited information access.<br>4 - Initial misdiagnosis. Possibly diagnosed with simple flu.<br>6, 9 - Also received no information about any "extreme risk" posed by VF, nor his own vulnerability as an African American.<br>9 - Received no information, had absolutely no idea what to do after his diagnosis with respect to pursuing his case. |

PAVONE & FONNER, LLP<br>600 W. BRAODWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| | | | TABLE 3<br>PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION |
|---|---|---|---|
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 10 - Physically incapacitated by medication following diagnosis, which interfered with is ability to pursue his case, obtain counsel, etc. |
| 78. | Taramona, Julio | 12 | |
| 79. | Thomas, Maurice | 0 | |
| 80. | Thompson, Tyrone | 4 | (African-American)<br>4 - Originally misdiagnosed with cold/flu. Told that he "might have" either of these by nurse.<br>9 - Suggests that there was no information from prison officials regarding VF – no notices, no bulletins, etc. Suggests only source of reliable information was inmates' families.<br>9 - All doctors, nurses, guards, etc. all refused to answer his inquiries.<br>9 - No real awareness of liability issues.<br>9 - No information provided about danger of VF or any "exceptional risk" to Black, Hispanic and Asian inmates. |
| 81. | Vasquez, Roberto | 7 | |
| 82. | Vasquez, Solomon | 18 | 2 - No decent access to information or ability to conduct research.<br>9 - Provided no information. No disclosures made. |
| 83. | Wallace, Patrick | 9 | (African-American)<br>2, 9 - Heard a bit about VF on TV, radio and legal news, but "never anything from CDC warning me of any danger of contracting VF"<br>4, 9 - Says he wasn't "educated or informed" about the dangers of VF.  His race was ignored. Request for transfer denied.<br>6, 9 - Nothing referring to high risk or emphasizing the risk associated with his race. Says everything he learned was through "word-of-mouth and rumors."<br>10 - Was taking meds for "voices," which interfered with his ability pursue claim. Later came off psych meds and became "mentally clearer." |
| 84. | Williams, Alonzo | 2 | (African-American)<br>4 - Symptoms began in October 2010. Became suspicious in May 2011. Not misdiagnosed, but doctor mentioned VF almost as an aside. Unnecessarily protracted process. Williams requested tests due to other inmates contracting illness. These tests confirmed VF.<br>6, 9 - No explicit information or warnings from prison officials. Most knowledge from word-of-mouth and rumors. Nothing acknowledging unique racial vulnerabilities of inmate. |

PAVONE & FONNER, LLP<br>600W. BRAODWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| | | | |
|---|---|---|---|
| **TABLE 3** **PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** | | | |
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 7 - Was diligent in efforts to obtain legal representation (7). |
| 85. | Williams, Xavier | 5 | (African-American) 1, 4, 5, 9 - It was nurses and surgeons at Mercy Hospital, not at the prison, that finally let Williams know that VF was a problem in CA prisons. This was 2-3 months after his diagnosis. He was diagnosed but never informed that he was part of a larger epidemic. 2 - Limited information. No Internet, no databases. Some newspaper articles. Law library restricted. Had no TV. Family couldn't afford collect calls. Couldn't afford attorney. Unable to properly assert rights and wasn't able to conduct adequate research. 4 - Roughly six weeks between symptoms and diagnosis. Blood test only takes a few days. 9 - Had no idea about potential liability, ability to file claim, etc. Entirely ignorant and thus did nothing initially: "I was unaware of the process." 9 - Told nothing about any "exceptional risk" involving VF and racial heritage. 10 - Indicates that medication left him drowsy in the period following diagnosis. |
| 86. | Wood, Theodore | 21 | 1, 3 - When he questioned doctors, counselors, COs, etc., he was told, "We have to work here too!" and "We were born here so we are immune to Valley Fever." False, misleading information about his level of risk and the risk generally. 3 - Officials adopted a tone and position in response to his 602, complaints, etc. that they were in no way responsible, that this was an unpredictable event, etc. 4 - Significant misdiagnosis. Two different doctors initially diagnosed two different conditions, neither of which was VF. 7, 8 - Diligent in speaking with people, reading memos, conducting research, filing grievances and complaints, etc. 10 - Difficulty retaining attorney (tried close to a dozen). Almost all replied, "Outside the scope of my expertise." 10 - VF medications prevented him from thinking clearly. |
| 87. | Yancey, Kenneth | 0 | |
| 88. | Young, Gerald | 7 | 2 - Virtually no access to relevant information. No Internet, databases, newspapers, etc. Law library access restricted, possible lockdown. |

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | **TABLE 3**<br>**PARTICULAR GROUNDS FOR ACCRUAL DATE EXTENSION** |
|---|---|---|---|
| **No** | **INMATE** | **EST. MOS. SHORT** | **GROUNDS FOR ACCRUAL[15]** |
| | | | 4 – He was told initially to drink a lot of water and not told he had VF (according to Young). However, he was diagnosed roughly 10 days later at hospital.<br>7 - Attempted to retain counsel but could not afford this.<br>9 - Most info from other inmates, not from prison officials, including issue of racial susceptibility. Also saw television programming covering VF issue. No "official" pronouncements.<br>9 - No information or disclosures of "exceptional risk" related to racial heritage.<br>10 - Extremely ill for first 30 days, interfering with his ability to pursue claim. Couldn't think clearly due to meds. |

866.    Alternate to the grounds for extension in Tables 2 and 3, each plaintiff seeks equitable tolling as each prosecuted his case with reasonable diligence, given the numerous limitations inherent in being incarcerated, including but not limited to, the lack of access to information and the lack of ability to communicate with the outside world in order to timely obtain counsel to navigate a case of this difficulty.[16]

867.    For these reasons, and based on all the circumstances, Plaintiffs claims are timely enough, or sufficiently excused for their modest amount of untimeliness to make them timely under the FTCA.

## FACTUAL ALLEGATIONS

### A.  Coccidioidomycosis is a Serious Disease

#### 1.  Origin and History of the Disease

868.    Coccidioidomycosis is a parasitic disease caused by exposure to airborne spores of Coccidioides organisms found in the soil in certain locations in the southwestern United States.

---

[16]    *Holland v. Florida*, 560 U.S. 631, 653 (2010); *Lonchar v. Thomas*, 517 U.S. 314, 326-327; *Sossa v. Diaz*, 729 F.3d 1225, 1236 (9th Cir. 2013); *United States v. Wong*, -- U.S. --, 135 S. Ct. 1625, 191 L. Ed. 2d 533 (2015).

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

869.    The disease originates in a fungus that mostly exists in arid soil in Arizona and parts of California, especially the San Joaquin Valley, referred to as the endemic or hyperendemic zone.[17]

870.    California health officials have known about the prevalence of Valley Fever in the San Joaquin Valley, where the hyper-endemic prisons are located, for over fifty (50) years.[18]

871.    Valley fever was first detected in humans in 1892.  Given its symptoms, it is often confused with influenza but was determined to be its own kind of ailment.  It was first noticed as a more widespread problem in the 1930's in the Central Valley, where it was studied by a tireless epidemiologist, Dr. Charles E. Smith, who wrote several prescient papers.

872.    Its adverse effects were widely chronicled during World War II when several training airfields were built in California's San Joaquin Valley.  The rate of infections in military personnel was 8-25% per year and it was the most common cause of hospitalization at Southwestern airbases.  Numerous soldiers became sick for an extended period of time.[19]

## 2.  Pathology of Coccidioidomycosis

873.    When a human being inhales the coccidioides fungal spores, they lodge in various locations in the respiratory system.  They then grow and transform into large tissue-invasive parasitic spherules.  The spherules divide, enlarge, and rupture, each releasing many thousands of new endospores that can invade surrounding tissue or can

---

[17]   Smith, C.E., "*Epidemiology of Acute Coccidioidomycosis with Erythema Nodosum*," Am.J.Public Health, Vol. 30(6): 600, 602 (1940); Rosenstein, N., "*Risk Factors for Severe Pulmonary and Disseminated Coccidioidomycosis*," Kern County Dept. of Health, California (1995–1996).

[18]   *See*, *e.g.*, Smith, C. E., "*The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*," 30 American Journal of Public Health 600, 608 (1940).

[19]   Kirkland, Theo, M.D., et al., "*Coccidioidomycosis: A Reemerging Infectious Disease*," Emerging Infectious Diseases, Vol. 2, No. 3, p. 2 (1996).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

migrate through the blood to other tissues and organs, where they repeat the reproduction process and continue to multiply in the body.

874.   The fungus produces spores that lodge in the lungs.  The developing endospores grow on host body tissue starting with the lungs, dissolving some of that tissue in the process.  Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain.

875.   Lesions may occur in every organ in the body, as reflected by the fatal outcomes below.[20]

 

876.   If not successfully treated, the fungal infection spreads in visibly unpleasant ways and can be debilitating, disfiguring, painful, and can result in death.[21]

877.   When the disease dangerously spreads from the lungs to other parts of the body, the condition is referred to as disseminated coccidioidomycosis.

[20]  Smith, Pappagianis, *et al.*, "*Human Coccidioidomycosis*," Bacteriology Reviews, 25(3), p. 311 (September, 1961).

[21]  Filip, David, <u>Valley Fever Epidemic</u>, p. 29 (2008).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

878.    Disseminated spores attack various parts of the body including the eyes, bones, joints, spine, nervous system, and brain.   They may cause destruction of soft tissue, erosion of bones and joints, ulcers in the lungs, and colonization of other organs including the spine and brain, which results in meningitis.

879.    Both the spore-provoked pneumonia and the disseminated infection, especially if it reaches the brain and causes meningitis, can cause death.[22]

### 3.  Contraction Frequency

880.    Dangerous cocci zones can infect 20% to 100% of a vulnerable population depending on the activity in and relationship to dangerous soil.[23]

881.    In the general population, 40% of those exposed will show symptoms of a respiratory illness resembling the flu that lasts for a few weeks up to several months but usually resolves without long-term complications.[24]

882.    In a segment of that 40%, however, which varies depending on the ethnicity and medical vulnerability of the individual, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as a disseminated infection.[25]

883.    In that situation, the condition becomes permanent, incurable, disseminated, and potentially fatal.[26]  This percentage varies based on immunological resistance to the disease, which differs among racial groups.

---

[22]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[23]  Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, p. 111 (1968); California Department of Health, Letter for "The Record," Infectious Disease Branch, p. 1 (January 11, 2007).

[24]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[25]  *Plata v. Newsom*, Case No. 01-cv-1351, Dkt. 2598, Dec. John Galgiani, ¶ 7 (April 25, 2013).

[26]  *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, pp. 2-3 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D.)

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

884.   Scores of inmates during the epidemic died.[27]  Many more live with serious medical complications, per Table 5.

885.   Plaintiffs in this case, who have had valley fever for many years, have one or more of the following symptoms: skin lesions; fever; shortness of breath and wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint and bone pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain.  This detail is itemized in Table 5.

### 4.  Special Vulnerability to the Disease

886.   Certain minorities, particularly African-Americans, Filipinos and Hispanics, have higher rates of contraction and suffer more severe consequences upon contraction.

887.   Individuals whose immune systems are compromised, for whatever reason, are also more vulnerable.

888.   A 1940 study by Dr. Smith indicated that African-Americans were 23 times as likely to die and Filipinos 170 times as likely.[28]

---

[27]   CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006).  A cluster of contractions is considered by medical researchers to constitute an "epidemic."  This term has been used to describe a situation in 1942 when *(i)* 7 of 14 Stanford students contracted the disease on a field trip, *(ii)* when 4 students from UCLA contracted it during a similar venture, and *(iii)* when 16 of 16 UCLA students caught it in Los Banos during an archeology dig. *Schmelzer*, 107. Accordingly, contraction events at the two main prison locations, PVSP and ASP, representing thousands of cases of contraction, clearly represents a medical epidemic. *See* Table 1, Chart 1, *infra*.

[28]   Smith, C. E., "*The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*," 30 American Journal of Public Health 600, 608 (1940); Crum N, *et al.*, "*A Cluster of Disseminated*

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

889.   In 1969, both groups above were estimated to be at 10x as much risk for disseminated coccidioidomycosis.[29]

890.   In 1985, African-Americans were determined in a study to contract the disease 47% more frequently.[30]

891.   Dr. Smith's opinion in 1940 was that eventually most of the inhabitants of the San Joaquin Valley region would be exposed to, and undergo, an infection with coccidioides.  According to this logic, for groups that are at high risk, the only truly safe course of action is exclusion.

### 5.  Treatment and Expense

892.   There is no cure for coccidioidomycosis.[31]  The disease is managed with powerful anti-fungal drugs which have correspondingly serious side effects.[32]

893.   Treatment of Valley Fever is expensive, for the patients and for the public health system.  As of 2006, "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment.  For managing critically ill patients with coccidioidomycosis, there are considerable additional costs including intensive care support for many days or weeks."[33]  Some patients require repeated hospitalization for the disseminated disease.  As of 2011, the cost for such treatment was approximately $55,000 per hospitalization.

---

*Coccidioidomycosis Cases at a US Military Hospital*," 168 Military Medicine 6, pp. 460-464 (2003).

[29]   Kirkland, Theo, M.D., et al., "*Coccidioidomycosis: a Reemerging Infectious Disease*," Emerging Infectious Diseases, Vol. 2, No. 3, p. 3 (1996).

[30]   Iger M, *et al*., "*Review of 135 Cases of Bone and Joint Coccidioidomycosis*," Proceedings of the 4th International Conference on Coccidioidomycosis, Washington, DC. National Foundation for Infectious Diseases, pp. 379-389 (1985).

[31]   Goodyear, Dana, "*Death Dust*," The New Yorker (January 12, 2014).

[32]   Marois, M.B., "*Deadly Spore in California Dirt Menaces Prison Expansion Plan*, Bloomberg News (October 19, 2007).

[33]   Galgiani, John, "*Practice Guidelines for the Treatment of Coccidioidomycosis*," Infectious Diseases Society of America, Clinical Infectious Diseases 658, 659 (June 1999).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

894.    For those with the chronic version of the disease, the medication must be taken indefinitely.

895.    These drugs do not cure the disease, however, since they only reduce (but do not eliminate the population) of infectious spores.  Continuous treatment with oral anti-fungal medication may keep the disease partially and temporarily at bay, but the disease remains within an infected person for his or her lifetime, and repeated debilitating relapses may be expected.  As many as 75% of patients who stop taking the drugs will relapse into the life-threatening disease within a year.[34]

### 6.  Scientific and Governmental Response to Cocci

896.    Coccidioides replicate so quickly that it is considered the most virulent fungal parasite known to man.[35]

897.    In the 1950's, both the U.S. and the Soviet Union developed biological warfare programs to deploy cocci on enemy populations.[36]

898.    A 1958 textbook commented for the benefit of African-American and Filipino lab workers that handling coccidioides without proper precautions may be interpreted as suicidal.[37]

899.    In 1996, Coccidioides fungus was initially listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism[38] – in the Antiterrorism and

---

[34]    *See, e.g.,* Filip, David, <u>Valley Fever Epidemic</u>, p. 40 (2008); Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers, p. 4 (November 5, 2004) (hereinafter "Kanan" or "Kanan Memo"); Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

[35]    Dixon, "*Coccidioides Immitis as a Select Agent of Bioterrorism*," Journal of Applied Microbiology, 91(4):602-5 (October 2001).

[36]    Goodyear, Dana, "*Death Dust,*" The New Yorker (January 12, 2014).

[37]    Fiese M, "*Epidemiology of Coccidioidomycosis,*" pp. 77-91 (1958).

[38]    Miller, J, *et al.*, <u>Germs: Biological Weapons and America's Secret War</u>, Simon & Schuster, New York (2001).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Effective Death Penalty Act of 1996 and the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002.[39]

900.   The Center for Disease Control requires scientists handling the spores to use protective protocols comparable to the Ebola virus.[40]  Clearly, coccidioidomycosis is a dangerous disease and has been understood and viewed throughout its study as such.

901.   By the late 1960s, employers understood that bringing workers into in the San Joaquin Valley carried with it the responsibility to take precautions to minimize the cases of contraction.[41]

902.   They were warned that "the importation of any susceptible labor force into the endemic areas carries with it the responsibility for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[42]

903.   On September 29, 1995, CDCR's health care division issued a policy memorandum, 12 years before the Receivers' 2007 policy memo, which acknowledged significant mortality risks to minorities:

> Coccidioidomycosis may cause serious disease with
> significant mortality in immunocompromised and Human
> Immunodeficiency Virus (HIV)-infected individuals,
> pregnant women, African-American, Mexican-American,

---

[39]  Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip"). Published in 2008, this reference summarized 268 published medical studies, professional journal articles, and other authoritative material concerning Coccidioidomycosis.

[40]  Filip, D., Valley Fever Epidemic, p. 2 (2008); see also "Biosafety in Microbiological and Biomedical Laboratories," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health (2009, 5th Edition).

[41]  Schmelzer and Tabershaw, "Exposure Factors in Occupational Coccidioidomycosis," 58 American Journal of Public Health and the Nations Health 1, pp. 108, 110-111 (1968).

[42]  Schmelzer and Tabershaw, "Exposure Factors in Occupational Coccidioidomycosis," 58 American Journal of Public Health and the Nations Health 1, pp. 108, 110-111 (1968).

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

and Filipino-American racial minorities. These patient groups are more susceptible to developing the disseminated form of the disease, which commonly manifests as meningitis, osteomyelitis, or chronic dermal lesions [emphasis added].

904.    In a second memorandum, dated about a month later on November 1, 1995, CDCR treated valley fever as a more serious ailment than previously disclosed.

Coccidioidomycosis … is … an acute problem for California, and an undulating epidemic for Kern County … And yet for all its prevalence and consequence, important epidemiological questions remain unanswered…

"Acute Valley Fever," however, produces more dramatic symptomology, and occurs in about 25% of diagnosed cases [citation] … In rare cases, the patient may develop "disseminated" (extrapulmonary) disease that substantially compromises muscles, bones, tendons and joints … or Meningitis, which, if left untreated, results in an approximately 90% fatality rate…

During the period 1991-93, Coccidioidomycosis "accounted for approximately $45 million in direct costs … and inestimable costs in work productivity, disability and economic and social displacement.  Since 1991, there has been a substantial Valley Fever "outbreak in California" [citation], affecting thousands of residents, innumerable visitors … In Kern County, the disease kills more people than does AIDS. [emphasis added].

905.    This memo also cited a 1988 study by Pappagianis as a definitive authority.   That study found that African Americans were at 10-20 greater risk for disseminated cocci; various other statistics presented therein were consistent with their exceptional vulnerability.

906.    Institutional health authorities were thus aware of the extraordinary seriousness of VF no later than 1995, especially to minorities, such that their inaction during the 2004-2014 epidemic cannot be justified as a medical surprise by a

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

mysterious ailment.  In fact, the established seriousness of cocci infection dates back to the 1940s.

907.   This reality underscores Plaintiffs' point in the "contemporary standards" debates (where the State argues that contemporary standards for treatment of prisoners did not require it to recognize valley fever as a threat under an *Estelle* Eighth Amendment analysis) since health authorities knew to take all available precautions to mitigate valley fever – they were directly aware at least 9 years before Kanan's 2004 memo – consistent with their 1939 statutory duties as health officials to take all available precautions to mitigate disease epidemics.[43]

908.   These duties, in conjunction with the scientific studies and policy pronouncements cited above, reveal that every reasonable health official would have understood in 2006 that ignoring an epidemic of a serious disease like valley fever directly violates the rights and expectations of persons needlessly placed at risk by such inaction.

909.   It is plainly inconsistent with a duty to take all available steps for a health official to pass a policy with unknown efficacy and then play a six-year, wait-and-see game.

910.   Frankly, by 2006, responsible penology counseled authorities to evacuate PVSP until the epidemic abated.  But if not, the notion of keeping ultra-vulnerable African-Americans housed at, or sending them to, particular Central Valley prisons, ones with sky-high incidence rates, ought to have been a non-starter.

911.   An exponentially higher risk of contracting valley fever in the subject prisons during the epidemic is statistically indisputable.  As per the California Department of Health's Infectious Diseases Director in 2013: "We concur that rates of cocci among inmates at Pleasant Valley State Prison (PVSP) and Avenal State Prison

---

[43]   *In re Martin* (1948) 83 Cal.App.2d 164, 167, *citing* Health & Saf. Code, § 2554 [repealed and replaced by essentially identical § 120175].

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(ASP) are higher than rates among the general population," a considerable understatement given the magnitude expressed in the numbers.[44]

912.    Valley fever is known as the "silent epidemic" and it appears that people living in, or moving to, the Central Valley were not, and are not, fully aware of just how much danger they are exposed to, even at the much lower rates attendant to the local non-incarcerated population, even though governmental authorities were well aware of these risks and may have actively suppressed this information in order to protect the area's commercial viability.

913.    Society does not accept that government may do nothing during epidemic exposure to valley fever at specific places. Rather, it expects government officials to engage in full disclosure of known risks and take every reasonable precaution under the circumstances, including and up to exclusion.

914.    In September 2007, the California Department of Transportation (Caltrans) contracted with the Bugler construction company to expand a highway culvert in Kern County. The work involved movement of soil. Bugler workers labored at the project in late June 2008. By early July 2008, seven plaintiffs were diagnosed with coccidioidomycosis, as had several other persons including a Caltrans inspector.

915.    The Bugler workers contended that the site was a dangerous condition: that Caltrans had notice and failed to warn the plaintiffs. Plaintiffs proved that Caltrans knew before contracting with Bugler Construction that:

> *(i)*    the construction site was in a hyperendemic area;
>
> *(ii)*    the project site posed danger to persons engaged in soil moving activities;
>
> *(iii)* Caltrans' employees were trained to take steps to prevent or mitigate exposure;
>
> *(iv)*    as part of that training, the Caltrans employees received a map which identified areas where the fungus had been isolated in the soil, including the area where plaintiffs were to work;

---

[44]    *See* Table 4; Chart 1.

PAVONE & FONNER, LLP
600W. BRADOWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

*(v)* Caltrans had received reports of its own employees and contractors' employees contracting valley fever working at construction sites in the highly endemic area;

*(vi)* Caltrans had warned all of its Kern County employees who had email accounts about the risk of exposure to the cocci fungus during excavation or other soil-disturbing work, and informed them how to prevent or mitigate exposure;

*(vii)* Caltrans, however, did not inform Bugler Construction or its employees of the risk, despite multiple opportunities.

916. On these facts, the jury awarded four Bugler employees $11.8 million in damages.

917. To the extent a jury verdict reflects the attitudes and positions of Central Valley society as of the date that wrong occurred, in 2007, the Bugler verdict unmistakably rejects the contention that society blindly accepts undisclosed, unmitigated exposure to the risk of contracting valley fever.

918. In other words, Bugler confirms what we all know and what is otherwise self-evident: society expects state authorities to maximize the protective response to disease epidemics, including to a serious disease like valley fever, and has held and acted under such expectations for decades.

919. The exact definition of the term "epidemic" or "outbreak" varies from disease to disease, but under any definition, the geometric incidence rates and resulting epidemic mortality in this case required health authorities to act immediately and aggressively in order to safeguard the population at specific locations from valley fever, according to various positions, policies, memorandums and publications of government authorities.[45]

920. Society, as reflected by government's own policy and scientific research, created and has for many years acted under a universal expectation for state health

---

[45] *See* Freedman, "*Coccidioidomycosis Outbreaks, United States and Worldwide, 1940–2015,*" Emerging Infectious Diseases, Vol. 24, No. 3 (March 2018).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

authorities to take prompt and serious action in the face of epidemic danger, including to a serious disease like valley fever.[46]

921.   In *Edison v. Geo*, the Ninth Circuit confirmed the seriousness of valley fever.  It observed that "[i]n most individuals, cocci manifests primarily as a minor fever.  In an unlucky few, however, the disease takes a different, more devastating course – it causes a number of painful conditions, and can be fatal … As prisoners, Plaintiffs were particularly vulnerable to infection: Even if Plaintiffs had been warned of the disease, they were unable to move to a different location, remodel their living quarters, or erect protective structures, such as covered walkways.  Thus, by placing prisoners at Taft, the BOP directly increased Plaintiffs' risk of harm. Under California law, the United States had a duty to protect Plaintiffs from the risk of contracting cocci." [47]

922.   The Northern District Federal Court's order in June, 2013, the one in which Judge Henderson removed inmates from PVSP and ASP is also relevant here, in holding that the controlling question is whether prison officials failed to take reasonable measures to address the cocci problem.   Judge Henderson formally faulted CDCR by ordering vulnerable inmates to be moved out of the hyperendemic prisons includes the predicate assumption that such measures should have been taken earlier.[48]

---

[46]  *See* Schmelzer, L, "*Exposure Factors in Occupational Coccidioidomycosis*," 58 Am.J.Pub.Health 107, 108-111 (1968); California Department of Public Health, "*Operational Plan for Emergency, Response to Mosquito-Borne Disease Outbreaks*," pp. 3-14 (2013); California CDCP Public Health Emergency Preparedness Cooperative Agreement (PHEP) Program, pp. 1-3 (2018); California Office of Emergency Services, "*Emergency Plan*," Ch. 6.3.13 (2017); Banach, D. "*Infection Control & Hospital Epidemiology, Outbreak Response and Incident Management, etc.*," Vol. 38, No. 12, 1393-1402 (2017); County of San Diego, "*Hepatitis Outbreak A, After Action Report*," p. 7 (2018); California Dept. of Public Health, "*Occupational Health Branch, Preventing Work-Related Valley Fever (Coccidioidomycosis)*" (2019); California Dept. of Public Health, Department of Industrial Relations, "*Preventing Work-Related Valley Fever (Coccidioidomycosis)*" (2013).

[47]  *Edison v. Geo*, 822 F.3d 510, 513, 522 (9th Cir. 2016) [emphasis added].

[48]  *Plata v. Newsom*, 427 F.Supp.3d 1211, 1229-1230 (N.D.Cal. 2013).

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

923.    In contrast, the *Smith/Hines* opinion suggests that society accepts a heightened risk of valley fever and this implies that it is acceptable for officials to do nothing.  However, its position rests partly on the profoundly inaccurate premise that the rates of contraction in the prison are the same as the local rates.  As per Table 4 and Chart 1, this assumption was clearly not true.

924.    The *Smith/Hines* position is founded on another fallacy: that migration to the Central Valley means that society accepts the risk of *unmitigated* exposure.  In other words, the *Smith/Hines* Court assumed that persons moving to the Central Valley accept any quantum of elevated and unmitigated risk, when the reality is that local government and business take various and sometimes extensive steps to minimize exposure.

925.    Sixty-five (65) years before the (2004) epidemic in question, Dr. Smith attested that coccidioidomycosis was causing significant illness among WWII soldiers and pilots at military bases in the endemic areas.  His studies revealed that preventive measures, notably dust control, were effective in reducing the rate of infection and thus the seriousness of epidemics.  His scientific work from 80 years ago, unchallenged in its continuing relevance today, is another measure of society's expectations.

926.    The State's own 1995 memorandums make clear that California knew how dangerous cocci was, knew how expensive its infliction was on a given person, and knew that it should take precautions commensurate with that level of danger.

927.    Given the statistical realities, 1995 memos, the Bugler jury verdict, the positions of business and local government and the historical scientific literature, *Edison*, *Plata* and related legal cases, the contention that the California Central Valley or any other sector of American society accepts a state authority to be warned about an epidemic risk of valley fever (or any other serious disease) and to take no action in response, is to maintain a profoundly inaccurate position about society's view of government accountability.

### B. The 2004-2014 Coccidioidomycosis Epidemic

928.     Between 1987 and 1997, CDCR built eight prisons within the hyper-endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison, both at Corcoran; and Kern Valley State Prison.

929.     Locating these prisons in these hyper-endemic regions of the Central Valley, significantly overcrowding them, housing inmates at risk or at increased risk from valley fever there, and failing to implement any of the remedial measures recommended to reduce inmate exposure to cocci has had drastic repercussions on the health and welfare of California's inmate population.[49]

930.     Though all of these prisons presented an elevated risk of exposing inmates to valley fever, there are two – ASP and PVSP – at which these risks were acutely amplified, and one in particular, PVSP, which by 2006 was known to be extraordinarily dangerous.

931.     Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates.  It was opened in November 1994, covers 640 acres and was designed to house 3,000 inmates.  Today, there are approximately 730 staff and 5,188 prisoner beds.  It is located at 24863 West Jayne Avenue, in Coalinga, California, 93210.

932.     Coalinga State Hospital is a hospital for sexually-disordered offenders located literally next door at 24511 West Jayne Avenue, Coalinga, CA 93210, as depicted by the two facilities next to each other on the satellite image below.

[49] California Correctional Health Care Services, *"Coccidioidomycosis in California's Adult Prisons 2006-2010,"* Report (April 16, 2012).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**FIGURE 1 – CSH *next to* PVSP**



933.    During the environmental impact phase in 1999-2000, prior to initiation of its construction, the EIRs and the California Department of Health recommended a series of dust suppression measures in order to minimize the risk of contraction of valley fever.

934.    As noted at the time, "The proposed 320-acre project site in Coalinga is immediately east of PVSP … The city of Coalinga proper, which is 2 miles west of the site, reports that soils in the project area contain naturally occurring asbestos and the spore that produces Valley Fever."

935.    In 2001, construction of the hospital immediately adjacent to PVSP was nevertheless approved and construction proceeded over the next four years until the hospital's opening on September 5, 2005.  It is not known whether state agents actually adhered to the seven recommendations for dust suppression for the (main) purpose of minimizing the risk of valley fever contamination, but whatever they did or didn't do, it was profoundly inadequate given the results.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

936.    This tragic planning decision contaminated PVSP with the coccidioides spores.[50]

937.    Could the location, mitigation or policy decisions have been racist?  At first one would assume rank-and-file state officials would never be so abjectly evil.  But revelations about how American government officials and other parties in power have behaved toward African Americans, including terrorizing them, using them for experiments, perpetuating slavery even after the passage of the 13th Amendment (through various incarceration schemes, including the Black Codes and pretextual arrests during harvest season to bolster the labor pool), covering up terrorist acts committed on them and then marking the subject as too taboo to discuss as in the 1921 Tulsa Massacre,[51] along with years of selective prosecution of African Americans in crack cocaine cases throughout the 1990s and 2000s[52] – are jarring to process in their depravity and really leaves no level of possible racist malice off the table.

938.    Regardless, in November 2004, the California prison system was notified in a report by Dr. Renee Kanan that valley fever was a problem.[53]  Incidence rates for cases of coccidioidomycosis started climbing rapidly at PVSP in particular, especially for minorities.[54]

939.    The Kanan memo advised officials that the risk and incidence of disseminated disease was highest in American Indians, Asians, and Blacks.  "In patients

[50] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California*," p. 4 (June, 2007).

[51] Astor, Maggie, "*What to Know about the Tulsa Greenwood Massacre*," New York Times (June 20, 2020); "*Nancy Feldman, Her Legacy as an Educator*…" Voices of Oklahoma, Interview of Feldman, Website: https://m.voicesofoklahoma.com (2020).

[52] *See, e.g.*, Conyers, John, "*Unfairness in Federal Sentencing: Is it Time to Crack the 100 to 1 Disparity?*" Report by the Committee on the Judiciary, U.S. House of Representatives, 111th Congress, First session (May 21, 2009).

[53] Kanan, Renee, "*Health Care Managers*," CDCR Memorandum, p. 1 (November 5, 2004).

[54] *Id*.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

who have developed pneumonia, dissemination occurs in 1 of every 300 patients with pneumonia. In Hispanics and Blacks, it is 1 in 40, and in Filipinos it is 1 in 10."[55] However, officials took no measures to prevent the spread of disease or otherwise protect any inmates.

940.    The memo noted that prisons located in the Central Valley have cocci spores buried in the soil. It advised that wind and construction can cause them to be dislodged and blown around in the air, where they may be inhaled.

941.    In 2005, a prisoners' rights group sent a letter and information packet to then-Governor Schwarzenegger describing the threat posed by valley fever and identifying high-risk groups.

942.    In Fall 2005, despite these several warnings, the state prison agency completed construction of Coalinga State Hospital, literally next to PVSP, without taking effective spore suppression precautions.[56] The construction churned cocci spores into the air and distributed them onto surfaces throughout the prison.[57]

943.    In 2006, the California Department of Health Services (CDHS) advised the prison's health department (CCHCS) that the contraction rate at PVSP was 38 times that experienced by residents of Coalinga and 600 times the rate in Fresno County.[58]

---

[55]    *Id*.

[56]    California Department of Mental Health, "*Findings of Fact and Statement of Overriding Considerations*," New Mental Health Treatment Facility, Sch #1999061074, p. 17 (October 2000) (Officials were aware of the potential problems upon construction of the hospital: "Generation of PM10 or fugitive dust during excavation and grading is also a concern in the Coalinga area because of the potential presence of Valley Fever spores in local soils," they noted. Such "fugitive dust" is widely credited as contributing to the epidemic at neighboring PVSP indicating that recommended dust suppression failed.)

[57]    *See* Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, p. 110 (1968) ("occupational factors must be considered in relation to the magnitude of probable dust exposure").

[58]    California Department of Health, Letter for "*The Record*," Infectious Disease Branch, pp. 5, 9 (January 11, 2007).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

CDHS also made safety recommendations.[59]  It suggested moving high risk inmates to safer prisons.[60]  It also suggested CDCR take environmental steps to suppress the spread of the spores.[61]

944.    Given the hospital construction, the prison population subsequently experienced a spike in infection rates including multiple deaths.[62]  A CDCR memo dated October 27, 2006 revealed that the prison system had an epidemic on its hands: 1,145 cases of cocci were reported in 2006 as compared to 187 from the year before.[63]

945.    Rates at one point peaked at over 1,000 times the rate seen in the general California population.  Demetrius Pappagianis, an expert in coccidioidomycosis, attributed this to the construction.

946.    In an August 24, 2006 memorandum from Peter Farber-Szerkenyi at CCHCS, to John Dovey, then-director of CDCR's Department of Adult Institutions, Farber-Szerkenyi informed Dovey:

> As you are aware, the California Department of Corrections and Rehabilitation (CDCR) during 2005 experienced a significant

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

[59]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, pp. 1, 11-12 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

[60]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, p. 11 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

[61]  California Department of Health, Letter for "*The Record*," Infectious Disease Branch, pp. 11-12 (January 11, 2007); Sillen, Robert, "*Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report*," CDCR Memo, Office of the California Prison Health Care Receivership, p. 1 (May 21, 2007).

[62]  CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006); McKinley, J., "*Infection Hits a California Prison Hard*," New York Times (December 30, 2007)

[63]  CDCR Memo, "*Coccidioidomycosis (Cocci) Report*," (October 27, 2006);

increase in valley fever cases at specific institutions within the
Central Region of the State. As a result of this disease the CDCR
Division of Ccrrectional Health Care Services (DCHCS)
contacted the Department of Health Services (DHS) to conduct a
study of this "<u>apparent epidemic</u>." (Underscore added).

947.   CDCR documented the dramatically increased risk and the deaths.  Yet
the only action taken in CDCR's 2006 policy memorandum was to provide
educational material to medical and custody staff, to *consider* planting ground cover,
and when digging, to use a protective mask and wet the ground.[64]

948.   When it comes to handling epidemics, health authorities do not have the
luxury to take years to monitor a situation.[65]  Emergency action is required to avoid
continuing infections.[66]

949.   In 2007, CCHCS issued safety recommendations to CDCR that
included environmental mitigation, relocation of high-risk inmates, and abandonment
of an expansion project at PVSP proposed by then-Governor Schwarzenegger.  High-
risk inmates included persons of African or Filipino descent, and immunosuppressed
patients. "Prevention efforts … may mitigate the risk, but physical removal of these
highest risk groups from highly endemic regions, if possible, would be the most
effective method to decrease risk."[67]

950.   Yet in 2007, Dr. Suzan Hubbard and Dr. Dwight Winslow announced
CDCR's amended policy to only exclude an extremely select set of ultra-vulnerable

---

[64]   Dovey, J, "*Inmate-Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions*," CDCR Policy Memorandum, p. 4 (August 3, 2006).

[65]   *Plata v. Newsom*, Case No. 4:01-1351-JST, Dkt. 2598, p. 5 (N.D.Cal.2013) (Corrected Declaration of Dr. John Galgiana, M.D).

[66]   Schmelzer and Tabershaw, "*Exposure Factors in Occupational Coccidioidomycosis,* 58 American Journal of Public Health and the Nations Health 1, pp. 111-112 (1968); California Department of Public Health, "Operational Plan for Emergency Response to Mosquito-Borne Disease Outbreaks," (June 2013).

[67]   California Department of Health, Letter for "*The Record*," Infectious Disease Branch, p. 11 (January 11, 2007).

inmates.  They ignored prior recommendations to exclude high risk minority populations.

951.   During a 2007 press conference announcing further prison construction plans, former Governor Schwarzenegger responded to a question asking whether he was comfortable exposing more inmates to the disease. He cavalierly announced that the State would "go ahead and build."

952.   Meanwhile, also in 2007, CDCR facility officials developed a plan to implement safety measures to mitigate the epidemic.  But it was vetoed by PVSP's then warden, James Yates, citing its $750,000 cost.

953.   Given this lack of action, unsurprisingly, rates from 2006 to 2010 were 100-1000x greater than the general California population.

954.   Fiscally, during the peak years of the epidemic, California spent over $23 million per year treating infected inmates.

955.   In 2009, CDCR putatively requested federal health agencies to assist them.  However, the federal agency resigned due to lack of CDCR's actual interest in receiving assistance.

956.   From 2006-2012, approximately one thousand eight hundred (1,800) inmates became infected at PVSP alone.  Over 30 died.  PVSP's (epidemic) contraction rate was estimated at one point to be 7 out of every 100 hundred inmates. In other words, all other things being equal, within 5 years, 1/3 of the resident population at PVSP would contract the incurable fungal respiratory disease.

957.   From 2007-2010, the contraction rate at the state hospital next door was six times lower than PVSP, which suggested that its newer, cleaner physical facility impacted the rate of contraction.

958.   In 2012, eight years after the epidemic began, CCHCS released a report which found that CDCR had done nothing of any consequence about the epidemic from 2006-2010.

959.   In 2013, Dr. John Galgiani, a leading expert, pointed out that prisoners comprised 71% of the valley fever deaths between 2006 and 2011.

960.   In 2013, a spokesperson from the Receiver's office stated that the State of California had known since 2006 that certain inmates were at greater risk, but no one had taken any real action in response.

961.   From 2005-2012, contraction rates at the prisons were 20-50 times greater than rates in the surrounding (hyperendemic) Central Valley region, as reflected by the following table and chart:

| TABLE 4 - INCIDENCE RATE[68] | | | | | |
|---|---|---|---|---|---|
| Year | CA State Rate/ 100K | Central Valley Rate/ 100K | PVSP-ASP Rate/ 100K | PVSP-ASP/ State Rate | PVSP-ASP/ Central Valley |
| 2005 | 8 | 83.5 | 1822 | **228x** | **22x** |
| 2006 | 8.7 | 107.7 | 4784 | **550x** | **44x** |
| 2007 | 8.2 | 104.9 | 3192 | **389x** | **30x** |
| 2008 | 7 | 71.0 | 2397 | **342x** | **34x** |
| 2009 | 6.7 | 70.0 | 3561 | **531x** | **51x** |
| 2010 | 12.4 | 159.7 | 4203 | **338x** | **26x** |
| 2011 | 14.6 | 188.7 | 5306 | **363x** | **28x** |
| 2012 | 11.7 | 131.3 | 3412 | **292x** | **26x** |

[68] *See Bates v. Schwarzenegger*, Case No. 19-17094, Dkt. 20, p. 21, Dkt. 21-13, pp. 2876-2883 [13 AER 2876-2883] (9th Cir. 2019).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Viewed graphically:

## CHART 1 - VF INCIDENCE RATE / 100K[69]



962.   About 12% of California prisoners suffer disseminated coccidioidomycosis.  They experience some combination of infection of the brain or spine, loss of the ability to walk, loss of use of extremities, have undergone spinal surgery, or live with permanent damage to other organs.

963.   About 25% of California prisoners suffer permanent lung damage. These include masses, lesions, nodules and other impairments that impair their breathing.

964.   About 25% of California prisoners experience pervasive rashes.  Half reported severe skin lesions.

965.   About 25% of California prisoners require hospitalization, some numerous times, and some were in bed for 20-30 days at a time.

---

[69]   *Bates v. Schwarzenegger*, Case No. 19-17094, Dkt. 20, p. 21, Dkt. 21-13, pp. 2876-2883 [13 AER 2876-2883] (9th Cir. 2019).

966.    Slightly less than 25% of California prisoners had or repeatedly had pneumonia.

967.    About 12% of California prisoners experience permanent liver damage or outright failure, including some who require liver transplants.

968.    About 20% of California prisoners experience severe weight loss.

969.    About 12% of California prisoners experience major side effects from the medication, including kidney and liver damage, resulting surgery, infections, and painful skin sores.

970.    About 25% of California prisoners are misdiagnosed or undiagnosed, with predictable exacerbation of the disease.

971.    About 33% of California prisoners experience severe and constant coughing.

972.    About 25% of California prisoners coughed or vomited blood on a regular basis.

973.    About 50% of California prisoners report difficulty breathing.

974.    The epidemic prompted a flurry of business activity for medical institutions treating it.  Direct, outside medical care expenses are difficult to estimate, plus all of the peripheral goods and services, including in-house medical care, overtime, pharmacology, transportation and medical equipment purchases, with expenses to the California taxpayers in an amount that is presently unknown but is surely many millions of dollars.

975.    The particular plaintiffs have suffered a combination of the above symptoms, along with specific reported injuries and problems as follows.

| **TABLE 5 – PLAINTIFFS' INJURIES** | | |
|---|---|---|
| **No.** | **PLAINTIFF** | **INJURY** |
| 1 | Arteaga, Richard | Difficulty breathing. Arteaga: 'always dizzy, always tired, my bones hurt.' |

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | PLAINTIFF | INJURY |
|-----|-----------|--------|
| 2 | Bracamonte, Ray | Rashes. Bracamonte: 'I continuously worry that my valley fever is back and that it will kill me. Every time I'm bed ridden from it, I fall into a depression thinking it will slowly kill me.' |
| 3 | Bates, Eric | "Can't sleep at night because of joint aches, shortness of breath and I'm just in pain daily." |
| 4 | Beagle, Frederick | Disseminated coccidioidomycosis; damaged/failing liver; blood clots; rashes.  Beagle: "I have joint and back pain still, and have skin rashes on my legs.  Also chronic pain." |
| 5 | Bradford, Darrell | 'I suffer each day from severe muscle/joint ache throughout my body; fatigue; dizziness.  Had gallbladder removed symptomatic of VF. |
| 6 | Briones, Johnny | 'I am unable to go outside due to my not being able to breath outside, so my daily program has been poor because I am sick all the time in this prison.' |
| 7 | Bustamante, Joseph | Always short of breath, dehydrated. |
| 8 | Campbell, Corey | Disseminated cocci.  'The disease travelled from my lungs to my lumbar spine.  It ate out L2 and T12.  I had to have an operation on my lumbar spine to replace the disc.' |
| 9 | Carr, James | Has body aches all the time, low energy, sores appear in head and on body. |
| 10 | Carter, Ricky | My body is always in pain. |
| 11 | Castaneda, Pablo | Pneumonia; difficulty breathing. Castaneda: 'I feel like I can't breathe sometimes. |
| 12 | Conley, Robert | Damaged/failing liver. Conley: 'Every morning I go through a tough time for the first two hours of my day. |
| 13 | Cooper, Alvin | It's hard for me to breath correctly.  I have headaches, stomach pains, fever, and sweat even if it's cool outside. |
| 14 | Corley, Kenneth | Hospitalized; difficulty breathing.<br><br>Kenneth: 'My shortness of breath is still the same, I just manage to deal with it each day using my inhaler … I experience pain because of my lungs trying to function normally at times throughout each day and emotional suffering knowing I have to deal with my condition every day.' |
| 15 | Cornethan, Walter | Difficulty breathing. |
| 16 | Corning, Roy | Difficulty breathing. |
| 17 | Dean, Keith | My joints are always killing me |
| 18 | Del Aguila, Marco | Severe joint pain on a daily basis and according to my last x-ray, the disease might be spreading from my right lung. |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | |
|---|---|---|
| **TABLE 5 – PLAINTIFFS' INJURIES** | | |

| No. | PLAINTIFF | INJURY |
|---|---|---|
| 19 | Duran, Joseph | Lungs damaged (partial removal recommended). |
| 20 | Duree, Dennis | My life now depends on me taking a medication that is actually poison to my body. From the moment I wakeup, I must evaluate the degree of pain I'm in to judge how much activity my body can stand. |
| 21 | Estrada, Vickter | "I can no longer think clearly all day long. My mental capacity is now limited. I'm always in aches and pain that causes my physical capacity and performance to be limited." |
| 22 | Everhart, John | I always have a cough, every day and night. |
| 23 | Franco, Antonio | I'm in pain all the time. I have trouble breathing. I feel very tired, very weak, headaches. I'm unable to do normal daily activities. |
| 24 | Franco, Emmanuel | It hurts to perform simple tasks like walking and getting on and off my bed. I cannot stand, sit or work without reasonable accommodation. My livelihood is extremely affected. |
| 25 | Frederikson, Michael | Joint pain and breath shortness. |
| 26 | Galloway, Aubrey | Severe weight loss; lesions; severe/painful/continuous coughing. |
| 27 | Garrett, James | I find myself exhausted, extreme joint pain, headaches with a lot of colds. I'm also very disoriented at times. |
| 28 | Hardin, Kevin | Years of aches and pains, flu-like symptoms, day and night headaches, burning lungs, very bad joint pain, stiffness, locking up and popping of the joints, low to no energy. |
| 29 | Haynes, Herman | Cough up/vomit blood; severe weight loss; hospitalized; severe/painful/continuous coughing. |
| 30 | Hayter, Clifford | Regular back pain and headaches. |
| 31 | Hernandez, Carlos | Chest pains, problems breathing. |
| 32 | Hernandez, Williams | I'm tired all the time … very hard to stand for long periods of time, strength cut in half. |
| 33 | Hockley, Jason | Joint pain is so bad that I find myself taking several pills daily. I've also had breath shortness and sinus attacks. |
| 34 | Islas, Jose | Treated with itraconazole but comes back if I go off. |
| 35 | Hughes, Darnell | It affects my movement, because I hurt, and it's been affecting my mental state. |
| 36 | Jalotjot, Danilo | Hospitalized; lungs damaged (fluid); difficulty breathing. "I can't breathe." |
| 37 | Johnson, Daniel | Shortness of breath, any physical activity, I lose my breath within minutes. I use to be very health and physical before I caught valley fever. |

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| **TABLE 5 – PLAINTIFFS' INJURIES** | | |
|---|---|---|

| No. | PLAINTIFF | INJURY |
|---|---|---|
| 38 | Johnson, Jesse | Back pain, heartburn, loss of appetite, always in pain throughout my body.  Knowing that I can get really sick at any time and die. |
| 39 | Jones, Daniel | Extraordinary fatigue. |
| 40 | Klvana, Milos | Chronic arthritis, daily pain, low back pain. |
| 41 | Leinweber, Mikhiel | Badly scarred lungs and breathing issues. |
| 42 | Lewelling, Jesse | It affects my breathing and my back hurts, along with my joints. |
| 43 | Lewis, Asad | Lesions. |
| 44 | Lewis, Cleofas | Severe weight loss; severe/painful/continuous coughing.<br>Cleofas: 'Being a diabetic, it is preventing me from exercising like I need, affecting my sugar level, I'm always tired and can't work out.  I'm still getting headaches.  I'm just not the same anymore.' |
| 45 | Lewis, George | Severe weight loss; rashes.<br>George: 'I now have something that the doctors are referring to as neutropenia, which is a condition where a certain type of white blood cell in my body becomes lower than normal.  This makes me at greater risk of getting severe infections, viruses and bacteria.' |
| 46 | Lewis, Joe | Severe/painful/continuous coughing. |
| 47 | Lewis, Kevin | Hospitalized.  Had a lung tumor, wanted to remove half his lung.  Cannot exercise like before, cannot do cardio.  Bones constantly hurt.  Meds are hard on liver. |
| 48 | Manning, Michael | Disseminated coccidioidomycosis; hospitalized; lesions; difficulty breathing; severe/painful/continuous coughing; pneumonia.<br><br>Michael: 'All through this terrible ordeal, I suffered chest sores, painful boils spread about the skin covering my chest, which had burst open. I had severe burning throughout my torso, bleeding. Every day, night and day, I believed I was dying. I certainly felt as if I were dying. My fever was high enough to cause severe dizziness, and I found sleep impossible. Depression, hopelessness, acute anxiety, and feelings of abandonment tore at me. I suffered from relentless vomiting, painful and debilitating.' |
| 49 | Martinez, Juan | Lack of energy is the worst. I have no motivation for anything in life.  The days I do try to move around for exercise, I'm short of breath.  It's depressing. |
| 50 | McDonald, Jeffery | Disseminated coccidioidomycosis; hospitalized; fluid in lungs; cold & pneumonia; seizures; heart problems; pneumonia; difficulty breathing; severe/painful/continuous coughing.<br>Jeffrey: extensive complications from VF. |
| 51 | McGinley, James | Excessive headaches, night sweats, cold chills, skin rashes, unable to think clearly. Bone and muscle aches. |
| 52 | Milford, Thomas | Hospitalized; severe/painful/continuous coughing. |

PAVONE & FONNER, LLP<br>600W. BRADWAY, STE. 700<br>SAN DIEGO, CALIFORNIA 92101

| No. | PLAINTIFF | INJURY |
|-----|-----------|--------|
|     |           | Thomas: 'the physical pain includes bone aches, severe headaches, lung and chest pain with difficulty breathing.' |
| 53  | Miller, Dale | Disseminated coccidioidomycosis; damaged/failing liver; lost use of leg. "Can't walk, can't work." |
| 54  | Milton, William | I am in pain everyday!  Severe knee, back, neck and chest pain. |
| 55  | Moody, Andre | Severe weight loss (30 lbs); hospitalized; lungs damaged (spots on left lung); VF misdiagnosed/undiagnosed (given sinus pills); skin boils & lesions in nostrils; continuous coughing. "I still can't work out … I have many nosebleeds." |
| 56  | Neal, Freddy | Severe weight loss (13 lbs in 2 weeks); severe/painful/continuous coughing; |
| 57  | Ngoun, Check | Lungs damaged (scar tissue); VF misdiagnosed/undiagnosed; difficulty breathing; continuous coughing; |
| 58  | Page, Mack | Hard to breathe. |
| 59  | Parker, Cedric | I have constant muscle aches and pain.  I can't get pain medication. |
| 60  | Parker, Theodore | I have a number of issues with stress and depression.  It is frightening to have to succumb to the negligence of CDCR. Psychologically I fear the re-occurring effects. |
| 61  | Peav, Sim | Coughing/vomiting blood; VF misdiagnosed/undiagnosed (allergies); kidney failure; rashes; continuous coughing. "Valley fever has destroyed my life. |
| 62  | Penalva, Juan | VF misdiagnosed/undiagnosed; internal bleeding; difficulty breathing. |
| 63  | Preston, Robert | Lungs damaged (masses); VF misdiagnosed/undiagnosed (told he was cured); pneumonia; difficulty breathing; continuous coughing. 'I have a hard time catching my breath. |
| 64  | Quiroga, Manuel | I can not breath properly.  I have pain in my bones always. |
| 65  | Richardson, Paul | Disseminated coccidioidomycosis; severe weight loss; rashes. |
| 66  | Ripoyla, Ronnie | Severe side effects from medication (damaged liver); continuous coughing. "Feelings of weakness." |
| 67  | Robinson, David | Urinating blood; spinal issues; difficulty breathing |
| 68  | Robertson, Richard | Uncontrollable coughing. |
| 69  | Rodriguez, Ronald | Lesions; pneumonia. "I am fatigued some days." |
| 70  | Ruggles, John | VF misdiagnosed/undiagnosed (told that since he was white, couldn't contract VF, symptoms ignored); difficulty breathing; continuous coughing; |
| 71  | Sams, Lorenzo | Pneumonia in right lung; rashes on legs; pneumonia; spleen removed; severe/painful/continuous coughing. Lorenzo: 'difficulty breathing, getting short of breath while walking. I am now on three inhalers.' |

**TABLE 5 – PLAINTIFFS' INJURIES**

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | PLAINTIFF | INJURY |
|---|---|---|
| 72 | Sanchez, Johnny | Severe weight loss; lungs damaged (collapsed lung); continuous coughing. "I am always worried about it." |
| 73 | Sanders, Tyrone | Cough up/vomit blood; erratic heart beat; pneumonia; difficulty breathing; severe/painful/continuous coughing.<br><br>Tyrone: 'I can't exercise property for fear of irritating my disease and losing breath.  I can't take deep breaths due to the pain it causes.' |
| 74 | Sherrod, Albert | Wasn't diagnosed till a year after symptoms; difficulty breathing; severe/painful/continuous coughing.<br><br>Albert: 'I'm always submitting CDCR health care forms complaining about valley fever issues: depression, chronic arthritis pain, neutrogenic bone disease, nerve damage.' |
| 76 | Steels, Willie | Severe weight loss; pneumonia; difficulty breathing; severe/painful/continuous coughing. |
| 77 | Taramona, Julio | Sometimes I feel like I am suffocating. |
| 78 | Terry, Danny | Joint soreness, kidney issues, and rash.  This disease doesn't give up. |
| 79 | Thomas, Maurice | Severe weight loss; hospitalized; difficulty breathing; severe/painful/continuous coughing.<br><br>Maurice: 'I still have chronic headaches, shortness of breath, aches in my shoulders and knees.  My energy and strength levels have gone down.  I'm not able to perform the exercise and work habits I used to.  It has altered my life.' |
| 80 | Thompson, Tyrone | Hospitalized; didn't implement hospital treatment plan: wheelchair; severe/painful/continuous coughing. |
| 81 | Vasquez, Roberto | Shortness of breath. |
| 82 | Vasquez, Solomon | Severe side effects from medication; severe weight loss; lungs damaged (lobe pneumonia); pneumonia; difficulty breathing. |
| 83 | Wallace, Patrick | Hospitalized (1 month, 3 surgeries); sores & blisters on legs; difficulty breathing |
| 84 | Williams, Alonzo | Energy level compromised. |
| 85 | Williams, Xavier | I cannot lift heavy objects without feeling a distinct strain on my lower back. |
| 86 | Wood, Theodore | Can't sleep in the same position for more than 15-20 minutes, constant ache affects ability to work. |
| 87 | Yancey, Kenneth | Joint pain, rash outbreaks, mental and physical anxiety, depression and pain. |
| 88 | Young, Gerald | My whole body has changed. |

## C.  Societal Expectations for Management of Epidemics

976.    In 1993, in the context of discussing how second-hand smoke should be dealt with, the US Supreme Court decided *Helling v. McKinney*, which analyzed the question of whether exposure to such smoke could be considered a potential Eighth Amendment violation under the *Estelle* standard.[70]

977.    The *Estelle* standard asks whether a punishment is incompatible with "the evolving standards of decency that mark the progress of a maturing society."[71]

978.    An exponentially higher risk of contracting valley fever in the subject prisons is statistically indisputable.  As per the California Department of Health's Infectious Diseases Director in 2013: "We concur that rates of cocci among inmates at Pleasant Valley State Prison (PVSP) and Avenal State Prison (ASP) are higher than rates among the general population."

979.    There is no evidence to support a finding that Central Valley society is comfortable with the kind of heightened risk associated with that seen in the prisons during the epidemic – the local population lived under risk that was about 1/33 as great[72] – especially when it occurs at a distinct location where concrete steps can be taken to ameliorate the situation, up to and including exclusion of people from that area.

980.    Valley fever is known as the "silent epidemic" and it appears that people living in, or moving to, the Central Valley were not, and are not, fully aware of just how much danger they are exposed to, even at the much lower rates attendant to the local non-incarcerated population.

### 1.  The Only Jury to Render a Valley Fever Verdict Did Not Find Unmitigated Exposure to be Societally Acceptable.

981.    According to the only known jury verdict, the Central Valley certainly does not accept that government may do nothing during epidemic exposure to valley

---

[70]  *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).
[71]  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).
[72]  *See* Table 4.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

fever at specific places.  Rather, it expects government officials to engage in full disclosure of known risks and take every reasonable precaution under the circumstances, including and up to exclusion.

982.    In September 2007, the California Department of Transportation (Caltrans) contracted with the Bugler construction company to expand a highway culvert in Kern County.  The work involved movement of soil.  Bugler workers labored at the project in late June 2008.  By early July 2008, seven plaintiffs were diagnosed with coccidioidomycosis, as had several other persons including a Caltrans inspector.

983.    A jury later awarded four Bugler employees $11.8 million in damages.

984.    To the extent a jury verdict reflects the attitudes and positions of Central Valley society, the Bugler verdict unmistakably rejects the contention that society blindly accepts undisclosed, unmitigated exposure to the risk of contracting valley fever.

### 2.    Society Expects State Authorities to Maximize the Protective Response to Epidemics including to Valley Fever.

985.    The exact definition of the term "epidemic" or "outbreak" varies from disease to disease, but under any definition, the geometric incidence rates and resulting epidemic mortality in this case required health authorities to act immediately and aggressively in order to safeguard the population at specific locations, according to various positions, policies and publications of government authorities.[73]

986.    As to health officials, an analysis requires as a prefatory matter to assess what a reasonable health official in 2006 would have understood his duties to encompass.  According to statutory law since at least 1939, California health officials

---

[73]  S*ee* Freedman, "*Coccidioidomycosis Outbreaks, United States and Worldwide, 1940–2015*," Emerging Infectious Diseases, Vol. 24, No. 3, March 2018.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

are obligated to "take all measures necessary" to prevent the spread of infectious diseases.[74]

987.    Similarly, there had been a mandatory obligation in place since at least 1995 for health officials to take steps to abate and prevent disease epidemics, as well as to report their progress in this regard to the California Health Department.[75]

988.    Thus, society as reflected by California state law, government policy and scientific research creates a universal expectation for government health authorities to take prompt and serious action in the face of epidemic danger from disease.[76]

### 3.  *Edison* Suggests that Society Expects California Custodial Facilities to be Safe from Valley Fever.

989.    In *Edison v. Geo*, the Ninth Circuit observed that "[i]n most individuals, cocci symptoms track that of a modest fever.  In an unlucky few, however, the disease takes a different, more devastating course – it causes a number of painful conditions, and can be fatal … as prisoners, Plaintiffs were particularly vulnerable to infection: Even if Plaintiffs had been warned of the disease, they were unable to move to a different location, remodel their living quarters, or erect protective structures, such as

---

[74]  *In re Martin* (1948) 83 Cal.App.2d 164, 167, *citing* Health & Saf. Code, § 2554 [repealed and replaced by essentially identical § 120175].

[75]  Health & Saf. Code, § 120185.

[76]  *See* Schmelzer, L, "*Exposure Factors in Occupational Coccidioidomycosis*, 58 Am.J.Pub.Health 107, 108-111 (1968); California Department of Public Health, Operational Plan for Emergency, Response to Mosquito-Borne Disease Outbreaks, pp. 3-14 (2013); California CDCP Public Health Emergency Preparedness Cooperative Agreement (PHEP) Program, pp. 1-3 (2018); California Office of Emergency Services, Emergency Plan, Ch. 6.3.13 (2017); Banach, D. Infection Control & Hospital Epidemiology, Outbreak Response and Incident Management, etc., Vol. 38, No. 12, 1393-1402 (2017); County of San Diego, Hepatitis Outbreak A, After Action Report, p. 7 (2018); California Dept. of Public Health, Occupational Health Branch, Preventing Work-Related Valley Fever (Coccidioidomycosis) (2019); California Dept. of Public Health, Department of Industrial Relations, Preventing Work-Related Valley Fever (Coccidioidomycosis) (2013).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

covered walkways.  Thus, by placing prisoners at Taft, the BOP directly increased Plaintiffs' risk of harm. *Under California law, the United States had a duty to protect Plaintiffs from the risk of contracting cocci*."[77]

990.    Judge Henderson's 2013 Order removing inmates out of PVSP and ASP is also relevant here, in holding that the controlling question is whether prison officials failed to take reasonable measures to address the cocci problem.   To formally fault them for doing so by moving the inmates out of the hyperendemic prisons includes the predicate assumption that such measures probably should have been taken earlier.

991.    In contrast, the *Hines* opinion states that society accepts a heightened risk of valley fever and thus implies that it is acceptable for officials to do nothing. However, its position rests partly on the inaccurate factual premise that the rates of contraction in the prisons were the same as the surrounding local area.

992.    The *Hines* position is founded on another fallacy: that migration to the Central Valley means that society accepts the risk of *unmitigated* exposure.  In other words, the *Hines* court assumes that persons moving to the Central Valley accept any quantum of elevated and unmitigated risk, when the reality is that local government and business take various and sometimes extensive steps to minimize exposure.

993.    Sixty-five (65) years before the epidemic in question, Dr. Smith attested that cocci was causing significant illness among WWII soldiers in training at camps in the endemic areas.  His studies revealed that preventive measures, notably dust control, were effective in reducing the rate of infection and thus the seriousness of epidemics.  His scientific work from 80 years ago, unchallenged in its continuing relevance today, is another measure of society's expectations.

994.    Given the statistical realities, the jury verdict, the positions of business and local government and the scientific literature, the contention that the California Central Valley or any other sector of American society accepts a state authority to be

---

[77]    *Edison v. Geo*, 822 F.3d 510, 513, 522 (9th Cir. 2016) [emphasis added].

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

warned about an epidemic risk of valley fever (or any other serious disease, including ones impacting prisoners) and to take no action in response, is to maintain a profoundly inaccurate position about society's view of government accountability.

**D.    Former Receiver Robert Sillen's Role in the 2004-2014 Epidemic**.

995.    In 2005, clinicians at Pleasant Valley State Prison (PVSP) noted a greater than usual number of cocci cases among prisoners. The California Department of Public Health (CDPH) confirmed the outbreak by noting the occurrence of at least 166 cases of valley fever at PVSP, including 29 inmates who were hospitalized, and four inmates who died.

996.    CDPH determined the rate of PVSP valley fever cases was 38 times the rate of cocci in residents of Coalinga, the city in which PVSP is located, and 600 times the rate of Fresno County.  CDPH also offered specific recommendations for reducing coccidioidomycosis among CDCR prisoners.

997.    These recommendations included the physical removal from prisons in highly endemic regions of inmates of African or Filipino descent, heavily immunosuppressed inmates, and inmates with chronic medical conditions, especially pulmonary conditions.

998.    On October 3, 2005, federal judge Thelton Henderson issued an order creating a receivership over the California state prison medical delivery system.  In relevant part, it states that:

> On June 30, 2005, after six days of evidentiary hearings, this Court ruled from the bench that it would establish a Receivership to take control of the delivery of medical services to all California state prisoners confined by the California Department of Corrections and Rehabilitation.

999.    On February 14, 2006, the Court issued a second order in which it outlined the Receiver's authority and responsibilities.

> The Receiver shall provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing, implementing, and validating a

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

> new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable.
>
> To this end, the Receiver shall have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions *of the medical delivery component of the CDCR*.

1000. Similarly, "[t]he Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system."

1001. Similarly, "[t]he Receiver shall have the power to hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding CDCR employees or contract employees who perform services related to the delivery of medical health care to class members. The Receiver shall have the power to establish personnel policies and to create, abolish, or transfer positions related to the *delivery of medical health care* to class members."

1002. As so defined, the Receiver did not have authority to preventatively manage the State's response to the epidemic. Although valley fever is a disease, the Receiver's authority based on the language utilized by the district court was limited to providing *health care services*; not to generally directing any and all policy action that might beneficially or preventatively impact the health of an inmate.

1003. For example, these orders did not suddenly give the Receiver's Office broad powers to interject itself into – *and direct policy about* – CDCR's water management, food delivery or other sanitation issues. The Receiver could not suddenly tell CDCR how much exercise to provide inmates; how much sleep to allow; or what custodial punishments were contraindicated to a specific inmate's health.

1004. Rather, the *Plata* case was based on a failure to provide competent prison medical treatment. The district court's orders were clearly limited to a jurisdictional grant to reform the provision of *medical care services*.

1005. Here, the Receiver was entitled to direct how cases of valley fever were treated, medically.  Its office was not entitled to direct how CDCR managed the need for prevention, aka, how the government should respond to the epidemic: how/where inmates would be moved to maximize safety, what categories of inmates would qualify as at-risk; and what other environmental steps might be taken to secure the grounds.

1006. CDCR certainly needed input about these issues, including from cocci medical specialists, security experts, and environmental mitigation professionals. CDCR was certainly entitled to solicit input from the Receiver, and the Receiver was certainly entitled to make recommendations to CDCR, about anything and everything that might impact its own ability to function including cocci policy.

1007. For example, the Receiver could rightly urge CDCR to take specific steps that would, in its view, minimize the risk of valley fever.  The more infections that came into the Receiver's domain desk for medical treatment, the more its costs escalated and therefore the more difficult it was to do its job of reforming that system to provide medical services at a reasonable cost.

1008. However, the prerogative to make recommendations and the power and right to give directions represent two very different situations.

1009. As noted above, in 2005, clinicians at Pleasant Valley State Prison (PVSP) noted a greater than usual number of cocci cases among prisoners.

1010. On August 3, 2006, a policy memorandum was passed.  It is co-signed by Peter Farber-Szekrenyi, Dr. P.H., as a director in the division of "Correctional Health Care Services."  The genesis of this entity is not clear, and on information and belief, falls under the umbrella of the Receiver's medical care authority.

1011. In *Hines v. Youssef*, The Ninth Circuit found that, in response, "[t]he federal Receiver asked the California Department of Health Services to investigate the outbreak at Pleasant Valley State Prison, the prison with the highest infection rate." (Notably, however, Winslow's May 21, 2007 memorandum states that CDCR made

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

that request.)

1012.  In *Hines v. Youssef*, the Ninth Circuit found that, "[a]fter its investigation, the Department of Health Services issued a report in January 2007."

1013.  In *Hines v. Youssef*, the Ninth Circuit found that, "[a]fter receiving the health department's recommendations, the Receiver convened its own committee."[78]

1014.  On May 21, 2007, Dr. Dwight Winslow, M.D., signing as statewide medical director, wrote a detailed memorandum to Robert Sillen, the Receiver at the time, about the cocci epidemic.

1015.  Among other observations, Winslow stated that, "[a]t this point, there is little debate that it is essential to make environmental changes at PVSP to arrest the increase in CM infections."

1016.  In *Hines v. Youssef*, the Ninth Circuit found that, "[i]n June 2007, the Receiver's committee made recommendations that were similar to those from the health department."

1017.  In June 2007, Dr. Winslow, signing as the statewide medical director, issued a report following his receipt of various professional input about how to manage cocci in the hyperendemic areas.

1018.  The Winslow report was copied to Robert Sillen, former Receiver.

1019.  Winslow's report claimed that progress had been made on four of the Department of Health recommendations, but little progress had been made "on one of

---

[78]  This committee is assumed to be different from the group of professionals listed in a June 2007 report titled, "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," as this report was prepared as a summary of the May 24, 2007 annual Valley Fever Symposium hosted by the Kern County Health Department.  In fairness, the opening statement of that report reads, "[t]his report builds on the information previously provided to the Receiver in the May 21, 2007 memorandum entitled Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison – Background and Status Report."  Thus, there is some connection between the Receiver and this report, but it unclear whether the June 2007 report was work product of "the Receiver's committee."

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

the most important recommendations, however, involving increasing ground cover throughout the prison property."

1020.  Dr. Winslow thereafter noted various procedural steps and meetings he planned to conduct to follow up with the major outstanding recommendations.

1021.  On July 10, 2007, armed with the Winslow report, Receiver Sillen requested a meeting with former CDCR Secretary, James Tilton.  Sillen also copied six other state officials.  It is not clear whether the meeting that Mr. Sillen requested with Mr. Tilton (and others) ever occurred or what its outcome was.

1022.  On July 20, 2007, one of the recipients of Sillen's email (with the attached Winslow report), Deborah Hysen, responded to Secretary Tilton commenting as applicable to the Receiver, "As you know, the Receiver and his staff have passed on to CDCR a white paper on the effects of valley fever on the prison population and have requested a follow-up meeting with state officials on the recommendations of the report."

1023.  In *Hines v. Youssef*, the Ninth Circuit found that, "[i]n response [to Winslow's June 2007 report], a statewide exclusion policy went into effect in November 2007."

1024.  It is apparently the view of the Ninth Circuit that the Receiver bears formal responsibility for the terms and conditions of the 2007 policy.

1025.  On September 9, 2007, Sillen was quoted in the Sacramento Bee as not only against excluding inmates for any reason but against stopping the additional planned construction at PVSP, a decision that would have profoundly exacerbated the epidemic:

> Sillen, in spite of the recommendations in the report he
> commissioned, said he is not in favor of stopping the infill
> construction program at the valley prisons.  He said there are
> "construction techniques and groundskeeping techniques,"
> such as watering, laying concrete and planting grass and trees,
> that serve to mitigate valley fever's spread.

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1026. Given the outcome, this singular statement (and the attitude it reflects) by then-receiver Sillen to continue disturbing soil and thus effectively perpetuate an ongoing disease epidemic explains much in terms of why the resulting exclusion policy, passed just two months later, was so narrow and why, as a consequence, the continuing valley fever epidemic was ultimately such an epidemiological catastrophe for the inmates.

1027. The November 2007 policy memorandum is signed again by Dwight Winslow, again as statewide medical director, but this time with the qualification "*Plata* support division."

1028. It is also co-signed by Suzan Hubbard, acting on behalf of CDCR.

1029. The term "*Plata* support division" can be read to suggest that Dr. Winslow has authored the report under the umbrella of the Receiver's authority, as it was the *Plata* case that give rise to the prison health care receivership, in other words, suggesting that the Receiver has taken command of the epidemic by passing an exclusion policy.

1030. The Ninth Circuit in *Hines* found that, "The inmates who were 'most susceptible to developing severe or disseminated cocci' would be moved from prisons in the Central Valley or not housed there in the first place."  This idea of identifying the most susceptible inmates was based on a list of six factors, however, none of those factors included a crucial criterion: race, particularly African-Americans.

1031. Without consideration of race, as reflected by the subsequent cocci statistics, the 2007 exclusion policy passed by the Receiver's office during the tenure of Defendant Robert Sillen was wildly ineffective in terms of reducing the incidence rates and the overall adverse health consequences to the inmate population.

1032. In addition, there appears to be no directive in the 2007 exclusion policy to actually do anything in the field of environmental mitigation, another well-known and crucial ingredient to minimizing contraction of cocci, one Sillen had himself recognized, especially during an epidemic.  To the extent the Receiver

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

projected authority over the epidemic, including environmental mitigation, it did not get done.

### E.  Receiver Clark Kelso's Involvement in the Cocci Epidemic

1033.   Shortly after the November 2007 policy was passed, on or about January 23, 2008, Receiver Robert Sillen was replaced by current Receiver, Clark Kelso.

1034.   Within that order appointing Mr. Kelso, "[t]he Receivership must continue to maintain its independence as an arm of the federal courts established to take over state operations… ."

1035.   There is no known activity on the valley fever front from the time of his appointment in January 2008, until September 15, 2008, in which Mr. Kelso mentioned that a valley fever mitigation plan was being incorporated into certain additional construction to occur at Avenal State Prison.

1036.   On February 9, 2009, it appears that Dwight Winslow, writing on letterhead entitled "State of California, Prison Health Care Services" (thus, it is unclear whether this is part of the Receiver's office or not) encouraged CDCR facilities representative Hysen to take mitigation steps.

1037.   In 2010, according to a declaration by Michael Stainer, the Receiver implemented a Medical Classification System Policy that created criteria for identifying inmates who may have an increased infection rate or who had pre-existing conditions that would be aggravated by contracting valley fever.

1038.   Even if true, this would not impact the ongoing epidemic unless the system was completed and those persons became part of those excluded in the 2007 policy.

1039.   In 2010, information came out that formalized the reality that infection rates had not decreased from 2006-2010 despite the 2006 and 2007 exclusion policies. It is unclear why a four-year gap occurred in the accumulation, reporting and action in response to this data, when county health departments typically report cocci statistics

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

on an annual basis, and in any event, management of epidemics is measured against action taken within days and at most months – not years at a time.

1040.   From Mr. Kelso's appointment in 2008 through 2012, it appears that nothing of any substantive value was done to get the cocci epidemic under control, even though it was a simple matter to understand that certain inmates, based on studies from the 1940's, were dramatically more susceptible and warranted exclusion. It should have been easy to identify such persons housed in prisons in the hyperendemic area and exclude them; indeed, no one interested the subject could possibly miss the dramatic impact the epidemic was having at PVSP.  If nothing else, inmates were filing a number of lawsuits, many of them naming Kelso himself.

1041.   In April 2012, the Receiver's office put out a report documenting the ongoing cocci problem, without giving explicit directions to anyone as to how to interrupt the epidemic.  According to the language of the report, its purpose was merely to "evaluate the rates, fiscal impact, and deaths due to cocci in CDCR institutions, after CCHCS implemented most of the preventive measures recommended by CDPH."

1042.   Following the discovery of the Receiver's report, on September 6, 2012, PLO counsel wrote a letter to Receiver Kelso and Matthew Cate, then CDCR Secretary, summarizing the information set forth in the April 2012 report.

1043.   PLO counsel recited that valley fever is a public health emergency because of the continuing and serious risk of injury and death to prisoners.  PLO counsel requested that Kelso and Cate take immediate corrective actions including closing PVSP and other prisons with high infection rates, and prohibiting Filipino and African-American prisoners from being housed at these prisons.  According to PLO counsel, no written response was received.

1044.   In October, 2012, CCHCS put out a further report, essentially restating what it said in April 2012 with some additional information, while again not making specific recommendations to CDCR to interrupt the epidemic.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1045.   In November, 2012, CCHCS did make recommendations to interrupt the epidemic, which finally did include excluding African-Americans, but it took no other apparent action.

1046.   In March, 2013, Prison Law Office filed a motion in the *Plata* action arguing that:

> Between 2008 and 2010, 355 prisoners were hospitalized from cocci related conditions, and in five years 27 prisoners died due to complications of cocci. African-American prisoners suffered the most. During the time of this study, they died from Valley Fever at eight times the rate of the African-American population in California and twice the rate of non African-American prisoners.

> More recently, the Receiver's medical staff has determined that from 2006 through 2011, 36 prisoners have died with Valley Fever, and in 34 of those cases, the disease was a contributing cause of death. 71percent of the deaths were African-American prisoners, 15 percent were White, and 15 percent were Latino.

1047.   The Ninth Circuit found in *Hines* that, "[f]ollowing this [April 2012] report, the Receiver issued another exclusion policy – one that would effectively suspend the transfer of African-American and diabetic inmates to the Central Valley prisons.  The state objected, but the district court ordered the prisons to comply with the new exclusion policy."

1048.   The district court's order excluding minority inmates was issued on June 24, 2013, a year after the April 12, 2012 report, resulting in another large number of preventable infections.

1049.   The Ninth Circuit found that, "[i]t is especially significant that state officials could have reasonably believed that they were not violating the inmates' Eighth Amendment rights because the officials reported to the federal Receiver." However, this is not accurate.  CDCR officials did not report to the Receiver.  The Receiver had no authority to direct cocci policy.  It was a health expert, but not one empowered to order the fix the problems being experienced in the prisons.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1050.   In summary, the Receiver's office, which began with Messrs. Sillen from 2005-2007 and Messr. Kelso from 2008 to present, was apprised no later than May, 2007 (and probably earlier) that a cocci epidemic was in progress.

1051.   During the six-year interval from the 2007 through 2012, neither of them did anything of consequence to stop it.   Two completely ineffectual policies, ones not within their *Plata* mandate, only excluded the most ultra-vulnerable inmates and had no measurable effect on the magnitude of the epidemic.  Since they apparently did not monitor the cocci situation carefully after these policies were passed, year after year after went by with huge numbers of infections still occurring, with mostly African-American victims and infliction of an incurable disease that would drain inmates for the rest of their lives.

1052.   The Receiver's office did not have authority to dictate how the cocci problem would be managed, but it did interject by passing exclusion policies.  CDCR also signed off on these policies, but were not experts in the same way the Receiver's office was.  Thus, the Receivers led the policy discussion and CDCR complied with it. However, both actions were profoundly inadequate to meaningfully mitigate the epidemic, causing thousands of persons to continue to contract the disease with resulting serious adverse health impacts, ones that generally do not abate over the long run.

**F.  Defendants Knew Certain Groups Were Particularly Susceptible.**

1053.   It is commonly and widely-known among prison officials and medical personnel that certain groups are much more susceptible than others to valley fever.

1054.   The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over 80 years ago.[79]

1055.   The 1995 memos discussed above also captured this information.

---

[79]   *See* Smith, Pappagianis, et al, <u>Human Coccidioidomycosis</u>, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1056.   An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[80]

1057.   California's Department of Health Services referenced the exceptionally high-risk groups in a letter dated March 16, 2006 from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, citing an article in a contemporaneous medical journal.[81]

1058.   In addition to the higher-risk racial and ethnic groups, anyone with a compromised or suppressed immune system also has an increased risk of developing disseminated valley fever.[82]

1059.   A compromised immune system may be caused by any of several chronic diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis.

1060.   Individuals over the age of 55 have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[83]

1061.   California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed patients."  The

---

[80]   David Filip, <u>Valley Fever Epidemic</u>, (2008) p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*, Mil Med. (June 2003), 168(6), pp. 460-464.

[81]   *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[82]   *See, e.g.,* American Thoracic Society, "*Patient Information Series*," American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

[83]   Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15.   The 2011 Thoracic Society also supports this conclusion, p. 5.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

DPH in 2007 therefore concluded that exclusion of all of these high-risk inmates was "the most effective method to decrease risk [of valley fever infections]."[84]

1062.   CDCR's inmate mortality figures bear this out.  In analyzing reports from the Receiver's medical staff, Dr. Galgiani noted that "African-American prisoners [in the Central Valley state prisons] died with valley fever at a higher rate than the general inmate population, and at much higher rates than African-American men in California." [85]  In fact, African-American prisoners comprised 71% of the 34 deaths in CDCR prisons between 2006 and 2011.[86]

1063.   A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

1064.   After CDCR failed to act to address the risks to the susceptible racial and ethnic groups, the Receiver finally took steps to force CDCR to relocate the omitted higher-risk inmates. Joyce Hayhoe, a spokeswoman for the Receiver's office, disclosed that, "The State of California has known since 2006 that segments of the inmate population were at a greater risk for contracting valley fever, and mitigation efforts undertaken by CDCR to date have proven ineffective."  She stated that, "as a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

### G.   Defendants Knew the Severe Risks to Inmates But Disregarded Those Risks.

1065.   Defendants were aware that housing inmates at the hyper-endemic prisons posed a greatly elevated risk to those inmates of contracting valley fever and that failure to control exposure to the cocci-containing soil at those locations (such as by construction activity) increased that risk significantly.

---

[84]   CCHCS Report dated April 16, 2012 relating recommendations in Jan, 2007, p. 8, Box 2.
[85]   Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 10.
[86]   *Id*.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1066.   The 2004 Kanan Memo was circulated to a number of specific health care professionals inside the prison system and was intended to be circulated to all health care managers within the Department of Corrections, for general circulation to all health care professionals in the system.

1067.   In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by valley fever, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

1068.   Beginning in 2006-2007, and continuing yearly thereafter, a Fresno County Grand Jury undertook the task of evaluating inmate issues at PVSP and it made a series of recommendations.

1069.   Beginning in 2007, the Grand Jury issued periodic public reports concerning valley fever incidence at PVSP.   It observed that "[l]ocal prison officials are well aware of this health crisis. . ." and stated that inmates and staff continue to be at risk from valley fever.

1070.   The Grand Jury issued these reports, starting in 2007 and continuing each year thereafter, directly to Brazelton, Yates, and Cate, and to Defendant Kelso, as well as to other CDCR officials, while they held office within, and oversaw, the state prison system.

1071.   In these reports, the Grand Jury required Defendants Yates, Cate, and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Yates also sent copies of his response at a minimum to Cate, to Kelso, and other CDCR officials.

1072.   The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1073.   In addition to the other sources of information available to them, some of which are discussed further below, the Fresno Grand Jury findings informed Yates, Cate, Brazelton, each year from 2007 on, during the period each was employed in the state prison system, that inmates like Plaintiffs were at increased risk from valley fever and susceptible to potentially fatal health consequences as a result, if they were housed at or remained at PVSP.

1074.   Despite his personal knowledge of the threat of valley fever, including on information and belief, the information provided to him about the risks of increased exposure to the spores that cause valley fever by construction activity, in September 2007 then-Governor Schwarzenegger proposed that the state construct new dormitories at PVSP to expand by 600 the number of beds located and prisoners housed there.

1075.   At a press conference called to announce the expansion plans, Governor Schwarzenegger responded to questions about the fact that the proposed expansion would inevitably expose more prisoners to the disease.  Defendant Schwarzenegger indicated he would deliberately disregard the risk of exposing large numbers of additional prisoners to valley fever, stating: "We will go ahead and build."

1076.   On information and belief, as described herein, by the time of the press conference Schwarzenegger was fully informed that inmates housed at PVSP, and at the hyper-endemic prisons in general, were at a greatly increased risk of contracting valley fever, that racial and ethnic minorities were particularly susceptible to these risks, and that preventative measures such as ground cover to control spores were recommended but not implemented, and that the risks would be increased by the construction.  Governor Schwarzenegger's comments at the press conference evidenced his deliberate indifference to those risks.

1077.   Further, CDCR publishes and distributes an Orientation Manual for all medical personnel.  The Manual discusses the coccidioides epidemic in detail and specifically notes that African Americans, Filipinos, and those with compromised

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

immune systems or chronic diseases are at greatly increased risk for contracting valley fever in its most deadly form.[87]

1078.  The orientation manual is authorized and promulgated by Winslow, a member of the Receiver's office.  Winslow clearly knew of the increased risks but took no other steps to prevent Plaintiffs' infection.

1079.  All medical personnel and facility management at CDCR were aware of the information in the Orientation Manual and its implications for inmates housed at hyper-endemic prisons.

1080.  Defendants were provided with numerous others sources of information that further confirmed and reinforced the risk to inmates including Plaintiffs.

1081.  In 2006 the California Department of Public Health, Center for Infectious Disease conducted an epidemiological study of valley fever in California prisons (the "Study").  The Study was published in January 2007.

1082.  The Study found that the number of cases of valley fever reported at PVSP in 2005 was at least 3 times that of the entire rest of Fresno County combined. The Study reported that any persons with suppressed immune systems as a result of disease or medications which are immune-suppressive, such as those for chronic arthritis, are at risk of the deadliest form of valley fever, as are African-Americans, Hispanics, Filipinos and other Asians.

1083.  The Study recommended that CDCR evaluate relocating the highest risk groups to areas that are not hyper-endemic to Coccidioides, and at a minimum, to take steps at the prisons to minimize exposure, including ventilation, respiratory protection, and dust suppression and soil control.

1084.  On information and belief, Defendants were at all relevant times aware of the CDPH Study and familiar with its conclusions regarding inmates, valley fever, and suggested mitigation measures.  Nothing was done.

---

[87]  Imai & Winslow, M.D.'s, Department of Correctional Healthcare Services, "*Letter from the Chief Physician Executive*, January 23, 2008.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# I.

## FIRST CLAIM FOR RELIEF

## ACTION UNDER THE FEDERAL TORT CLAIMS ACT

**(By all Plaintiffs against both Defendants, in their Official Capacity)**

### A. General Allegations

1085.  Plaintiffs incorporate the allegations of 1-1084 as if fully set forth into this cause of action.

1086.  Pursuant to 28 U.S.C. 1346(b), the United States is liable if it or its officers (acting in the scope of their employment) inflict an injury by virtue of the negligent or wrongful act, under circumstances where the United States, if a private person, would be liable under California law.

### B. Factual Findings Applicable to the Receiver's Office from *Hines.*

1087.  In *Hines v. Youssef*,[88] the Ninth Circuit made a series of findings about the Receiver's relationship to the valley fever epidemic.

1088.  The Ninth Circuit found that, "[f]or years, inmates in California state prisons have claimed that the state violates the Eighth Amendment by failing to provide sufficient medical care."

1089.  The Ninth Circuit found that, "[m]any inmates have sued."

1090.  The Ninth Circuit found that, [i]n 2002, California signed a consent decree in one such case, *Plata v. Davis*."

1091.  The Ninth Circuit found that, "[a]s part of that decree, California promised to implement specific procedures to ensure that inmates statewide received constitutionally adequate medical care."

1092.  The Ninth Circuit found that, "[b]ut the state did not satisfy the terms of the decree, so in 2006 the *Plata* district court appointed a federal Receiver.

1093.  The Ninth Circuit found that, "[t]he court conferred on the Receiver 'all powers vested by law in the Secretary of the [California Department of Corrections

---

[88]   *Hines v. Youssef,* 914 F.3d 1218 (9th Cir. 2019).

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

and Rehabilitation] as they relate to the administration, control, management, operation, and financing of the California prison medical health care system.'

1094.  The Ninth Circuit found that, "[t]he court concurrently 'suspended' the Department of Corrections and Rehabilitation's exercise of those powers 'for the duration of the Receivership.'"

1095.  The Ninth Circuit found that, "[t]herefore, since 2006, state officials have made decisions about prison medical care while under the control of a federal Receiver, appointed by a federal district court to ensure compliance with the Eighth Amendment."

1096.  The Ninth Circuit found that, "[t]his [*Smith*] case challenges how those state officials responded to Valley Fever outbreaks in several prisons in the Central Valley of California, despite the Receiver's control."

1097.  The Ninth Circuit found that, "[i]n 2005, California prison officials noticed a 'significant increase' in the number of Valley Fever cases among prisoners.

1098.  The Ninth Circuit found that, "[t]he federal Receiver asked the California Department of Health Services to investigate the outbreak at Pleasant Valley State Prison, the prison with the highest infection rate."

1099.  The Ninth Circuit found that, "[a]fter its investigation, the Department of Health Services issued a report in January 2007."

1100.  The Ninth Circuit found that, "It [the January 2007 report] stated that Pleasant Valley State Prison had 166 Valley Fever infections in 2005, including 29 hospitalizations and four deaths."

1101.  The Ninth Circuit found that, "[t]he infection rate inside the prison was 38 times higher than in the nearby town and 600 times higher than in the surrounding county."

1102.  The Ninth Circuit found that, "According to the report, "the risk for extrapulmonary complications was increased for persons of African or Filipino descent, but the risk was even higher for heavily immunosuppressed patients."

1103.  The Ninth Circuit found that, "[t]he report then explained that

physically removing heavily immunosuppressed patients from the affected area "would be the most effective method to decrease risk."

1104.   The Ninth Circuit found that, "[t]he report also recommended ways to reduce the amount of dust at the prisons."

1105.   The Ninth Circuit found that, "After receiving the health department's recommendations, the Receiver convened its own committee."

1106.   The Ninth Circuit found that, "[i]n June 2007, the Receiver's committee made recommendations that were similar to those from the health department."

1107.   The Ninth Circuit found that, "[i]n response, a statewide exclusion policy went into effect in November 2007."

1108.   The Ninth Circuit found that, "The inmates who were 'most susceptible to developing severe or disseminated cocci' would be moved from prisons in the Central Valley or not housed there in the first place."

1109.   The Ninth Circuit found that, "[t]he prisons used six clinical criteria to identify which inmates were most likely to die from Valley Fever: '(a) All identified HIV infected inmate patients; (b) History of lymphoma; (c) Status post solid organ transplant; (d) Chronic inmmunosuppressive therapy (e.g. severe rheumatoid arthritis); (e) Moderate to severe Chronic Obstructive Pulmonary Disease (COPD) requiring ongoing intermittent or continuous oxygen therapy; [and] (f) Inmatepatients with cancer on chemotherapy.'"

1110.   The Ninth Circuit found that, "[i]nmates were not excluded from the Central Valley prisons based on race. The Receiver refined the exclusion policy in 2010 and created a list of 'inmates who [were] at institutions within the Valley Fever hyperendemic area that [needed] to be transferred out.' "

1111.   The Ninth Circuit found that, "[t]he record does not indicate that the 2010 policy excluded inmates from the outbreak prisons based on race."

1112.   The Ninth Circuit found that, "[i]n April 2012, the prison system's own healthcare services released a report examining Valley Fever in prisons."

1113.   The Ninth Circuit found that, "[t]he report concluded that despite the

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

'education of staff and inmates' and the 'exclusion of immunocompromised inmates,' there had been 'no decrease in cocci rates.'"

1114.  The Ninth Circuit found that, "[t]he authors found that Pleasant Valley State Prison inmates were still much more likely to contract Valley Fever than citizens of the surrounding county.  From 2006 to 2010, 7.01% of inmates at Pleasant Valley State Prison and 1.33% of inmates at Avenal State Prison were infected.  By comparison, the highest countywide infection rate was 0.135%, and the statewide rate was just 0.007%. From 2006 to 2011, inmates in the Central Valley prisons died from Valley Fever."

1115.  The Ninth Circuit found that, "[p]rison healthcare services also found that male African-American inmates were twice as likely to die as other inmates. Each year, about 29% of the male inmates in California are African-American, but 50% of the inmates who developed disseminated cocci between 2010 and 2012 were African-American, and 71% of the inmates who died from Valley Fever between 2006 and 2011 were African-American."

1116.  The Ninth Circuit found that, "[f]ollowing this report, the Receiver issued another exclusion policy – one that would effectively suspend the transfer of African-American and diabetic inmates to the Central Valley prisons. The state objected, but the district court ordered the prisons to comply with the new exclusion policy."

1117.  The Ninth Circuit found that, "[i]t is especially significant that state officials could have reasonably believed that they were not violating the inmates' Eighth Amendment rights because the officials reported to the federal Receiver.

1118.  The Ninth Circuit found that, "[t]he Plata district court appointed a federal Receiver in 2006 – just a year after the Valley Fever outbreak began."

1119.  The Ninth Circuit found that, "[t]he receiver entered orders about Valley Fever.  Studies were conducted, and in 2010, the Receiver amended the policy excluding certain inmates from the Central Valley."

1120.  The Ninth Circuit found that, "[t]hus the federal Receiver appointed by

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

the federal court to assure Eighth Amendment compliance actively managed the state prison system's response to Valley Fever."

1121.  The Ninth Circuit found that, "[t]he Receiver has filed papers with the *Plata* district court, and the district court has entered orders to improve medical care.

1122.  The Ninth Circuit found that, "[b]ecause the Receiver oversaw prison medical care and protective measures regarding Valley Fever, state officials could have reasonably believed that their actions were constitutional so long as they complied with the orders from the Receiver and the Plata court."

1123.  The Ninth Circuit found that, "[t]he inmates do not claim that state officials defied the *Plata* Receiver. The Receiver promulgated orders directed specifically to the Valley Fever problem, and the inmates do not claim that the defendants defied those orders and that the defiance harmed them."

1124.  The Ninth Circuit found that, "[t]he inmates fault the officials for not following various recommendations made before 2013.  For example, in 2007 the California Department of Health Services recommended covering the prison grounds, but the soil was not stabilized until 2011 after the prisons got funding from the Receiver."

1125.  The Ninth Circuit found that, "[o]ther recommendations were never adopted.  But the inmates do not argue that the officials disobeyed the Receiver's binding orders, only that the officials did not promptly follow recommendations that were not orders."

1126.  The Ninth Circuit found that, "[i]n determining what constituted the constitutionally sufficient level of protection, an official could reasonably have thought that it sufficed to comply with the Receiver's orders."

1127.  The Ninth Circuit found that, "[a]s we once stated in a different context, 'no reasonable prison official would understand that executing a court order without investigating its potential illegality would violate a prisoner's right to be free from cruel and unusual punishment.'"

1128.  In summary, the Ninth Circuit has already found that the receiver's

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

office proactively injected itself into the 2004-2014 cocci epidemic, that it entered orders during the epidemic, and that CDCR was guided by its decisions, including the failure to exclude vulnerable minorities.

### C. Negligent or Wrongful – General Application

1129.  Defendants, acting within the scope of their employment but outside of their authority (it having been limited to medical care delivery), undertook a legal duty to protect California prison inmates from unreasonable risk of cocci infection; a duty which they decided would include the creation, implementation, imposition and monitoring of cocci policy (and practice) in response to the 2004-2014 valley fever epidemic.

1130.  Having undertaken these and related duties, Defendants did not exercise due care, including but not limited to, the following: *(i)* they violated established science in terms of assessing the class of vulnerable persons (both in terms of extra risk of contraction and extra risk of a severe outcome) and thus implemented a wildly underinclusive, insufficient and unconstitutional exclusion policy, such that a mass number of people became infected with extraordinary rates as depicted in Table 4 and Chart 1; *(ii)* they did not adequately collect and review infection data to determine the efficacy of their policy in a time frame that allowed for adjustment to it to meet constitutional standards; *(iii)* they did not in fact adjust the inadequate exclusion policy in time to avoid the continuing mass infection of inmates; and (iv) they did not take other appropriate and effective mitigation steps to suppress the epidemic.

1131.  Defendants added to the risk of harm by virtue of these decisions, because they did not accurately, timely, or properly manage, oversee, monitor or mitigate the 2004-2014 cocci epidemic, and in addition, by taking the leading role, Defendants caused CDCR and its agents to rely on its inexpert management, as found by the Ninth Circuit.

1132.  Consequently, thousands of inmates became infected with the disease, which was thousands more per capita than the surrounding area.  Numerous of these inmates, including the plaintiffs herein, suffered various kinds of physical and

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

sometimes debilitating injuries, as reflected in Table 5.

1133.  Plaintiffs, who had no choice but to be governed by the Defendants' decisions, were required to follow these decisions and be subjected to them.

1134.  The added risk imposed by Defendants' injection of substandard management and oversight of the 2004-2014 epidemic was a substantial factor in causing Plaintiffs' injuries, in that had appropriate scientifically-accurate exclusion criteria been timely imposed, had timely monitoring of the extent of the epidemic occurred, and had timely adaptation even of an errant initial policy been corrected, Plaintiffs would have avoided contraction of the disease.

1135.  CDCR and its agents (formerly defendants but excused under qualified immunity) were otherwise responsible under the Eighth Amendment for all of the above obligations, but they, according to the Ninth Circuit, deferred to Defendants for these decisions and were excused from this litigation on the basis that such deferral was permissible under the doctrine of qualified immunity.

1136.  Although the epidemic in question required emergency action, the necessary policy, monitoring, adaptation and mitigation process was not required on such an extraordinarily short timetable that the "scene of an emergency" exception to the Good Samaritan doctrine applies.  The epidemic began in 2004.  The exclusion policies were put in place in 2006 and 2007.  For the most part, Plaintiffs contracted the disease in 2008 and beyond.  Thus, Defendants had years to study the available pre-existing VF policies, the history of cocci management, and the published science so as to engage in effective mitigation and management.

1137.  Defendants had plenty of time to engage in standard data and collection review intervals for epidemics, in order to optimize their management decisions. Furthermore, they had years more to adapt and adjust initial inaccurate positions toward a better outcome.  To the extent Defendants did any of these things, and there is a sparse record of them doing any of them, they did them in contravention of standard fungal epidemic practice, did not care or endeavor to improve their failing tactics as time went on, and ultimately, their mistakes and inaction resulted in the

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

then-most-serious epidemic disease failure in published penal history.

1138.  Consequently, and given all the circumstances, Defendants' conduct was sufficiently unreasonable and sufficiently dangerous – a six-year drama of effectively ignoring a serious disease epidemic – that they knew or should have known that it was highly probable that physical harm would result.

### D.  Cruel and Unusual Punishment

1139.  Cruel and unusual punishment occurs when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

1140.  It is cruel and unusual punishment to expose inmates to adverse environmental toxins that cause serious harm, especially at exposure levels that greatly exceed acceptable standards.

1141.  The Ninth Circuit in *Hines* did not determine whether exposure to cocci at the levels seen in this case constitutes cruel and unusual punishment; rather, it elected to dispose of the matter by reference to the qualified immunity doctrine.[89]

1142.  However, even a basic analysis under the standards governing such a finding reveals that the kind of risk exposure seen in this case states a claim.

1143.  By reference to previous discussions above, no one disputes that coccidioidomycosis is a serious disease.  Furthermore, no one can seriously dispute that the epidemic in question presented a significant risk of serious harm to the affected inmates.[90]

1144.  To the extent qualified immunity is available as a defense to an FTCA claim brought against a federal official, every such official ought to know that he, having undertaken a duty to handle a cocci epidemic and thus acting under a statutory rubric in which officials are obligated to take all available measures to mitigate such epidemics, he cannot just pass any exclusion policy and then effectively ignore the matter for the next six years, by failing to notify the affected population that there is

---

[89]  *Hines v. Youssef*, 914 F.3d 1218, 1231 (9th Cir. 2019).
[90]  *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *Hutto v. Finney*, 437 U.S. 678, 682, 685 (1978).

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

an epidemic, failing to take sufficient precautions, failing to monitor cocci rates, and by essentially taking no further action, while thousands and thousands of cases pile up.

1145.  Given the long history of government's effort and obligation to combat diseases outbreaks, and in particular valley fever, society had surely evolved by 2004 – well after the 1940s studies by Dr. Smith, the warnings and protocols to employers developed in the 1960s, the 1993 *Helling* decision and the 1995 CDCR valley fever memos – to recognize exposure to this disease at levels that everyone considers unsafe is a danger that health officials could not simply ignore, even if *Hines* found that prison officials could defer to those health officials.

1146.  Both defendants were aware that inmates housed at the hyper-endemic prisons faced a significantly elevated risk of serious harm from infection by the coccidoides spores known to be present at elevated levels there, and knew that the risk at specific prisons and for specific groups was even greater.

1147.  The failure by each Defendant who undertook to assume control over the epidemic by establishing and implementing cocci policy during their tenure, which should have excluded at-risk inmates or higher-risk inmates from the hyper-endemic prisons, thereby proximately and substantially caused that plaintiff to be housed at a hyper-endemic prison and to be exposed to an increased risk of infection leading to their injury.

1148.  Defendants knew there was a serious, epidemic level of risk of harm to Plaintiffs and all prisoners that faced incarceration in hyper-endemic prisons, as early as 2005.

1149.  Defendants had actual knowledge of the serious risk of harm to the Plaintiffs but nevertheless ignored the risks and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Coccidioidomycosis by failing to adopt an exclusion policy that protected these high-risk inmates or to adapt it once it became clear that it was ineffective.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1150. Having undertaken to manage the epidemic in excess of their *Plata* authority, but having failed to adopt an appropriate exclusion policy, each Defendant's actions and omissions, and each Defendant's failure to take the required remedial actions to make those prisons safer for all inmates, including in particular PVSP and ASP, caused (or contributed to causing) Plaintiffs' injuries.

1151. Furthermore, having undertaken to manage the epidemic and project authority over the epidemic, Defendants failed to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures, or adequately warning inmates about the danger they faced.

1152. Both defendants asserted a level of control over the cocci epidemic, even though they did not have authority from the *Plata* court to do so, by passing policies in relation thereto.

1153. However, each ultimately was deliberately indifferent to the health risks the state-caused epidemic posed and failed to take meaningful action to prevent or reduce the risk, causing Plaintiffs' injuries.

1154. Because those policies were vastly underinclusive, did not consider the impact of biologically-ultra-vulnerable minorities, and defendants did not monitor the adverse effects of their policies after they were passed, their conduct imposed cruel and unusual punishment on the inmates that became infected and thereby constituted negligent and wrongful conduct as defined by the FTCA.

**E. Dangerous Condition**

1155. The subject prisons where Plaintiffs contracted cocci were in a legally dangerous, infectious condition during the 2004-2014 cocci epidemic: they were contaminated with cocci spores from a combination of state-sponsored construction, a failure of sanitary maintenance, and insufficient precautions and protection against the natural elements that spread cocci spores, such as proper and maintained ventilation systems.

1156. It was reasonably foreseeable that these dangerous prisons would cause

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

inmates housed at them to contract the disease, and in fact as detailed, Plaintiffs did contract the ailment.

1157.  Defendants were aware that the subject prisons were dangerous: they had received detailed warnings and memos outlining the state of the crisis.

1158.  Having undertaken a duty to manage the 2004-2014 epidemic, Defendants did not take timely, adequate or sufficient steps to warn, remediate, mitigate, or make safe the property that they effectively asserted as under their control by their imposition of authority over the epidemic.

1159.  CDCR is traditionally considered the owner, and the party in control, of the 30-odd prisons in the State of California.

1160.  The Receivers' assertion of authority over the 2004-2014 cocci epidemic included their own assessment that the grounds at the subject prisons was dangerous and that steps should be taken to minimize that danger.  These mainly included three guidelines:

1.   Continue to provide educational material to medical and custody staff and to inmate-patients regarding cocci disease.
2.   Consider planting ground cover or grass on open dirt areas within the prison grounds.
3.   When digging, use a protective mask and wet the ground prior to digging.

1161.  However, having undertaken a duty to safeguard the prison population, these policy pronouncements were wildly insufficient to accomplish anything of value in relation to the objective of minimizing contraction cases.

1162.  As explained above, the memos released to the inmates did not adequately identify the real risks to them, including the extraordinary risks posed to certain minorities, and did not arm them with concrete strategies to avoid contraction, given prisons that were already blanketed with the dangerous spores.

1163.  Furthermore, Defendants did not issue a mandatory policy to CDCR to perform effective mitigation on the prison grounds.  Though scientific studies beginning as early as the 1940s counseled authorities desiring to reduce infection rates

to impose aggressive ground cover measures, and found that rates could be reduced by half by so doing, Defendants did not impose any mandatory ground cover or take any other effective mitigation steps.

1164.  Perhaps because Defendants did not have authority over CDCR premises, they were reluctant to act as if they did.  But having injected themselves into the cocci epidemic as the leading authority, and having created a detailed policy that proposed to (and did) regulate the epidemic throughout its course, Defendants' half-hearted suggestion for CDCR to engage in environmental mitigation, without requiring it, constituted the worst of both worlds for the inmates: it did not require CDCR to do anything and CDCR did not; and it simultaneously gave CDCR legal cover to argue that they complied with the Receivers' directions, which as indicated, did not actually require any real action by CDCR on this issue.

1165.  Consequently, having undertaken a duty to solve the situation of a dangerous condition in the form of infectious disease spores laden on several of CDCR's prisons, Defendants did not exercise due care for the reasons stated above and therefore behaved in a negligent and wrongful manner.

**F.  Good Samaritan Cause of Action**

1166.  Under California common law, a person [such as a Receiver] has no duty to come to the aid of another.  If, however, that person elects to come to someone's aid, he has a duty to exercise due care.  Thus, a 'good Samaritan' who attempts to help someone might be liable if he or she does not exercise due care and ends up causing harm.

1167.  Plaintiffs have argued that the Receivers had no legal duty to proactively manage the cocci epidemic.  However, by exceeding their orders as granted to them in the *Plata* case, Defendants gratuitously undertook to manage the cocci epidemic by, among other things, passing policies related thereto.  As such, Defendants created a special relationship with the inmates that required Defendants to act in a competent manner.

1168.  This was not the scene of an emergency but a long window of time in

PAVONE & FONNER, LLP
600 W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

which Defendants enjoyed every opportunity to apply correct standards and policies to manage the epidemic.

1169.  For all the reasons discussed above, and incorporated herein, they did not exercise due care or competently in applying correct standards or carrying out competent policies, and as such, Defendants are responsible for the resulting mass number of cocci infections that resulted and this is another way in which their conduct constituted negligent and wrongful conduct under the FTCA.

### G.  Immunities

1170.  Defendants are not entitled to any form of immunity for their actions. As to qualified immunity, it is obvious that inaction in response to a disease epidemic, other than to exclude an ultra-narrow sliver of inmates, violates their basic health care mandate to take all reasonable action to minimize its impact.

1171.  As to discretionary immunity, Defendants certainly had the discretion to not get involved, but having gotten involved and having decided to lead the management of the epidemic, they did not have the discretion to pass policies and take (or fail to take action) that would be considered negligent or wrongful.  However, for all of the reasons argued above, their policies were negligent, wrongful, insufficient, cruel, and otherwise sufficient to subject them to liability under the FTCA.

### II.

### SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FEDERAL PROHIBITION AGAINST

### CRUEL & UNUSUAL PUNISHMENT

### (U.S. CONSTITUTION, EIGHTH AMENDMENT)

### (By All Plaintiffs Against Both Defendants, in their Individual Capacity)

### A.    Defendants Violated the Eighth Amendment.

1172.  Plaintiffs incorporate the allegations of 1-1084 as if fully set forth into this cause of action.

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1173. In the 1971 case of *Bivens v. Six Unknown Named Federal Agents*,[91] the US Supreme Court held that federal agents may be sued for damages for violating the US Constitution. This kind of claim became a "*Bivens* action."

1174. It is essentially similar in its elements to a 1983 action, in that it appears that the same standards and elements to establish a constitutional violation exist for federal agents, while it must be shown that the federal agent was acting under color of law.

1175. Each plaintiff had a federally-protected right to be free from cruel and unusual punishment, a right secured by the United States Constitution under the Eighth Amendment.

1176. Defendants acted as federal agents in that they were appointed by a federal court in 2005 to act as receivers of the California medical care delivery system.

1177. The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

1178. An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

1179. It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm.

1180. Both defendants were aware that inmates housed at the hyper-endemic prisons faced a significantly elevated risk of serious harm from infection by the coccidoides spores known to be present at elevated levels there, and knew that the risk at specific prisons and for specific groups was even greater.

1181. Both defendants asserted a level of control over the cocci epidemic, even though they did not have authority from the *Plata* order to do so, by passing policies in relation thereto, but each ultimately was deliberately indifferent to the health risks the state-caused epidemic posed and failed to take meaningful action to

---

[91] *Bivens v. Six Unknown Named Federal Agents*, 403 F.3d 388, 395-396 (1971).

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

prevent or reduce the risk, causing Plaintiffs' constitutional injuries, because those policies were vastly underinclusive, did not consider the impact of biologically-ultra-vulnerable minorities, and defendants did not monitor the adverse effects of their policies after they were passed.

1182. Both Defendants' actions and failure to act as alleged herein proximately and substantially caused significantly increased risk to each Plaintiff who later became infected.

1183. Each Defendant's decision to proactively manage the epidemic by passing valley fever policies, along with resulting failure to competently implement protective remedial measures throughout their tenure (even if beyond their *Plata* mandate, having injected themselves into the epidemic's management), as well as at any time after their tenure and prior to the dates each Plaintiff herein became infected, allowed the dangerous conditions at the prisons to continue unabated. These dynamics proximately and substantially caused Plaintiffs to be exposed to a significantly greater risk of exposure at all times subsequent and each plaintiff was in fact infected.

1184. The failure by each Defendant who undertook to assume control over the epidemic by establishing and implementing cocci policy during their tenure, which should have excluded at-risk inmates or higher-risk inmates from the hyper-endemic prisons, thereby proximately and substantially caused that plaintiff to be housed at a hyper-endemic prison and to be exposed to an increased risk of infection leading to their injury.

1185. Defendants knew there was a serious, epidemic level of risk of harm to Plaintiffs and all prisoners that faced incarceration in hyper-endemic prisons, as early as 2005.

1186. Defendants had actual knowledge of the serious risk of harm to the Plaintiffs but nevertheless ignored the risks and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Coccidioidomycosis by failing to

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

adopt an exclusion policy that protected these high-risk inmates or to adapt it once it became clear that it was ineffective.

1187.  Having undertaken to manage the epidemic in excess of their *Plata* authority, but having failed to adopt an appropriate exclusion policy, each Defendant's actions and omissions, and each Defendant's failure to take the required remedial actions to make those prisons safer for all inmates, including in particular PVSP and ASP, caused (or contributed to causing) Plaintiffs' injuries.

1188.  Furthermore, having undertaken to manage the epidemic and project authority over the epidemic, Defendants failed to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures, or adequately warning inmates about the danger they faced.

**B.     Former Receiver Robert Sillen Knew of Serious Health Risks to Plaintiffs, Adopted a Duty to Protect Plaintiffs in Excess of His *Plata* Authority, but Then Acted in a Manner Reflecting Deliberate Indifference to their Plight.**

1189.  On information and belief, and no later than May 21, 2007, Mr. Sillen knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; and (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases

1190.  In light of Mr. Sillen's position and responsibilities at the time of the 2004-2014 epidemic, and in light of the information known throughout the community of individuals addressing prison health care issues, it is implausible that he would not have had this knowledge.

1191.  The sources of his knowledge include:

(1) the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property;

(2) a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover;

(3) a May 21, 2007 memorandum written by Dr. Winslow and addressed specifically to him that explained at length the Valley Fever problem and situation;

(4) a July 10, 2007 memorandum written by Mr. Sillen in which he asked the Secretary of CDCR, James Tilton, to hold a meeting about the subject in light of a June, 2007 valley fever report "Recommendations for Coceidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California and copied to 6 other state officials;

(5) an October 19, 2007 article in the Bloomberg in which Mr. Sillen is quoted as saying, "[t]he risk will never be zero ... but steps can be taken to reduce the increased risk of susceptibility through the construction mitigation efforts";

(6) the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," as mentioned above, which suggested the diversion and relocation of high-risk inmates and contained a myriad of environmental suggestions to minimize further harm;

(7) and the November 11, 2007 policy memorandum, which discusses the various CDHS recommendations from the January 2007 memorandum.

1192.  However, despite Mr. Sillen's role as Receiver of California's medical delivery system, the agency tasked with correcting (and thus presumably knowing about) serious health issues in the California prison system, CCHCS's misguided intervention in the epidemic left thousands of inmates to catch the disease.

1193.  When, in late 2007, Sillen allowed the policy to exclude only certain

PAVONE & FONNER, LLP
600W. BRADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

medically immune-compromised persons as high-risk, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about valley fever that included other high-risk groups, such as African-American, Filipino, Latinos, Indians, and other races, and persons over 55 years old, and further failed to implement any of the other recommendations to help minimize the risks of infection.

1194. Mr. Sillen was aware of the valley fever problem in general by his obvious personal knowledge of the problem as reflected by the very communications he was directly involved in; by the policies that were passed during his tenure; and he was aware that certain groups were at higher risk of suffering more serious complications from it based on the information in the reports that had been provided to him.

**C.** **Current Receiver Clark Kelso Knew of Serious Health Risks to Plaintiffs, Adopted a Duty to Protect Them in Excess of His *Plata* Mandate, But Then Acted in a Manner Reflecting Deliberate Indifference to their Plight.**

1195. On information and belief, and no later than his appointment as receiver, Mr. Kelso knew of:

    (1)    the prevalence of valley fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; and

    (2)    the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians.

1196. The sources of his knowledge about the valley fever problem include:

    (1)    the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians;

    (2)    the August 3, 2006 valley fever policy;

    (3)    the August 24, 2006 memorandum from John Dovey discussing inmate removal due to valley fever; a widely-circulated email on September 14, 2006 authored by Teri McDonald;

    (4)    the October 27, 2006 memo regarding the number of inmates adversely affected by VF in the state prisons written by Karen Durst;

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(5) an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of the hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions";

(6) a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover;

(7) a January 16, 2007 memorandum concerning VF identification and reporting authored by Dr. Winslow;

(8) the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property;

(9) a May 21, 2007 memorandum written by Dr. Winslow addressing the VF problem;

(10) the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which suggested the diversion and relocation of high-risk inmates and contained a myriad of environmental suggestions to minimize further harm;

(11) a July 20, 2007 memo written by Deborah Hysen discussing environmental mitigation and the costs and requirements associated with that program;

(12) an August 8, 2013 Valley Fever mitigation plan;

(13) a September 9, 2007 news article in the Sacramento Bee, which reflected Igbinosa's statement that experts had made it clear that it was not safe to engage in additional construction at PVSP;

(14) the November 11, 2007 policy memorandum authored by Drs. Winslow and Hubbard, which discusses the various CDHS recommendations from the January 2007 memorandum;

(15) a February 18, 2009 request by Dr. Winslow to reconsider the ground cover issue in light of unabating incidence rates;

(16) the 2008-2009 Fresno County Grand Jury report which discussed the valley fever problem, referenced "high risk inmates" and which directed

prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever";

(17) the April and October 2012 CCHCS reports which assembled various reports and studies about the valley fever problems;

(18) the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1197. However, despite Mr. Kelso's role as Receiver of California's medical delivery system, which did not under the *Plata* order give him authority to intervene, Kelso's office nevertheless did intervene by passing and continuing a wildly inadequate policy that served to defeat effective management of the epidemic: the policy was insufficient while simultaneously causing CDCR to rely on it, which according to the Ninth Circuit was reasonable for the officials to do.

1198. When, in early 2008, and continuing thereafter, Kelso allowed the existing 2007 policy to continue to exclude only certain medically immune-compromised persons as high-risk, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about valley fever that included other high-risk groups, such as African-American, Filipino, Latinos, Indians, other races, and persons over 55 years old.

1199. Mr. Kelso was aware of the valley fever problem in general by his receipt of the November, 2007 policy, among other documents noted herein; and he was aware that certain groups were at dramatically higher risk of suffering more serious complications from it.

1200. Mr. Kelso personally participated in the decisions not to exclude these high-risk inmates by his continuing validation and enforcement of the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates. As Receiver, he was not in a position to dictate preventative health care policy, but did so in contravention of the limits of his authority, to tragic effect.

PAVONE & FONNER, LLP
600W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**D.    Defendants Do Not Have the Right to Quasi-Judicial Immunity for their Role in the Valley Fever Epidemic, as They Exceeded the Scope of their Authority in Passing Policies Related to It.**

1201. Generally speaking, a court-appointed receiver is treated as an arm of the court itself, and as such, enjoys all the protections that courts do, specifically, judicial immunity.

1202. When applied to receivers (and other persons who are not judicial officers), judicial immunity is denominated "quasi-judicial immunity."

1203. Judicial immunity and quasi-judicial immunity extend only so far as the scope of judicial authority extends, in other words, a judge is not immune for acts he commits that are not done while acting in the scope and role of a judge.

1204. The same logic applies to receivers: they enjoy the same protections of immunity for acts within the scope of their authority, with other caveats discussed below.

1205. As detailed above, however, the Receivers in this case took various and affirmative steps to inject themselves into the cocci epidemic beyond the scope of authority: by leading the passage of policies in 2006 and 2007, with CDCR as co-signatories, and by passing additional policies in 2013.

1206. However, at no time did they have authority over the epidemic.  Their appointment was limited to the provision of medical care services.  However, by authoring and signing the various policies, the Receiver's office interjected itself into the epidemic, performed the task improperly, did not correct its errant policy for years, and only corrected it at the insistence of civil rights groups, who litigated to that outcome.

1207. Given the sheer magnitude of the harm inflicted by this failure of study of an appropriate policy, and failure of monitoring of the effectiveness of the errant policy, an inference can be drawn that the Receivers were deliberately indifferent to a significant risk of serious harm and thereby violated Plaintiffs' Eight Amendment constitutional rights.

PAVONE & FONNER, LLP
600W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1208. The Receivers' actions were taken in the absence of all jurisdiction. Defendants clearly had no right to interject themselves into the affirmative management of prison housing policy, by directing who was required to be, or who was not required to be, excluded from being housed at a given prison.

1209. The Receiver's authority began and ended at medical care services. They were authorized to provide medical care to prisoners, including medical care for valley fever.

1210. Plaintiffs are not contending in this lawsuit that Defendants are responsible to them for inadequate medical care for valley fever (though many victims make that claim). Rather, the question of preventing the spread of diseases, while sometimes a function of health care professionals, was not a function authorized by the federal court when it created the receivership in this case.

1211. While passing preventative health care policy might possess some of the badges of an act associated with a health care prison receivership, it was clearly beyond the scope of authority granted in this case, much the same as issuing *ex parte* guardianship papers though an act performed while acting as a judge, was treated as beyond the judge's authority.[92]

## PRAYER FOR RELIEF

*Wherefore*, Plaintiffs request the following, equally as to both causes of action:

(i)     economic damages;

(ii)    non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its

---

[92] *Rankin v. Howard,* 633 F.2d 844, 848-49 (9th Cir. 1980); *see Mullis v. U.S. Bankruptcy Court*, 828 F.2d 1385, 1389 (9th Cir. 1987); *Stump v. Sparkman*, 435 U.S. 349, 357 n. 7 (1978).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

disseminated form resulting in severe health consequences up to and including an early and painful death;

       (iii)   reasonable attorney's fees to the extent recoverable by law;

       (v)   costs of suit including the expense of experts;

       (vi)   interest; and

       (vii)   such other relief as the Court deems just and proper.

Date: September 22, 2021                        PAVONE & FONNER, LLP

                                         Benjamin Pavone, Esq.

                                         Attorneys for Plaintiffs

## **DEMAND FOR TRIAL BY JURY**

      Plaintiffs hereby request trial by jury.

Date: September 22, 2021                        PAVONE & FONNER, LLP

                                       /s/ Benjamin Pavone

                                        Benjamin Pavone, Esq.

                                        Attorneys for Plaintiffs

PAVONE & FONNER, LLP
600 W. BRAODWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101